JANE C. ROSENBAUM, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rosenbaum v. Commissioner
Docket Nos. 5199-72, 5200-72, 5311-72, 5312-72, 2460-75
United States Tax Court
T.C. Memo 1983-113; 1983 Tax Ct. Memo LEXIS 674; 45 T.C.M. (CCH) 825; T.C.M. (RIA) 83113; February 24, 1983; Reversed and Remanded January 10, 1989 Austin J. Doyle, for petitioner in Dkt. No. 5199-72.
Francis N. Rosenbaum, pro se in Dkt. No. 5200-72. Sidney Gelfand,Wallace Musoff, and Barry Gordon, for petitioners in Dkt. Nos. 5311-72, 5312-72, and 2460-75. Marlene Gross and Thomas F. Kelly, for respondent.[2]
WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION
*677 WILBUR, Judge: These consolidated cases were tried before a Special Trial Judge pursuant to Rule 180, Tax Court Rules of Practice and Procedure. His report was filed with the Clerk of the Court on February 29, 1980, and was served on the parties. Respondent and petitioner Francis N. Rosenbaum filed exceptions to the report, and the cases were assigned to this Division pursuant to Rule 182(d), Tax Court Rules of Practice and Procedure.
In particular, respondent has objected to the findings and conclusions of the Special Trial Judge that: (1) Petitioners Andrew L. Stone and/or Francis N. Rosenbaum did not receive constructive dividends and unreported income, respectively, arising from deductions claimed by Chromcraft Corporation and/or Alsco, Inc. with respect to payments to Scientific Electronics, Ltd., Bregman Electronics, Ltd., Republic Electronic Industries, Inc., Western Molded Fibre Products, Inc., Establissement Velo International, Establissement Orma-Commerce, CEPAB, Finax A.G., and Dr. Jorg Haemmerli.
(2) Petitioner Andrew L. Stone had legitimate interest expense for his transactions with Finanz Gesellschaft and Peralta Shipping. (3) Neither petitioner Andrew *678 L. Stone nor Francis N. Rosenbaum is liable for civil fraud for the taxable years 1963 through 1967. (4) The assessment and collection of deficiencies and additions to tax for the taxable year 1963 of petitioners Stone, and for the taxable years 1963 and 1964 of petitioner Francis N. Rosenbaum, are barred by the statute of limitations. (5) Petitioner M. Jeanne Stone is not liable as a transferee under section 6901 [3] for the deficiencies in tax of Andrew L. Stone, additions to tax, and interest with respect thereto for the taxable years 1963 through 1967. Respondent also contends that petitioner M. Jeanne Stone does not qualify for innocent spouse status under section 6013(e). Since under the determination of the Special Trial Judge the requisite omissions from gross income were absent, this issue was not presented in all its aspects. Petitioner Francis N. Rosenbaum has objected to the finding and conclusion of the Special Trial Judge that *679 he has failed to carry the burden of proving he is entitled to interest deductions claimed for the taxable years 1963 through 1967. We have given due regard to the circumstance that the Special Trial Judge had the opportunity to see and evaluate the credibility of the witnesses. Nevertheless, the presumptive correctness of the Special Trial Judge's report does not impair nor dilute our duty of bearing the ultimate responsibility for determining matters before us. Rule 182(d), Tax Court Rules of Practice and Procedure and note thereto. See 60 T.C. 1150. Montgomery Coca-Cola Bottling Co., Inc. v. United States,222 Ct. Cl. 356, 615 F.2d 1318, 1322 (1980). After careful consideration of the evidence presented and the exceptions noted above, we hold for respondent on all issues excepted to, other than those concerning Republic Electronics Industries, Inc. and a portion of Stone's interest expenses. We also decide that M. Jeanne Stone qualifies as an innocent spouse during the years in issue. In reaching these holdings, we have to a very large degree, adopted the findings of fact of the Special Trial Judge; to the extent that we disagree with the *680 Special Trial Judge, our disagreement relates to certain inferences he drew and the conclusions which he reached based on those findings. Respondent determined deficiencies in income tax and additions to tax for fraud under section 6653(b) and transferee liability for deficiencies and additions to tax against petitioners in amounts and for years as follows: Deficiency
Addition
Petitioner
Docket No.
Year
(or Liability)
to Tax
Jane C. Rosenbaum
5199-72
1963
$174,021.32
1964
1,559,931.25
1965
1,923,724.85
1966
1,578,936.91
1967
332,576.27
Francis N. Rosenbaum
5200-72
1963
174,021.32
87,010.66
1964
1,559,931.25
779,965.63
1965
1,923,724.85
961,862.43
1966
1,578,936.91
789,468.46
1967
332,576.27
166,288.47
Andrew L. Stone
5311-72
1963
171,488.03
85,744.02
1964
1,347,174.97
673,587.49
1965
1,945,630.33
972,815.17
1966
992,449.38
496,224.69
1967
282,498.43
141,249.22
M. Jeanne Stone
5312-72
1963
171,488.03
85,744.02
1964
1,347,174.97
673,587.49
1965
1,945,630.33
972,815.17
1966
992,449.38
496,224.69
1967
282,498.43
141,249.22
M. Jeanne Stone,
2460-75
1963)
Transferee
1964)
1965)
1,460,098.00
1966)
1967)
*681 By amendments to his answers, respondent claimed increased deficiencies and additions to tax for fraud for 1966 and 1967, as follows: Increased
Increased
Docket No.
Year
Deficiency
Addition to Tax
5199-72
1966
$574,706.31
1967
532,709.55
5200-72
1966
574,706.31
$287,353.16
1967
532,709.55
266,354.78
5311-72
1966
565,440.53
282,720.27
1967
532,709.54
266,354.77
5312-72
1966
565,440.53
1967
* 532,709.54
The principal area of dispute concerns respondent's determination that certain items, which respondent determined to be unallowable deductions of Chromcraft Corporation (Chromcraft) or its successor corporation, Alsco, Inc. (Alsco), or unreported income of Chromcraft or Alsco, constituted constructive distributions [4] to Andrew L. Stone (Stone), and "unreported income" to Francis N. Rosenbaum (Rosenbaum) "representing funds accruing to your benefit from your manipulation of transactions to divert monies arising from contracts between Chromcraft Corp. [and Alsco, Inc.] and the United States Government."[5] Identical amounts were determined *682 to be the income of each of those individuals. There is also a group of items which respondent disallowed as deductions to Chromcraft or Alsco which were determined to be constructive dividends to Stone alone. Numerous issues raised by the pleadings have been settled or stipulated by *683 the parties. The issues thus remaining for our decision are: 1. Whether Stone and/or Rosenbaum are properly chargeable with constructive dividends and "unreported income," respectively, arising from respondent's disallowance of: a. Deductions claimed by Chromcraft with respect to payments to Scientific Electrics Ltd., of $108,175 for 1963, $1,051,766 for 1964, and $1,161,178 for 1965, which were charged to purchases of materials; b. Deductions claimed by Chromcraft with respect to payments to Bregman Electronics, Inc., of $812,386 for 1965 and $380,774 for 1966, which were charged to purchases of materials; c. (1) Deductions claimed by Chromcraft and Alsco with respect to payments to Republic Electronics Industries, Inc., of $255,000 for 1966, representing the purchase of rights to the Zuni rocket launcher, which were charged to purchases and factory office expenses; (2) Deductions claimed by Chromcraft and Alsco with respect to payments to Republic Electronic Industries, Inc., of $821,009 for 1966 and $761,013 for 1967, which were charged to purchases of materials (this sub-issue was raised by respondent in his amended pleadings); d. Deductions claimed by Chromcraft *684 with respect to payments to Western Molded Fibre Products, Inc., of $8,983 for 1963, $136,034 for 1964, $221,084 for 1965, and $318,406 for 1966, which were charged to purchases of materials; 2. Whether Stone and/or Rosenbaum are properly chargeable with constructive dividends and "unreported income" respectively, arising from respondent's disallowance of: a. Deductions claimed by Chromcraft and Alsco with respect to payments to Establissement Velo International of $571,328 for 1966 and $250 for 1967, which were variously charged to purchases of materials, factory expenses, and sundry expenses; b. A deduction claimed by Chromcraft with respect to a payment to Establissement Orma-Commerce of $22,768 for 1963, which was charged to purchases of materials; c. A deduction claimed by Chromcraft with respect to a payment to CEPAB of $52,172 for 1965, which was charged to purchases of materials; d. A deduction claimed by Alsco with respect to a payment to Finax Aktiengesselschaft of $8,000 for 1967, which was charged to factory office expense; e. A deduction claimed by Alsco with respect to payments to Dr. Jorg Haemmerli of $16,000 for 1967, which were charged to sundry expense; *685 f. Deductions claimed by Chromcraft with respect to payments to Scientific Electronics, Ltd., of $50,400 in 1964 and $38,500 in 1965, which were charged to purchases of dies and jigs. 3. Whether Stone and/or Rosenbaum are properly chargeable with constructive dividends and "unreported income," respectively, arising from respondent's disallowance of: a. Deductions claimed by Chromcraft and Alsco with respect to payments to Scientific Industrial Developments, Ltd., of $18,000 for 1963, $48,000 for 1966, and $18,500 for 1967, which were variously charged to purchases of materials, factory office expense, and sundry expense; b. A deduction claimed by Chromcraft with respect to a payment to GEAG Aktiengesselschaft of $15,000 for 1963, which was charged to sundry expense; c. Deductions claimed by Chromcraft and Alsco with respect to payments to Pacific Enterprises, Inc., of $70,500 for 1967 and $40,000 for 1966, which were charged to sundry expense; d. A deduction claimed by Chromcraft with respect to payments to Harold E. Schendell totaling $33,000 for 1967, which were charged to sundry expense. 4. Whether Stone and/or Rosenbaum are properly chargeable with constructive *686 dividends and "unreported income" arising from: a. Allegedly understated sales by Chromcraft and Alsco to Les Forges de Zeebrugge of $158,059 in 1965, $21,529 in 1966, and $13,428 in 1967; and b. Royalty income alleged to have been received by Chromcraft and Alsco of $13,793 for 1963, $13,700 in 1964, $101,321 in 1965, and $69,201 in 1966. 5. Whether Stone is properly chargeable with constructive dividends arising from respondent's disallowance of: a. Deductions claimed by Chromcraft with respect to payments to Goodwin, Rosenbaum, Meacham & White of $5,000 for 1963, $22,000 for 1964, and $5,750 for 1965, which were variously charged to legal fees and sundry rocket launcher expense; b. Deductions claimed by Chromcraft with respect to payments to Fred French of $1,265 for 1963, $1,265 for 1964, $959 for 1965, and $633 for 1966, which were charged to rent expense; c. Deductions claimed by Chromcraft and Alsco with respect to payments to L. M. Stone of $3,000 for each of the years 1963 through 1966, which were charged to professional fees; d. Deductions claimed by Chromcraft and Alsco with respect to payments to Vivian Smith of $2,400 in 1963, $2,550 in 1964, $2,500 *687 in 1965, $2,950 in 1966, and $2,500 in 1967; e. A deduction claimed by Chromcraft with respect to payment to Southwest Furniture, Inc. of $15,402 for 1966, which was charged to sundry expense. 6. Whether Stone is entitled to interest expense deductions, as set forth in adjustment (c) of the deficiency notice to him and M. Jeanne Stone, as follows: Year
Amount
1963
$2,089.55
1964
17,000.00
1965
34,000.00
1966
30,407.43
1967
199,740.65
7. Whether, if it is determined that Stone is not entitled to interest expense deductions with respect to claimed interest payments to Finanz Gesellschaft, he erroneously reported on his 1967 return certain long-term capital gain upon the transfer of Alsco shares to Finanz Gesellschaft. 8. Whether Rosenbaum is entitled to interest expense deductions, as set forth in adjustment (c) of the deficiency notice to him and Jane C. Rosenbaum, as follows: Year
Amount
1963
$5,250.00
1964
5,825.00
1965
7,593.75
1966
8,427.78
1967
12,878.42
9. Whether Stone is liable for additions to tax for fraud for each of the years 1963 through 1967. 10. Whether Rosenbaum is liable for additions to tax *688 for fraud for each of the years 1963 through 1967. 11. Whether petitioners Jane C. Rosenbaum and M. Jeanne Stone qualify for innocent spouse status under section 6013(e) for the years 1963 through 1967. 12. Whether as regards Stone, M. Jeanne Stone, and Rosenbaum, assessment and collection of deficiencies and additions to tax for each of the years 1963 through 1967 is barred by the statute of limitations. Jane C. Rosenbaum did not plead the bar of the statute in her petition at Docket No. 5199-72. 13. Whether petitioner M. Jeanne Stone is liable as a transferee under section 6901 for the deficiencies in tax of Andrew L. Stone, additions to tax, and interest with respect thereto for the taxable years 1963 through 1967, to the extent of $1,460,097.75. Petitioners Stone did not allege error or present any evidence with respect to a partial disallowance, for lack of substantiation, of $200 of the deduction for charitable contributions for 1963. No issue is deemed to be presented with respect to that disallowance. GENERAL FINDINGS OF FACT Many of the facts have been stipulated. The several stipulations, together with the exhibits identified therein, are incorporated *689 herein by reference. The legal residence of petitioners Stone and M. Jeanne Stone (Jeanne) on July 3, 1972, the date of the filing of the petitions in Docket Nos. 5311-72 and 5312-72, was St. Louis, Missouri. The Stones filed joint income tax returns for 1963 through 1967 with the District Director of Internal Revenue, Manhattan District, New York, New York. Jeanne's residence was St. Louis, Missouri, when she filed the petition in Docket No. 2460-75. The legal residence of petitioners Rosenbaum and Jane C. Rosenbaum (Jane) on June 30, 1972, the date of the filing of the petitions in Docket Nos. 5199-72 and 5200-72, was Washington, D.C. The Rosenbaums filed joint income tax returns for 1963 through 1966 with the District Director of Internal Revenue, Baltimore, Maryland, and a joint income tax return for 1967 with the Mid-Atlantic Service Center, Philadelphia, Pennsylvania. During 1963 and continuing through May 31, 1966, Chromcraft was a Missouri corporation engaged primarily in the manufacture and sale of rocket launchers for use on fixed and rotary winged aircraft under contracts from the United States Government. Chromcraft kept its books and records on the accrual *690 method of accounting and filed its income tax returns on a calendar year basis through 1965. In 1966, it filed its income tax return for the period January 1, 1966 through April 9, 1966.
During 1963, 1964, and up to March 2, 1965, Stone owned 75 percent of the stock of Chromcraft, and his basis therefor was $269,376. He was a director and president of Chromcraft.The remaining 25 percent of Chromcraft's stock was owned by Irwin C. Keefer (Keefer). On March 2, 1965, Chromcraft acquired Keefer's stock in Chromcraft, leaving Stone as the sole shareholder. During the taxable years at issue, Alsco, a Delaware corporation, was a publicly-held corporation whose outstanding shares were traded on the American Stock Exchange. Prior to May 31, 1966, its principal operations consisted of the manufacture and sale of aluminum siding, aluminum storm windows and doors, and related products. Alsco kept its books and records on the accrual method of accounting and filed its income tax returns on the basis of a fiscal year ending May 31. On April 9, 1966, Stone and Alsco entered into a contract for the acquisition by Alsco of Stone's shares in Chromcraft. As of May 31, 1966, Chromcraft was merged *691 into Alsco and its operations involving the manufacture and sale of rocket launchers continued as the Techfab Division of Alsco. Upon the merger of Chromcraft into Alsco, Stone became a director and president of Alsco and the owner of approximately 56 percent of the outstanding shares of Alsco stock. Effective November 21, 1969, Alsco was merged into Harvard Industries, Inc. (Harvard), a Delaware corporation. During the taxable years involved, Rosenbaum was an attorney and a partner in the Washington, D.C. law firm of Good-win, Rosenbaum, Meacham and White (GRM&W). The firm was tax counsel to Chromcraft, and Rosenbaum was the member of the firm generally responsible for Chromcraft matters. During 1965, Rosenbaum became a director of Chromcraft, and after its merger into Alsco he became a director of Alsco. The firm became tax counsel to Alsco and Rosenbaum was the member of the firm generally responsible for Alsco matters. The firm also acted as financial advisor to and represented Chromcraft and later Alsco in promotional activities with respect to rocket launchers. For convenience, the designation "Chromcraft" will be used herein for periods both prior and subsequent to *692 the merger of Chromcraft into Alsco. Thus, a reference to "Chromcraft" in a transaction or occurrence after its merger into Alsco on May 31, 1966, will be understood to refer in fact to the Techfab Division of Alsco. Chromcraft was a prime contractor for the United States military services in the manufacture of rocket launchers. It used several full-service sub-contractors, such as Engineered Instruments, Insul-8, and Republic Electronics Industries Corp. (Republic), for electronic parts; Western Molded Fibre Products, Inc. (Western) for fairings; Container Corporation for paper tubes; Cincinnati Die Casting for die cast parts; and Elliot Tool for stock parts. As full-service sub-contractors, these businesses had engineering, purchasing and production departments. Each purchased its own supplies, had its own program for quality control, and had a Navy inspector on the premises approving parts shipped to Chromcraft. The contracts for rocket Launchers received by Chromcraft from the United States military services were all fixed-fee contracts, except for the last two received in 1967 and 1968. On August 30, 1968, a Federal grand jury returned an indictment in the United States *693 District Court for the District of Columbia against Stone, Rosenbaum, Chromcraft, its successor Alsco, and others. Alsco pled guilty to one count of the indictment. On October 13, 1969, Stone and Rosenbaum each entered pleas of guilty to counts 1, 3, 7, 8, 9, 10, 11, 15 and 16 of the indictment. On February 10, 1970, Stone and Rosenbaum were sentenced on the charges to which they had pled guilty and the remaining counts of the indictment were dismissed as to Stone and Rosenbaum. Stone was incarcerated on February 24, 1970, to begin serving a 15-year sentence. Count 1 of the indictment, in short, charged Stone and Rosenbaum with being part of a conspiracy to defraud the United States Government on defense contracts through overbillings based upon false and fictitious invoices to Chromcraft. Pertinent portions of Count 1 read as follows: 18) From on or about January 1, 1963 and continuously thereafter through February 1, 1967, the exact dates being unknown, in the District of Columbia and elsewhere, ANDREW L. STONE, FRANCIS N. ROSENBAUM, EVELYN R. PRICE, ROBERT B. BREGMAN and CHROMCRAFT who are the defendants herein, and HANS SENN, WALTER A. LIPS and THE BANK FUR HANDEL, [sic] *694 and EFFEKTEN who are named herein as co-conspirators but not as defendants, unlawfully, willfully and knowingly did agree, combine, conspire and confederate among themselves and each with the other, and with other persons whose names are presently to the Grand Jury unknown, to defraud the United States of America, that is to say the said defendants and co-conspirators did agree, combine, confederate and conspire: (a) To hamper, hinder, frustrate, defeat, impair and impede by craft, trickery, deceit and dishonest means including false, fictitious and fraudulent statements and representations, concealments of material facts and kickbacks, the lawful and legitimate functions, operations and purpose of (1) the Department of the Navy in all phases of its negotiation for and the administration of contracts awarded to CHROMCRAFT for the procurement of rocket launchers under the hereinabove mentioned contracts and; (2) the Renegotiation Board to ascertain, determine, recoup and eliminate excessive profits derived under the hereinabove specified contracts. 25) It was further a part of said conspiracy that the DEFENDANTS would and did divert and cause to be diverted to the prsonal use, *695 gain and benefit of the DEFENDANTS money paid by the Department of the Navy under the hereinabove described contracts contrary to and in derogation of the purposes and intent of the national defense program and the Renegotiation Act of 1951, as amended, as follows: a) It was further a part of said conspiracy that the DEFENDANTS would and did pay and cause to be paid the above described false, fictitious and fraudulent invoices purportedly received from Scientific Electronics, Limited and Bregman Electronics, Inc.
b) It was further a part of said conspiracy that the DEFENDANTS would and did prepare and cause to be prepared false and fictitious invoices bearing the following foreign names and addresses: NAME
ADDRESS
a)
Geag
Chur, Switzerland
b)
Elpag, A.G.
Chur, Switzerland
c)
Alwatra, A.G.
Zurich, Switzerland
d)
Establissement, Macoba
Vaduz, Lichtenstein
e)
Infina, A.G.
Zurich, Switzerland
which false and fictitious invoices would be and were paid from funds received by Scientific Electronics, Limited and Bregman Electronics, Inc. in payment of the false and fictitious invoices described in subparagraph (a) of this paragraph. c) It was *696 further a part of said conspiracy that the DEFENDANTS well knowing that their interest in accounts in Swiss banks could and would be disguised and concealed by the co-conspirators HANS SENN, THE BANK FUR HANDEL and EFFEKTEN and WALTER A. LIPS would and did cause to be paid the foreign invoices described in the preceding paragraph and did transmit and caused to be transmitted checks in payment of same to the aforesaid WALTER A. LIPS at the Union Bank of Switzerland and HANS SENN at THE BANK FUR HANDEL and EFFEKTEN who would and did cause the said checks to be negotiated for the personal use, gain, and benefit of the defendants. In January 1969, the United States of America filed two essentially similar actions in the United States District Court, Eastern District of Missouri and the United States District Court, District of Columbia, seeking recovery of damages under the False Claims Act, 31 U.S.C. sections 231, etseq. (1976), from Stone, Rosenbaum, Chromcraft and Alsco as a result of an alleged multimillion dollar fraud on the United States perpetrated by Stone and Rosenbaum through Chromcraft and Alsco from 1963 through 1967. Various other actions *697 seeking damages in connection with the alleged fraud were brought by other parties in different jurisdictions. On March 7, 1969, a Federal grand jury returned an indictment in the United States District Court for the Eastern District of Missouri against Stone, Chromcraft, its successor Alsco, and others. Alsco pled guilty to one count of the indictment. Stone entered a plea of guilty to count 1 of said indictment. This court was a criminal charge of shipping munitions out of the country without first obtaining an export license or written approval of the Department of State, in violation of 22 U.S.C. section 1934. On April 3, 1970, Stone was sentenced and the remaining counts of the indictment were dismissed as to him. Issue 1.Constructive Dividends and Unreported Income-- Scientific, Bregman,Republic, Western Molded.
FINDINGS OF FACT (a) Scientific Electronics, Ltd.
As stated earlier, Chromcraft was a prime contractor for the United States military services in the manufacture of rocket launchers, and as such, utilized several subcontractors. A company known as Engineered Instruments was the subcontractor for electrical assemblies *698 up to 1960, when it failed. Chromcraft thereupon turned to a company by the name of Insul-8 as a subcontractor for electrical assemblies. Both Engineered Instruments and Insul-8 were full-service contractors, i.e., they had engineering, purchasing, and production departments, and there were United States Navy inspectors on their premises certifying to quality control. Toward the end of 1962, Chromcraft experienced difficulty in obtaining deliveries from Insul-8, which claimed it was losing money on Chromcraft orders. Chromcraft agreed to increase the price it was paying, and Insul-8 finished out its contract in 1963. Insul-8 was not interested in continuing to work on what it considered to be the low profit items required by Chromcraft, and Chromcraft refused to continue paying the increased prices. Labor costs at union rates and union jurisdictional conflicts precluded Chromcraft from making electrical assemblies at its own plant. Chromcraft was therefore compelled to look for a supplier to take the place of Insul-8, and John Nash, its chief engineer, obtained a list of possible suppliers from the Small Business Administration. Chromcraft ultimately selected a sole proprietorship, *699 Robert L. Wolf and Associates (Wolf), in Granite City, Illinois, across the Mississippi River from St. Louis. Wolf operated at the time in a quonset hut in the proprietor's backyard, in which the proprietor, his wife, his son, and two women assembled battery chargers. Wolf furnished only the labor.The raw materials were purchased by Chromcraft and were picked up by Wolf and taken to Granite City. Wolf would assemble the electrical components into finished products according to Chromcraft's specifications, and deliver them to Chromcraft. This method of picking up the raw materials from Chromcraft, assembling them, and shipping the completed assemblies back to Chromcraft continued even through 1968. Wolf did not have any research and development capabilities; quality control at Wolf was handled by Nash and Frank Best, Chromcraft's purchasing director. Among the clients of GRM&W was an individual named Mario Simonson (Simonson), a Brazilian active in banking, newspapers, coffee, real estate, communications, television stations, and other enterprises. Simonson's communication business, Wasim, at that time was involved in the Intel project, an effort aimed at expanding Brazil's *700 communication system. The New York office of Wasim was managed by Leon Schwartz (Schwartz), a director and vice-president of Wasim. [6] Sometime in 1963, Schwartz moved from New York to California to set up an office for Ladevco, Inc. (Ladevco), a California corporation formed by Simonson. Ladevco was engaged primarily in promoting relations between United States communication companies and the Brazilian Government.Its offices were located at 144 South Beverly Hills Drive, Beverly Hills, California. Ladevco's sole stockholder was Simonson and Schwartz was its president. Another of GRM&W's clients was an Englishman named Fred Charnock (Charnock) who headed a firm in England known as Scientific Industrial Developments, Ltd. (SID). Charnock wanted to form a California subsidiary of his English firm, to be known as Scientific and Industrial Development, Ltd. That name was not available for use in California so, at Charnock's request, Rosenbaum caused the formation of a California corporation *701 by the name of Scientific Electronics, Ltd. (Scientific) in March 1963. Further complications arose when the British Treasury would not authorize the transfer of funds from SID to pay for Scientific's stock. As a result, neither Charnock nor SID put any capital into Scientific. Rosenbaum and Schwartz became acquainted in 1959; Schwartz met Stone about a year later. In 1963, Rosenbaum requested that Schwartz allow Scientific to use as its corporate address the 144 South Beverly address which was the office of Schwartz and Ladevco. In addition, shortly after Scientific was formed, Rosenbaum asked Schwartz to become president of Scientific and Schwartz agreed. Schwartz was aware that the foregoing was being done for a client of Rosenbaum's, namely Stone.
The Ladevco offices at 144 South Beverly had 2,000 square feet of office space and no manufacturing facilities. Besides Schwartz, the only employees in the offices were a secretary and a part-time salesman. Schwartz had no experience in procuring electronic parts. His background was in real estate and his promotional activities for Simonson. When Schwartz agreed to become president of Scientific, Rosenbaum turned over to *702 him its charter, minute book and stock book. Ladevco subscribed for 5,000 shares of Scientific's stock but it never paid for the shares and no shares in the corporation were ever issued. From the beginning, Schwartz believed Rosenbaum and Stone to have complete authority to give directions and instructions with respect to Scientific. At Rosenbaum's direction, Schwartz opened a bank account in Scientific's name, upon which Schwartz was the sole signatory. As early as April 1963, Schwartz began receiving correspondence from either or both of them with instructions to write letters and/or checks to various businesses. (The first letter was from Stone, dated April 29, 1963, with a copy to Rosenbaum. Stone requested Schwartz to pay the two invoices enclosed--invoices from a St. Louis printer for letterhead stationery for Scientific and SID ordered March 15, 1963.) In September, 1963, Chromcraft began issuing purchase orders to Scientific for completed electrical assemblies. Stone's secretary, Evelyn Price (Price), prepared purchase orders on behalf of Scientific to Wolf for labor on the assemblies which Chromcraft had ordered from Scientific. Chromcraft obtained the raw materials *703 for the assemblies which were delivered to Chromcraft and then picked up by Wolf. For the first couple of months, the suppliers' bills were sent to Scientific and were paid by it. Scientific also paid Wolf for the labor performed. Scientific invoices for the completed assemblies were submitted to Chromcraft and they were paid by Chromcraft checks which were deposited in Scientific's account. The prices that Scientific charged Chromcraft for the completed assemblies were fixed by Stone, and these prices were set at figures from 5 to 10 cents less than those that had been charged by Insul-8. Toward the end of 1963, Stone and Rosenbaum decided to change the Chromcraft-Scientific relationship in the following respect. Instead of sending the suppliers' bills to Scientific for payment, Chromcraft paid the suppliers itself. Chromcraft deducted the amounts so paid on its tax returns as part of cost of goods sold, and never billed Scientific for the raw materials. Scientific continued to invoice Chromcraft for the entire cost of the completed assemblies, labor and materials, and continued to pay Wolf for its assembly charges. Chromcraft was thus paying for the raw materials twice, *704 thereby overstating its cost of goods sold, while Scientific was receiving payment for labor and materials, but only making payments for labor. At the same time, Stone, Rosenbaum and Schwartz agreed that Rosenbaum would obtain invoices for raw materials from what can best be described as "dummy" Swiss entities, which invoices would be submitted to Scientific and which Scientific would pay. Stone furnished to Rosenbaum the nomenclature that was used on the Swiss invoices. When Scientific made payment on such an invoice, it would send its check to Chromcraft, which would forward the check to the Swiss entity. The Swiss "vendor" would deposit the check in its own Swiss bank account and, after deducting a small percentage as a service fee for its participation in the endeavor, transfer the remainder to one of several Swiss bank accounts under the control of Rosenbaum. At Stone's direction, Price did all the paperwork involved, including preparing the purchase orders from Scientific to Wolf on blank Scientific forms in her possession; preparing the Scientific invoices to Chromcraft on blank Scientific forms in her possession; typing cover letters for Schwartz's signature, on blank *705 Scientific letterhead stationery in her possession, to accompany Scientific payments to Wolf and others; typing letters for Schwartz's signature, on Scientific stationery and addressed to Chromcraft, giving quotations and pricing information; receiving checks from Scientific to the foreign "vendors"; and, after making lists of the payments for Stone and Rosenbaum, forwarding the checks to the Swiss entities. For these services beyond her Chromcraft duties, Price was paid by checks from Scientific to her father, L. T. O'Connell. As indicated above, Scientific had a bank account, on which Schwartz was the sole signatory. In that account, Scientific deposited receipts of $123,518.33 in 1963, $1,312,621.93 in 1964, and $1,370,910.04 in 1965. In 1963, Scientific issued 19 checks to Wolf, 16 checks to recognized suppliers of materials and services, 1 check to Chromcraft, 3 checks for printing and stationery, 3 checks as loans to Schwartz or a corporation he owned (Sea Range Properties, Inc. (Sea Range)), 1 check to Ladevco as rent, 1 check to L. T. O'Connell, and 5 checks to SID. In 1964, Scientific issued 46 checks to Wolf, 25 checks to recognized suppliers of materials and services, *706 1 check to L. T. O'Connell, 1 check to Andrew Smith (Stone's nephew), 3 checks as loans to Ladevco, 2 checks as loans to Schwartz, 8 checks to Sea Range charged to Schwartz, 3 checks to the Union Bank of California charged as loans to Schwartz, 30 checks for rent, taxes, stationery, legal and accounting services, and promotion and travel expense, 38 checks to Alwatra, A.G. (Alwatra), 5 checks to Infina, A.G. (Infina), 3 checks to Albert Schelling (Schelling), and 34 checks to GEAG. In 1965, Scientific issued 19 checks to Wolf, 12 checks to recognized suppliers of materials and services, 3 checks to L. T. O'Connell, 3 checks to Andrew Smith, 1 check as a loan to Schwartz, 24 checks for rent, taxes, contributions, legal and accounting services, organization expense, and promotion and travel expense, 24 checks to Alwatra, 23 checks to Macoba Establissement (Macoba), and 1 check to Mario W. Simonson & Sons Trust Co. (the Simonson Trust). In connection with the rent, Schwartz determined whether payment should be made to Ladevco or to Sea Range. In 1964, Schwartz charged Ladevco expenses to Scientific and drew Scientific checks in payment therefor. The checks reflecting payments to *707 SID, Alwatra, Infina, Schelling, GEAG, Macoba, and the Simonson Trust were those mailed to Switzerland for deposit. The total amounts of the checks were as follows: 1963
SID
$50,688.58
$50,688.58
1964
Alwatra
372,409.00
Infina
43,686.50
Schelling
52,514.90
GEAG
406,660.49
875,270.89
1965
Alwatra
327,695.80
Macoba
972,913.34
Simonson Trust
5,873.73
1,306,482.87
Checks to SID, GEAG, and Schelling were sent for deposit at the Union Bank of Switzerland at Aarau, Switzerland (the Union Bank). [7] Rosenbaum's contact at the Union Bank was Dr. Walter Lips. Rosenbaum would tell Dr. Lips that he needed an invoice sent to Scientific for a certain amount, and Dr. Lips would pick the company and arrange to have the invoice sent. Rosenbaum had the same arrangement with Dr. Hans Senn at the Bank fur Handel und Effekten in Zurich, Switzerland (the Handel Bank), where the checks reflecting payments to Alwatra, Infina, Macoba, the Simonson Trust, and one check to GEAG were sent for deposit. Rosenbaum used the two different banks and their respective "contacts" because Lips and Senn were involved with different groups of companies and also *708 because Rosenbaum believed it would make the invoice scheme look more authentic. The Chromcraft-Scientific relationship came to a close in 1965 because Schwartz was found to have been using Scientific funds to his own advantage. During the period from late 1963 to late 1965 Schwartz had withdrawn in excess of $255,000 from Scientific's bank account without the knowledge of Stone or Rosenbaum. Portions of these withdrawals had been repaid by Schwartz, but when the withdrawals came to light in the latter part of 1964, there remained $118,000 which had not been repaid.Schwartz then repaid an additional $40,000, leaving a balance due of $78,000. By agreement between Schwartz, Rosenbaum, and Stone, Schwartz was credited with salary of $48,000 and gave Pacific Enterprises, Inc. (Pacific), as nominee for Chromcraft, three notes of $10,000 each. (See Issues 1(c)(2) and 3(c) infra, with regard *709 to Rosenbaum's relationship with Pacific). In December 1966, after the notes had not been paid, Pacific sued Schwartz on the notes. The moneys ultimately collected by Pacific on the notes were paid to Alsco, as successor to Chromcraft, the nominee for which Pacific had acted. The Scientific account was losed in July 1965, by a final check written to the order of the Simonson Trust. The check was drawn by Schwartz at the instructions of Rosenbaum and Rosenbaum deposited the check into an account under his control at the Handel Bank. Schwartz was again contacted by Rosenbaum in February 1968. At that time Schwartz was engaged in seeking a company to buy an electronics firm manufacturing microfilm readers. A grand jury investigation was then taking place and was inquiring into the affairs of Rosenbaum with respect to his activities with Scientific. Rosenbaum indicated that he might know of a company interested in Schwartz's microfilm readers, and suggested that he (Schwartz) take a trip to Europe at Rosenbaum's expense. The trip was 2 weeks in duration and the expenses were paid by Rosenbaum, using moneys from the Swiss accounts. Operations of Scientific were included *710 in the consolidated Federal income tax returns of Ladevco for the taxable years ended February 29, 1964, and February 28, 1965. Those returns were signed y Schwartz. Form 1122, with Ladevco's return for the fiscal year ended February 29, 1964, states under penalties of perjury that Ladevco owned 100 percent of the stock of Scientific, but that such stock had not yet been issued. Schwartz suggested the filing of consolidated returns to save money and to bolster the appearance of Scientific as a valid corporation doing subcontracting for Chromcraft. On October 19, 1971, respondent issued a statutory notice of deficiency to Ladevco pertaining to the consolidated income tax returns of Ladevco and Scientific for the fiscal years ended February 29, 1964, February 28, 1965, and a consolidated income tax return constructed by respondent for the fiscal year ended February 28, 1966. In that notice, respondent determined deficiencies and additions to tax for fraud, as follows: Additions
Year Ended
Deficiency
to Tax
February 29, 1964
$79,660.90
$39,830.45
February 28, 1965
642,683.66
321,341.83
February 28, 1966
420,162.15
210,081.08
That notice of deficiency *711 accepted the sales and deductions reported in the tax returns, except for $2,300 of rent in fiscal 1964, and $151,777.02 and $1,316,381.51 of purchases for fiscal 1964 and 1965, respectively. For fiscal 1966, respondent determined sales by Scientific to Chromcraft of $873,058.67, purchases of $13,993.49 and deductions for Scientific of $4,583.70, consisting of rent, accounting and legal fees, franchise tax, business promotion and travel, and sundry other items. A petition contesting the deficiency was filed with this Court on November 24, 1971, Docket No. 7926-71, executed by Schwartz, wherein it was alleged that the petitioner had acted as agent for Chromcraft with respect to the transactions of Scientific. In his answer at Docket No. 7926-71, respondent affirmatively alleged that Scientific was a wholly-owned subsidiary of Ladevco and that Scientific had income from sales of $873,058.67 in fiscal 1966 and had failed to file a consolidated income tax return for that year. On January 5, 1973, this Court entered a decision in Docket No. 7926-71, pursuant to stipulation of the parties, reflecting income tax deficiencies and additions to tax for fraud, as follows: Additions
Year Ended
Deficiency
to Tax
February 29, 1964
$79,117.61
$39,558.81
February 28, 1965
617,542.63
308,771.32
February 28, 1966
403,095.66
201,547.83
*712 Schwartz agreed on behalf of the corporation to pay the amount of the deficiency. He paid nothing on the deficiency personally but rather was protected from doing so by an agreement with Rosenbaum, whereby Rosenbaum agreed to hold Schwartz harmless from any payment on the deficiency or with respect to the activities of Scientific. On October 19, 1971, respondent issued a notice of transferee liability to Rosenbaum, as transferee of Ladevco, for the deficiencies and additions to tax of Ladevco for its fiscal years 1964, 1965, and 1966 set out above. A petition based upon such notice was filed with this Court on January 17, 1972, at Docket No. 459-72. In an amended answer filed in Docket No. 459-72 on July 23, 1974, respondent affirmatively referred to the Tax Court's entry of decision in Docket No. 7926-71 and pleaded the doctrine of resjudicata as conclusive of Ladevco's liability for the deficiencies and additions to tax and that the petitioner, as transferee, was accordingly barred from litigating the amounts of such deficiencies and additions to tax. Respondent has determined all the moneys paid by Chromcraft to Scientific in each of the years 1963, 1964, and *713 1965, less Scientific's payment to Chromcraft suppliers, are income to Stone, as constructive dividends from Chromcraft, and to Rosenbaum, as "unreported income," in those years and at the times when Chromcraft made the several payments. Respondent has also disallowed such payments as deductions to Chromcraft, but its liabilities are not before the Court in the present proceedings. (b) Bregman Electronics, Inc.
After Schwartz's use of Scientific funds had come to light, Stone and Rosenbaum decided to terminate the relationship between Chromcraft and Scientific. Rosenbaum had known Robert Bregman (Robert) since 1949. He introduced him to Stone in 1965 with the intention of having Robert organize a corporation to take the place of Scientific. Rosenbaum told Robert he needed a company to run paperwork through. Bregman Electronics, Inc. (Bregman) was incorporated in New York on June 1, 1965, and had a corporate address at 25 West 43rd Street, New York, New York. Its president was Robert Bregman and its treasurer and secretary was Edward Friedland (Friedland). Friedland, Robert's lawyer, formed the corporation and allowed Robert to use his law offices as the corporate *714 address. Robert was the corporation's sole stockholder and the signatory on its bank account. Shortly after the formation of Bregman, Chromcraft began to issue purchase orders for completed electrical assemblies to Bregman, for use in Chromcraft's manufacture of rocket launchers. As in Chromcraft's relationship with Scientific, Chromcraft purchased the raw materials for the assemblies and the materials were delivered to Chromcraft's plant. From there, they were either picked up by or shipped to Wolf. As before, Price did all the paperwork involved, and was paid for her services by checks to L. T. O'Connell from Bregman. She prepared the Bregman purchase orders to Wolf for the latter's labor in producing the assemblies. Wolf delivered the completed assemblies to Chromcraft's plant, along with its invoices for labor. Price then sent the labor invoices to Bregman for payment. Price prepared the Bregman invoices to Chromcraft for the completed assemblies -- labor and materials -- and Chromcraft paid those invoices by checks which Bregman deposited in its account. Chromcraft, which had paid the suppliers of the raw materials going into the assemblies, never billed Bregman for the *715 cost of these raw materials, with the result that Chromcraft took a double deduction for raw materials and overstated its cost of goods sold on its tax returns. The prices charged to Chromcraft by Bregman for the electrical assemblies were set by Chromcraft and were arrived at by taking the lowest prices quoted by other firms and reducing them by 5 to 10 cents. Again, as in the Chromcraft-Scientific relationship, Rosenbaum arranged for invoices to be submitted by a "dummy" Swiss entity to Bregman for raw materials which were never shipped to or received by Bregman. Bregman issued its checks in payment of those invoices to the foreign entity. That entity deposited such checks in its own bank account in Switzerland and, after deducting a small percentage as an accommodation fee for supplying the invoices, transferred the remainder to a bank account in Switzerland controlled by Rosenbaum. Stone created correspondence relating to Bregman which purports to discuss actual transactions regarding the receipt of materials by Bregman from this foreign vendor. The correspondence was prepared to give the appearance of authenticity to these transactions. Bregman deposited in its bank *716 account receipts of $892,078 in 1965 and $432,251 in 1966. In 1965, Bregman issued 21 checks to Wolf, 2 checks to Friedland for rent, 2 checks to an independent accountant, 8 checks for Robert's personal purposes, 19 checks for office expenses, telephone, taxes, travel, stationery and supplies, and other expenses, as well as 13 checks to Macoba. In 1966, Bregman issued 3 checks to Wolf, 3 checks to Robert for personal purposes, 9 checks to Friedland, 1 check to L. T. O'Connell, 1 check to Andrew Smith, 36 checks for rent, office expenses, taxes, travel, and salaries, and 5 checks to Macoba. The 18 checks of Bregman to Macoba reflect deposits at the Handel Bank. The total amounts of those checks were: 1965
Macoba
$657,839.50
1966
Macoba
522,852.60
Rosenbaum and Stone decided to terminate the Chromcraft-Bregman arrangement in 1966 because Robert's performance was less than satisfactory and because he had very expensive personal habits. After Bregman ceased operations, Rosenbaum found Robert a job with a friend and Rosenbaum agreed to finance Robert in going to Europe and trying to do business there. Rosenbaum arranged for certain funds to be made available *717 to Robert at the Handel Bank. During the pendency of the criminal investigation against Stone and Rosenbaum, Rosenbaum made payments to Robert from a Swiss bank account to secure Robert's cooperation and to have him confirm Rosenbaum's version of the events. Again, as he did with respect to the Chromcraft-Scientific relationship, respondent disallowed Chromcraft's payments to Bregman and determined deficiencies against Chromcraft. He also determined those payments in their entirety (less Bregman's payments to Wolf) were income to Stone and Rosenbaum, as constructive dividends and unreported income, respectively, at the times and in the years when Chromcraft made the payments to Bregman. Bregman filed tax returns, one of which was a Federal income tax return for its fiscal year ended May 31, 1966. On that return it reported sales of $1,319,257.55, which represented the amounts it received from Chromcraft. Bregman showed as cost of goods sold $1,304,851.77, which is 99.7 percent composed of the amounts it paid to Wolf and to the "dummy" Swiss entity. So far as the record herein shows, respondent did not make any adjustments with respect to that return. (c)(1) Republic *718 Electronics Industries Corp. -- Zuni Rocket Launcher
Prior to November 1, 1965, Republic Electronics Industries Corp. (Republic) was a subsidiary of Belock Instrument Corporation (Belock), which owned 62 percent of Republic's common stock, its only class of stock. The remaining 38 percent was owned by a large number of individuals and was traded over the counter. An individual named Jeremy Taylor (Taylor) was Republic's executive vice-president and responsible for its operations. Taylor held the degree of Master of Science in Physics and had done further graduate work in physics and science. He had been employed by Bell Telephone Laboratories as a research physicist on semiconductors for two years, by Lockheed Corporation in telemetry and space recognizance for six years, and by Belock as executive assistant to the president for two years before moving to Republic. On November 1, 1965, Belock's 62 percent interest in Republic was acquired by Falrock Corporation (Falrock). The stockholders of Falrock were John W. Seabrook, (Seabrook) (60 percent), William Witmer (Witmer) (30 percent), and Rosenbaum (10 percent).More background with regard to the organization of Falrock *719 will be given in the next section of these findings dealing with the disallowed purchases of materials from Republic. In the late summer of 1965, Taylor received a telephone call from Stone, in which Stone expressed his interest in having Chromcraft acquire the rights in the seven-round Zuni rocket launcher, which Republic was developing for Belock, and in having Chromcraft acquire Republic as a supplier of electronic parts utilized in Chromcraft's manufacture of rocket launchers. Thereafter Taylor went to St. Louis to meet with Stone. Stone, acting for Chromcraft, expressed the desire to acquire the rights to the Zuni and agreed to buy them if Republic could arrange to acquire the rights from Belock. Stone and Taylor discussed the potential profitability of the Zuni. Republic purchased from Belock the latter's rights in the Zuni, effective November 1, 1965. The purchase of Belock's interest by Republic occurred simultaneously with the purchase of the Republic stock by Falrock. At the end of 1965 or early 1966, Stone asked to buy the Zuni and inquired of Taylor as to a price. Earlier, in 1964, Taylor had written an extended memorandum to the cognizant officer of Belock *720 wherein he projected Zuni sales of $3,000,000 if the launcher were developed and marketed and that a 10 percent rate of profit, or $300,000, could be expected. Based upon that projection, Taylor initially stated to Stone that Republic would sell its rights to the Zuni for $300,000. Stone countered with an offer for Chromcraft to purchase such rights for $225,000, to which Taylor agreed. Taylor, at Stone's request, prepared invoices for engineering development and testing charges ($77,000), fabrication (labor) charges ($103,000), and material charges ($45,000). The foregoing allocations were made by Taylor. Chromcraft issued its checks in payment on January 31, 1966, and charged the $225,000 to rocket launcher inventory. Later, in April and May 1966, further amounts totalling $30,000 were paid by Chromcraft to Republic to enable it to continue development of the Zuni, based upon estimates by Republic's engineers. Zuni prototypes, ready to fire, were stocked in a section of the Chromcraft plant. The Zuni ultimately passed all test-firing requirements, and Chromcraft endeavored to promote sales of the Zuni.Republic was also aggressive in trying to sell Zuni launchers to *721 the United States Government, but was not successful.Proposals to the Government were submitted under Republic's name, since Republic was to be the producer under arrangement with Chromcraft. Republic realized a profit of approximately $189,000 on the sale of its rights in the Zuni to Chromcraft. The $225,000 paid by Chromcraft to Republic was reported by the latter in its tax return. None of that amount was remitted to Stone or to Rosenbaum. Respondent has disallowed deductions to Chromcraft for the $225,000 which it paid in January 1966 to Republic and for the $30,000 paid later in April and May of that year, and in his notices of deficiency he has determined that the total amount of $255,000 was income to Stone as a constructive distribution from Chromcraft, and to Rosenbaum, as "unreported income", for 1966, the year Chromcraft made the payments to Republic. Rosenbaum was a director of Republic from November 1965 to the fall of 1968; he was never an officer or stockholder. As found above he was a 10 percent stockholder in Falrock which owned 62 percent of Republic's common stock. Stone was never an officer, director, or stockholder of Republic. (c)(2) Republic *722 Electronics Industries Corp. -- Purchases of Materials
In October 1964, Belock had acquired 62 percent of the stock of Republic, the operations of which were in a facility in Melville, Long Island, New York. At that time Republic was in a Chapter XI bankruptcy proceeding. Subsequent to the acquisition by Belock of its interest in Republic and Republic's thereby becoming a subsidiary of Belock, the two companies entered into two joint venture contracts with the United States Government covering the manufacture and sale of navigation equipment. Republic could not have entered into these Government contracts alone because of its poor financial condition. Belock's financial assistance was required so that the Government could award contracts to Republic. Belock undertook to furnish such assistance by providing raw materials under Belock purchase orders. During 1965, Belock's ability to assist Republic financially changed significantly, due to the indictment by the Government of two of Belock's officers for fraud. This caused consternation among suppliers who had been providing Republic with materials based on Belock's credit. Because of the dire situation which Republic *723 faced, Taylor approached the president of Belock and requested permission to put Republic on the market with a view to obtaining an outside infusion of capital. As mentioned in the preceding section of these findings, in the late summer of 1965, Taylor received a telephone call from Stone wherein the latter expressed his interest in having Chromcraft acquire Republic's rights to the Zuni and having Chromcraft acquire Republic as a supplier of electronic parts. Negotiations for the acquisition proceeded between Chromcraft and Republic and it was planned that Chromcraft would organize a wholly-owned subsidiary, Falrock Corporation (Falrock), to acquire Republic. Chromcraft's counsel caused the formation of Falrock on or about October 20, 1965. Chromcraft eventually decided, on the advice of its counsel, not to have Falrock make the acquisition, due to the pendency of a lawsuit against a bank and Belock by a former shareholder of Republic, Thomas F. Lo Giudice, alleging duress by Belock in Lo Giudice's sale of his Republic stock to Belock. Rosenbaum, who had been following the negotiations between Chromcraft and Republic and who along with Stone was aware that Republic had *724 a net operating loss of $1,600,000, viewed Chromcraft's withdrawal as unwise. He informed Stone that he (Rosenbaum) was going to follow through with the acquisition of Belock's 62 percent interest in Republic, using therefor moneys in Switzerland that had their origin in Chromcraft-related transactions, such as those involving Scientific and Bregman hereinbefore described. Such funds in banks in Switzerland, in the aggregate, will be referred to hereinafter as "the Chromcraft Swiss Fund." Rosenbaum informed Stone that he (Rosenbaum) would repay the Chromcraft Swiss Fund the full amount withdrawn, plus interest, in any event; and if the investment proved to be a profitable one, the Chromcraft Swiss Fund would not only receive repayment with interest, but also an unspecified share of the profit ultimately realized upon disposition of the investment. Chromcraft's counsel suggested that Rosenbaum might utilize the Falrock corporate entity which had been formed by Chromcraft and which had not yet issued any stock. Rosenbaum decided to use Falrock and proceeded to obtain a release from Lo Giudice of his claims against Belock and the bank. Rosenbaum also prevailed upon Seabrook and *725 Witmer to become stockholders with him in Falrock, which would be utilized for the making of investments, using moneys which Rosenbaum represented that a client of his in Europe had available. The only basis on which Rosenbaum could induce Seabrook and Witmer to go into Falrock was on the guarantee that they would not be personally liable for any losses of the funds. At that time Seabrook was executive vice-president of International Utilities Corporation and Witmer was executive vice-president of Tennessee Gas Transmission Corporation (now called Tenneco, Inc.) The officers of Falrock were Seabrook (president) and Rosenbaum (vice-president and treasurer). Rosenbaum, Seabrook, and Witmer were its directors. Its principal office was in the law offices of GRM&W, the firm in which Rosenbaum was a partner. Falrock engaged in the making of investments, and it had no inventories of any kind. It kept its books and records on the accrual method of accounting and filed its income tax returns on the basis of a fiscal year ending September 30. Pacific Enterprises, Inc. (Pacific), which figured in the Falrock acquisition in a manner presently to be described, was incorporated on June 4, 1957. *726 Its place of business was located at the law offices of GRM&W. It kept its books and records on the accrual method of accounting and filed its income tax returns on a calendar-year basis. Prior to March 4, 1965, Rosenbaum and his brother, Joseph H. Rosenbaum, each owned of record 20 percent of the 250 shares of Pacific's outstanding stock. The remaining 60 percent of Pacific's shares were held of record in equal portions by three other persons as nominees for Rosenbaum. On March 4, 1965, Finanz A.G. (Finanz), a Liechtenstein corporation, acquired of record 375 newly issued shares of Pacific stock as a nominee for Rosenbaum. A plan was devised by Rosenbaum, under which Pacific would advance the money for the Republic acquisition to Seabrook who was then to advance a portion of such money as a capital contribution to Falrock and the remainder as a loan to that corporation. This method would enable Seabrook to act as agent for Witmer and Rosenbaum. When and if Falrock had profits and paid dividends, those dividends would be used to pay the subscription price for Falrock's shares, which theretofore had not been paid. Thus, in order for Falrock to purchase Belock's interest in *727 Republic, it borrowed the necessary funds from Seabrook who in turn borrowed the funds from Pacific. In 1965, the books and records of Pacific reflect total loans from Finanz of $575,000. During 1966, the books and records of Pacific also reflect certain loans received from Finanz and from the Handel Bank. These loans totalled $2,060,000. There were, in fact, no loans or advances by Finanz to Pacific. Pacific had received such funds from drafts drawn on the Agencia account at the Handel Bank.The Agencia account was controlled by Rosenbaum and was the principal depository of the Chromcraft Swiss Fund. Finanz was owned by an individual named Fidel Gotz, who was told by Rosenbaum that Finanz would be compensated for its participation and that by accommodating Rosenbaum in this matter he (Gotz) would come into contact with important business executives in the United States. Under the final purported loan agreement between Pacific and Seabrook, Pacific was to receive two-thirds of any profits realized by Falrock on its investments. Falrock in effect would retain one-third of the profits it realized after returning to Pacific all principal. The closing date for the sale of *728 Belock's shares in Republic was November 1, 1965, at which time Falrock bought 334,105 shares of Republic, approximately 62 percent of the outstanding shares. The remainder, as mentioned above, was publicly held and traded over the counter. The initial investment was $400,000. One thousand dollars was allocated to the shares, $150,000 went to Belock for repayment of various payables due Belock from Republic, and the remainder stayed in Republic for working capital. Rosenbaum did not discuss with Stone the mechanics of the transfer of funds from the Chromcraft Swiss Fund in Switzerland, what rate of interest would be paid by Rosenbaum on those funds, or what was meant by the participation in profits to which the Chromcraft Swiss Fund would be entitled in the event the Republic investment proved to be profitable. At all times, however, Stone was aware of Rosenbaum's decision to use the money in the Agencia account for Falrock's investment in Republic. Additional moneys were invested in Republic by Falrock subsequent to its initial acquisition. As stated earlier, the source of these additional funds was also the Chromcraft Swiss Fund. Immediately after the acquisition of *729 Republic by Falrock, Stone approached Taylor with respect to doing subcontract work for Chromcraft. At that time, Republic was so heavily committed on its above-mentioned Government contracts for nvaigation equipment that Taylor did not want the Chromcraft business. Rosenbaum prevailed upon Taylor to take the Chromcraft work, and Republic and Chromcraft agreed that Republic was to be Chromcraft's sole subcontractor for electronic parts, receive all orders, and supervise the fulfillment of such orders. Chromcraft agreed to pay Republic prices competitive with quotations Chromcraft was receiving and assured Republic that it would realize a 15 percent profit on its business with Chromcraft. The price per part Chromcraft paid Republic was the lowest obtainable. The assured 15 percent profit was to be obtained by adjusting the cost of raw materials which Chromcraft furnished to Republic and for which Chromcraft charged Republic. The first two purchase orders received from Chromcraft by Republic, in November 1965, were for 20,000 intervalometers and 20,000 harness assebmlies. Republic had previously received drawings and samples of those parts so that it could become acquainted *730 with them. It had previously manufactured harness assemblies for Belock, and had the required knowledge. Republic sent one of its engineers to Wolf to study how that proprietorship was assembling the parts ordered by Chromcraft. As indicated above, Chromcraft was to procure the materials. Prices on Chromcraft's second group of purchase orders dated December 20, 1965, as were those on the first two, were set by Chromcraft, but were reviewed by Taylor and Republic's operating personnel. Republic had serious production problems on its first two orders from Chromcraft. Someone had used a solvent instead of water in which to wash the completed parts, with the result that the reject rate on the parts was unusually high and Chromcraft's rocket launcher delivery schedule was adversely affected. Republic, which was heavily committed to the performance of its Government contracts for the navigation equipment, did not have enough trained personnel to work on those contracts and on Chromcraft's orders in its own plant. It would have been hard pressed to do any major work for Chromcraft after the first two orders. At Stone's suggestion, Republic turned to Wolf to do the labor on the *731 parts ordered by Chromcraft from Republic. Taylor had Republic's purchasing department send to Chromcraft approximately 20 blank Republic purchase order forms with control numbers. In order to eliminate the time lag in the beginning that would be incurred in Chromcraft sent its purchase orders to Republic and Republic then issued its own purchse orders to Wolf, Chromcraft completed the Republic forms and sent them directly to Wolf. After the first four to six Republic purchase orders to Wolf, Republic prepared its own purchase orders, signed by its own purchasing agent, to Wolf. Republic paid Wolf for its labor on all Chromcraft parts assembled by it. Up until July 1, 1967, Republic continued to subcontract labor on Chromcraft purchase orders to Wolf. Chromcraft purchased the raw materials which were delivered to its own plant, where they were picked up by or sent to Wolf. Wolf delivered the completed parts directly to Chromcraft. This practice, called "drop-shipping," is not unusual in the business world. In contradistinction to what had prevailed in the Chromcraft-Scientific and Chromcraft-Bregman transactions, Chromcraft billed Republic for the cost of such raw materials. *732 Republic, in its turn, billed Chromcraft for the completed parts, material and labor included. In November and December 1965, Republic was hard pressed for cash, and Stone and Rosenbaum were aware of this condition. As a consequence, Chromcraft transmitted advances to Republic against the purchase orders of $60,000 on November 10, $100,000 on November 19, and $40,000 on December 3. Before the end of the year 1965, Stone asked Taylor to send Chromcraft invoices for the entire amount of those purchase orders, $230,000; and on January 8, 1966, after deducting the $200,000 previously advanced, Chromcraft transmitted its check to Republic for the $30,000 balance due thereon. At that time, only 6 of the 20,000 units ordered had been completed; however, in 1966, Republic completed its performance under the purchase orders and delivered the quantities called for thereon in full. Chromcraft made other advances from time to time to Republic against purchase orders. Republic had received other advance payments on Government contracts in excess of expenditures. It was not unusual to receive advance payment for the total amount of such a contract.
Every payment made by Chromcraft to Republic *733 was for goods delivered by Republic at invoice prices which were fair and reasonable. All such payments received by Republic were taken into income. Its income tax returns were thoroughly examined and investigated for its fiscal years 1966 and 1967, and there was no dollar adjustment to its income. Republic made no payments on false invoices from "dummy" Swiss entities, nor did it send any funds overseas in the manner that Scientific and Bregman had done. Republic's facility on Long Island was inadequate to handle both its contracts from the Government work for Chromcraft and consequently, Republic began a search for a facility in which to do the work for Chromcraft. It contacted the Federal Office of Economic Opportunity, and considered possible sites in Brooklyn, Queens, and Jamaica in the New York area, as well as a site in Pennsylvania. Republic finally located a plant in Arnold, Missouri, near St. Louis, where labor rates and productivity were satisfactory. With advice and assistance from Chromcraft personnel, Republic commenced operations at this plant, called the Tenbrook Division, on or about July 1, 1967, with Chromcraft as its sole source of business. Even after *734 Tenbrook was established, Republic continued to subcontract some of its Chromcraft work to Wolf, which provided a second source of labor in case of interruption at the Tenbrook division. The prices paid by Chromcraft to Tenbrook for electrical assemblies were in line with prices paid in prior years. Prior to July 1, 1967, Republic engaged in research and development of two types of intervalometers for Chromcraft. Republic resumed intervalometer development when the Tenbrook facility was set up. Later, Republic developed an electromechanical intervalometer, which was less expensive to manufacture and more reliable than the dropped-wire type used in the beginning, and Republic manufacturered the new intervalometer. In his notices of deficiency, respondent determined Stone and Rosenbaum had income from the Republic transactions only as a result of the purchase of Republic's rights to the Zuni, described in the preceding section of these findings.In his amended answers in the Stone deficiency cases, and in his amendments to amended answers in the Rosenbaum cases, all filed on May 16, 1975, respondent alleged Stone had received constructive dividends from Chromcraft as a result *735 of causing the payment of inflated invoices of Republic to be paid by Chromcraft in the amounts of $821,009.01 and $761,013.63 in 1966 and 1967, respectively; and Rosenbaum had "unreported income" in the same amounts for the same years. Respondent sought increased deficiencies and additions to tax for fraud as a result of the foregoing allegations in his amended pleadings. None of the additional income is related to Chromcraft's purchases from Rpublic after July 1, 1967, when the Tenbrook division operations commenced. (d) Western Molded Fibre Products, Inc.
Rocket launchers manufactured by Chromcraft were fitted with fairings. Each launcher was fitted with a set, composed of one front fairing and one rear fairing. Up until 1963, these fairings were plastic, made of fibre material bonded together with a chemical known as phenolic formaldehyde. The purpose of the fairings was to give a streamlining effect to the launcher, thereby reducing aerodynamic drag. These plastic fairings were frangible, that is, the fairings were broken up by the rockets when fired and the pieces fell away to the ground. During the taxable years at issue, Western Molded Fibre Products, Inc. (Western) *736 was a California corporation which manufactured and sold fairings to Chromcraft and Alsco. Western was a subsidiary of Hawley Products (Hawley), which was publicly owned and which manufactured civilian products. Hawley's principal office and plant were in St. Charles, Illinois, near Chicago; Western's office and plant were in Gardena, California. The president of Western was Peter De Luca (De Luca) who, until July 1966, was stationed at Hawley's office in St. Charles. The person in charge of operations at Gardena was Thomas Austin (Austin). In July 1966, Austin was transferred to St. Charles, and De Luca replaced him in Gardena. Approximately 70 percent of Western's business was with Chromcraft, and fairings were Western's principal, if not sole, products.Sales of fairings were inextricably bound up with the sale of rocket launchers, and consequently, unless there were sales of launchers there would be no sales of fairings. Launchers purchased by the Armed Services of the United States were principally for use in Vietnam. As the launchers themselves were normally jettisoned to reduce weight and drag on the return from a mission, only frangible plastic fairings were specified. *737 However, rocket launchers purchased by NATO and other countries were chiefly used for training purposes, and were not jettisoned. A reusable launcher which could be fired 100 times would consequently use 100 sets of the disposable plastic fairings; and, while the cost of a set of fairings did not constitute a major portion of the cost of a fully-equipped launcher, if 100 sets of fairings were required, the result was that the fairings cost as much as the launcher itself.in these circumstances, foreign countries using rocket launchers wanted reusable fairings which could be used over and over again for the life of the launcher. At about the same time that the need for the development of reusable fairings arose, in the early part of 1963, a new development was taking place with respect to the frangible plastic fairing. The regular frangible fairing would, after firing, break into relatively large pieces which often caused problems both for the aircraft from which it dropped and for other aircraft flying in the same formation. To meet these problems a grenade-type fairing was developed, with a pineapple configuration on the inside surface of the fairing. Upon firing, the grenade-type *738 fairing would break into very small fragments, which posed much less of a hazard both to the aircraft on which the firing took place and to the other aircraft in the same formation. Chromcraft, the launcher manufacturer, had borne the cost of developing launchers, which entailed expenses of designing, engineering, manufacturing prototypes, and testing. It also was required, in its arrangements with Western, to buy the tools, dies and molds for the development by Western of the grenade-type fairings. Chromcraft also had promotional expenses in obtaining contracts from the United States Government for the purchase of launchers as well as in obtaining sales to NATO and other countries through the United States Military Assistance Program. Chromcraft paid the roughly $2 million of costs incurred out of its corporate treasury. Under Armed Services Procurement Regulations, Chromcraft was unable to recover these costs; the only way to recover such expenditures was to have a specific arrangement allowing expenditures for these types of expenses, to incur the expenses within the contract, and to have the expenses approved. Western, at this time, was the only supplier of fairings qualified *739 under military regulations to submit bids, although another company, General Molding, could have become qualified with Chromcraft's assistance. The necessary tools were owned by Chromcraft, and Chromcraft had a license from Hawley to use Western's patents.
In early 1963, Stone approached DeLuca purportedly seeking to have Western reimburse Chromcraft for a portion of the latter's costs in research, development, and promotion, from which Western was deriving significant benefits. Stone and DeLuca orally agreed that Chromcraft and Western would share such costs in the ratio of two-thirds/one-third, although Stone never intended any portion of the reimbursement to go to Chromcraft. The "reimbursement" agreement was for an ongoing program covering costs previously incurred by Chromcraft as well as those to be incurred in the future, both in the United States and abroad. No price for fairings was fixed at the time the agreement for sharing costs was reached, nor were the mechanics for Western's payment of its share determined. Stone subsequently suggested increasing the price on fairings by approximately $2.50 per set to cover Western's share of the costs. The price was eventually *740 increased another 50 cents, making the total increase approximately $3 per set. In June 1963, Western furnished Chromcraft with a price of $16.60 for a set of grenade-type fairings for a 19-round launcher ("round" refers to the number of rockets a launcher will hold and fire), which amount was utilized in a bid submitted to the Government by Chromcraft and on which it was subsequently awarded a contract. The price that had been previously charged by Western for non-grenade-type fairings for a 19-round launcher was $13.64 per set. In the early fall of 1963, Western quoted a price of $13.027 per set for the grenade-type fairings for a 7-round launcher, which amount was utilized by Chromcraft in its bids to the Government on which it was subsequently awarded contracts. The price previously charged by Western for non-grenade-type fairings for a 7-round launcher was $10.21 per set. Western did not have detailed cost data records regarding fairings. In essence, the cost figures were decided upon and then backed into. At the same time that Western furnished the above-mentioned prices to Chromcraft, a letter was drafted by De Luca containing a phony explanation for the increase in *741 price costs of the fairings contained in the new price quotations. The letters were drafted at the suggestion of and the contents dictated by Stone. Pursuant to the arrangements between Stone and De Luca, Stone initially asked Rosenbaum to have Scientific Industrial Developments, Ltd. (the same Scientific Industrial Developments, Ltd., or SID, mentioned previously in connection with Scientific Electronics), a London-based firm which handled promotional efforts for sales of Chromcraft's launchers to England and the British Commonwealth nations, submit a bill to Western. SID submitted such a bill for $9,000 to Western on May 20, 1963, for services and expenses of a market investigation of the potential use of the 2.75 inch rocket launcher in the United Kingdom and the Commonwealth countries. Upon receipt of this bill, De Luca returned it unpaid to SID and informed Stone he could not pay a bill for services but only for materials. De Luca gave Stone the name and specifications for phenolic formaldehyde, the chemical used to bind the fibre in fairings, and the unit price therefor. The method thereafter pursued to effect the reimbursement was as follows. Stone from time to *742 time would tell Rosenbaum an amount that was to be billed to Western for its share in reimbursing Chromcraft for the latter's research, development, and promotional costs. Rosenbaum then would have a "dummy" Swiss entity issue its invoice for phenolic formaldehyde to Western in a quantity which, when multiplied by the unit price, equaled the amount which Stone had given to Rosenbaum. When Western accumulated a number of these foreign source invoices, De Luca would cause a purchase order to be issued by Western to the "dummy" Swiss entity for the phenolic formaldehyde thus invoiced to Western. Austin, having been told by De Luca how the mechanics of payment were to be worked out, caused an accrued liability of $2.96 per set of fairings for 19-round launchers, and $2.82 per set of fairings for 7-round launchers to be set up on Western's books when Western billed Chromcraft for fairings shipped to it. Then, when Chromcraft paid such an invoice from Western, Western drew its check to the "dummy" Swiss entity in an amount computed by multiplying the number of sets of fairings paid for by Chromcraft times the appropriate per-set reserved or accrued figure ($2.96 or $2.82). In its *743 internal record keeping Western would charge the amounts of such checks against a foreign source invoice until the full amount had been paid.When the amount of a particular Western check exceeded the balance due on a particular foreign source invoice, Western would simply apply the excess to a different invoice and thereafter continue charging its payments against that second invoice, and so on and on. Western checks to the "dummy" Swiss entities were sent to Rosenbaum who in turn transmitted them to the entities in Switzerland, which deposited them in their Swiss bank accounts. Then, after deducting a fee for services, the Swiss entities would forward the balance, about 98 percent, to Swiss bank accounts on which Rosenbaum was the signatory. Rosenbaum was not an officer, director, or shareholder of any of the Swiss entities. All foreign source invoices were paid by Western. The last foreign source invoice to Western for materials was dated September 21, 1966, for $30,225. The last Western payment of a foreign source invoice was made by its check dated January 3, 1967, in the amount of $21,454.08. Western related that payment to Chromcraft's purchase orders and Western invoices *744 to Chromcraft of August 1966. De Luca did not seek more foreign invoices in 1966, although Western had continued to reserve or accrue a substantial amount of money to pay such, based upon Chromcraft's payments to Western. Stone did not ask De Luca to set aside a specific amount of money on each set of fairings for reimbursement to Chromcraft for its costs of research, development, and promotion of sales of rocket launchers, which totaled approximately $2,000,000 over the years. Stone did not learn the details of what Western had been doing in regard to reserving or accruing amounts for payment until 1971, although he was aware of the practice by January 1967. The system of reserving or accruing amounts was a Western decision by Austin, and was not one made by Stone. Stone did not furnish the accrual figures. The foreign source invoices which Rosenbaum caused to be sent to Western were sent at irregular intervals, and were not based upon the number of sets of fairings sold by Western to Chromcraft.
In January 1967, officials of Hawley learned of the payments made by Western to the "dummy" Swiss entities. In an effort to establish that the payments were not kickbacks, Rosenbaum *745 arranged for a number of foreign persons and organizations to send letters to Hawley stating that they had been paid for services. These letters were to a large extent fabrications, although, as found above, Chromcraft had actually incurred expenses of approximately $2,000,000 for research, development, and promotion of sales of rocket launchers. Western sent $663,481 to the "dimmy" Swiss entities, of which $31,269.38 was returned to Western after Hawley learned of the payments by Western. These payments were in the years and amounts as follows: 1963
Orma-Commerce
$8,612.20
$8,612.20
1964
Orma-Commerce
36,371.80
Geag
32,100.00
Alwatra
65,167.06
133,638.86
1965
Alwatra
55,152.94
Macoba
120,319.96
Export Technik
8,721.78
184,194.68
1966
Export Technik
315,581.23
315,581.23
1967
Export Technik
21,454.08
21,454.08
The checks of Western to Geag and Orma-Commerce reflect deposit at the Union Bank; the checks to Alwatra, Macoba, and Export Technik reflect deposit at the Handel Bank. Respondent disallowed Chromcraft's purchase expenses on its purchases of fairings from Western in the following amounts for the years and *746 periods indicated: 1963
$ 8,983
1964
136,034
1965
221,084
1/1 - 4/9/66
142,494
4/10 - 5/31/66
61,512
6/1 - 12/31/66
114,400
Total
$684,507
The foregoing disallowances were apparently based upon a disallowance of $2.96 for each set of 19-round launcher fairings and $2.82 for each set of 7-round launcher fairings purchased by Chromcraft from Western. Respondent determined the foregoing amounts disallowed were constructive dividends to Stone from Chromcraft and "unreported income" to Rosenbaum. Issue 1
ADDITIONAL FINDINGS OF FACT (e) Funds in Switzerland and the Swiss Bank Accounts.
As appears from preceding findings under this Issue 1 and as will appear from the findings under Issues 2, 3, and 4, substantial amounts of money originating from Chromcraft, Scientific, Bregman, Western and Zeebrugge were remitted overseas to Switzerland where they were deposited in Swiss banks. These may be summarized as follows: Chromcraft to Establissement Velo
$571,577.50
Chromcraft to Establissement Orma-Commerce
22,768.00
Chromcraft to CEPAB
52,172.00
Chromcraft to Finax
8,000.00
Chromcraft to Haemmerli
16,000.00
Chromcraft to Scientific
88,900.00
Chromcraft to SID
51,000.00
From Scientific
2,232,442.34
From Bregman
1,180.692.10
From Western
663,481.05
From Zeebrugge
193,016.00
*747 In addition, Stone, as will be shown in the interest expense deduction issue, remitted $102,000 in cash as interest to Finanz GmbH and $6,227 in cash as interest to Peralta, substantially all of which ultimately ended up in a Swiss bank account. There were several bank accounts utilized in the transactions in these cases. Principal among them was an account in the name of Agencia Industriale C por A (the Agencia account) in the Handel Bank in Zurich. Other accounts included the Chromcraft account at the Union Bank in Aarau, the Inversiones Petroleras Internationales S.A. account (the IPI account) in the Union Bank, and the Scientific Industrial Development account (the SID account) and the Establissement Velo account (the Velo account) at the Handel Bank. Neither the Chromcraft ledgers nor its financial statements showed the existence of the Chromcraft account, and neither Chromcraft's directors nor its shareholders knew of its existence. Although the foregoing accounts (with the exception of the Chromcraft account) bore names indicating that they were accounts of business enterprises, none was such during the taxable years involved. Stone was a signatory on the Velo account, *748 and became a signatory on the Chromcraft account in 1964 and on the St. Louis sub-account (but not the U.S. dollar or Swiss franc sub-accounts) of the Agencia account in 1965. Rosenbaum was a signatory on all the accounts. Not only Chromcraft funds were deposited in the Swiss accounts. Very large amounts of deposits, probably amounting to millions of dollars, were made by Rosenbaum from sources wholly unrelated to Chromcraft or to Stone. The accounts were managed by and totally under the control of Rosenbaum. He received the statements from the banks and the debit and credit advices which showed deposits and withdrawals from the accounts. He freely commingled the funds coming into the accounts from various sources, transferring money in his discretion from one account to another. Rosenbaum kept no written records of the funds and their sources, but kept only a mental tally of the funds and their whereabouts. Rosenbaum regarded himself as having an interest, which has never been specified as to amount, in all of such funds except those coming over to Switzerland from Zeebrugge and Western, with the balance belonging to Chromcraft or Stone to do with as either told him. That *749 undefined interest of Rosenbaum's he regarded to be his for his services in arranging for foreign invoices, making and managing investments, and generally managing the funds. Neither he nor his law firm billed Chromcraft or Stone or received payment for such services. Besides making payment to individuals such as Schwartz, Robert Bregman, Czarnecki (Issue 4), Schendell (Issue 3) and others, Rosenbaum from time to time would invest funds in certificates of deposit and in marketable securities. These investments were made to avoid having the funds lie idle and unused. Rosenbaum on occasion would discuss the investments with Stone; however, he generally did what he wanted to with the funds as regards investments. Stone trusted Rosenbaum completely because of their close personal relationship. [8] Rosenbaum never reported to Stone or to Chromcraft the income or gain or loss on any of the investments made with the Swiss funds, so neither Stone nor Chromcraft reported any such income or gains or losses on their Federal income tax returns, and neither did Rosenbaum. *750 Rosenbaum also made many investments on his own behalf from the aggregate of funds under his control in the Swiss banks. While Stone did not have the detailed knowledge that Rosenbaum had of the Swiss accounts and their contents, he was aware of the plan to send funds overseas from its inception. He handled the Chromcraft end and was aware of the various transactions, e.g. supplying the raw materials without billing the companies therefor while purchasing completed assemblies at full price. Moreover, in many instances, payments could not have been made to the Swiss accounts without Stone's knowledge and cooperation, as it was he who approved the invoices and signed the checks. In addition, Stone had at least a rough idea of the amount of money in the Swiss accounts. As stated in the findings of fact, the checks on foreign invoices from Scientific, Bregman and Western were sent first to Chromcraft or Rosenbaum, then forwarded overseas. Lists of the payments were routinely kept by the secretaries involved (Price at Chromcraft, and Shirley Sorenson and Elinor Harmon at Western) and given to Stone and Rosenbaum. According to Stone and Rosenbaum the moneys were accumulated in *751 Switzerland to build a fund for corporate (Chromcraft) investments and, particularly with those moneys coming from Western, for rocket launcher promotion in Europe. However, Stone and Rosenbaum had no specific purpose or corporate acquisition in mind when they started accumulating the funds. Also, of the $663,481 sent to Switzerland via Western for "rocket launcher promotion," only approximately $50,000 was disbursed, nd that to such people as Schendell, Vollmer and Charnock for their participation in the plan. Stone never sought to have Rosenbaum disburse any of the money in the Chromcraft Swiss fund directly to him or a member of his family, although Rosenbaum would have acceded to such a request if Stone had made one. There were, however, instances disclosed by the record of a disbursement for the personal benefit of Stone or a member of his family. One such instance occurred in 1965, in the following circumstances. On March 24, 1965, Rosenbaum withdrew $20,000 from the Agencia account to make a personal loan to Mme. de Ora Trujillo, a client of GRM&W, Rosenbaum's law firm. Rosenbaum was aware of a trip that Jeanne Stone and her children were planning to make to Europe *752 and he told Stone that Mme. Trujillo owed him money and that he would have Mme. Trujillo pay for the American Express tour when the Stone party arrived in Paris, as a means of her partially repaying Rosenbaum. When Jeanne and the children arrived in Paris, Mme. Trujillo did not make the payment which she had agreed to make.Rather than cause Jeanne embarrassment, Rosenbaum had the Union Bank wire $6,689.25 from the Chromcraft account in the Union Bank to Amexco Tours on May 18, 1965. When Mme. Trujillo subsequently repaid Rosenbaum, she did so by a payment to one of the Swiss accounts which he controlled. Rosenbaum never told Stone what had been done, and Stone did not learn until the taking of depositions in 1971 in the Alsco-Harvard Fraud Litigation that Rosenbaum had sent the money for Jeanne Stone's tour from the Chromcraft account in the Union Bank. Also, in 1966, Stone asked Rosenbaum to accumulate several parcels of land for him in St. Louis, on one of which was situated the Stones' present home. Stone asked Rosenbaum to act, since Stone feared that the price would escalate if the identity of the real purchaser were known. Stone did not know what the cost of the properties *753 would be; whatever the price, Stone agreed to pay. Pacific Enterprises, Inc., formed a subsidiary corporation, Blackacre (whose name was subsequently changed to Whiteacre, and later to Realacre), to accumulate the parcels. Pacific "borrowed" somewhat over $300,000 from the Agencia account, which was advanced to the subsidiary and used by it to acquire the parcels of land.Stone ultimately purchased the parcels from the subsidiary using funds which he had borrowed from domestic sources, and the "borrowed" funds, plus interest, were returned to the Agencia account. As will be shown in the interest expense deduction issue, Stone utilized the Swiss funds as loans on other occasions as well. Falrock Corporation, mentioned previously in the findings relating to the disallowed Chromcraft purchases from Republic, in which Rosenbaum was a shareholder, officer, and director, but in which Stone was none of these, in October 1965 acquired 334,105 shares, approximately 62 percent, of the outstanding shares of Republic from Belock Instrument Corporation. In December 1965 Falrock acquired all the outstanding stock of Concord Control, Inc., (Concord) from Computer Systems, Inc. On January 14, 1966, Falrock *754 purchased 386,952 shares of Alsco, Inc., from Kaiser Aluminum & Chemical Sales, Inc., for a cash consideration of $4.25 per share; 25,000 of the shares purchased were for Irwin C. Keefer, an associate of Stone in Chromcraft.Falrock became the record holder of approximately 44 percent of the outstanding shares of Alsco, and the other 56 percent was widely held. The investment in Alsco was an investment of funds emanating from the Chromcraft Swiss Fund in which investment Rosenbaum and the Chromcraft Swiss Fund were to share equally in both profits and losses. To effect the purchases of Republic, Concord, and Alsco stocks, Falrock borrowed from John Seabrook, Falrock's president, who in turn borrowed from Pacific Enterprises, Inc. Pacific received funds from drafts drawn on the Agencia account. The amount of $245,745.81 was loaned by Pacific to Seabrook in December 1965 for the acquisition of Concord. Two hundred twenty-five thousand dollars of Pacific's funds were obtained from the Agencia account and reflected on its books as a loan from Finanz A.G. Rosenbaum, in arranging to use money from the Chromcraft Swiss Fund for the investments in Republic and Concord, informed *755 Stone that he intended to borrow from the Chromcraft Swiss Fund and would repay it. If there were a loss, Rosenbaum agreed that he would see that the money was returned with interest. The money used to purchase Concord was ultimately returned to the Chromcraft Swiss Fund, together with a portion of the profit. The amount of $400,000 was loaned by Pacific to Seabrook in October 1965 for the acquisition of Republic stock and for loans to Republic. Three hundred fifty thousand dollars of Pacific's money for the loan to Seabrook was obtained from the Agencia account, and reflected on Pacific's books as a loan payable. In December 1966, Falrock purchased 5,283 units of Republic's subordinated income debentures and warrants for an aggregate cost of $264,150. In January 1969, Falrock exercised the warrants and acquired an additional 158,490 shares of Republic common stock at a total cost of $293,206, which increased its holdings in Republic to approximately 90 percent of the total common stock outstanding. Proceeds of $322,125 realized by Falrock on the sale of Alsco stock and of Concord stock, after paying income tax on the gains realized, were either loaned to Republic, or *756 returned to Pacific in repayment of loans and then returned by Pacific to the Agencia account. In January 1969, the United States filed essentially similar actions in the United States District Court for the Eastern District of Missouri and the United States District Court for the District of Columbia, seeking recovery of damages from Stone, Rosenbaum, Chromcraft, and Alsco as the result of an alleged multi-million dollar fraud on the United States perpetrated by Stone and Rosenbaum through Chromcraft and Alsco from 1963 to 1967. Various other actions seeking damages were brought by other parties in different jurisdictions. Upon motion of Stone and Rosenbaum for consolidated pre-trial proceedings in the various actions brought in connection with the alleged fraud, the judicial panel on multidistrict litigation concluded that all related actions should be transferred to the District of Columbia for coordinated or consolidated proceedings. For purposes of the consolidated proceedings, the said consolidated actions were referred to by the United States District Court for the District of Columbia as "In the Matter of Alsco-Harvard Fraud Litigation, Docket No. 54." The Alsco-Harvard *757 Fraud Litigation was the subject of a "Stipulation of Compromise and Settlement" on August 16, 1976. The defendants waived all rights in the 113,000 shares of Alsco stock registered in the name of Finanz and the 253,452 shares of Alsco registered in the name of Falrock, and Harvard and its shareholders dismissed on the merits and with prejudice all their claims against each of the settling defendants. Stone also dismissed certain claims he had asserted against Harvard. Such settlement was subject to the prior rights and claims of the United States. The 113,000 Alsco shares in the Agencia account registered in the name of Finanz and the 253,452 shares of Alsco registered in the name of Falrock were recovered by Harvard but surrendered to the United States with the understanding that Harvard may reacquire those shares from the United States. Harvard has subordinated in favor of the United States its claim to the money in the Agencia account and any shares of Alsco stock in the Agencia account which had become Harvard preferred shares. Harvard has also agreed to subordinate to the United States its claims against the assets of Falrock, including shares held by Falrock in Heath-Techna *758 corporation (into which Republic was merged in April 1969) and in Concord. The United States, to whom Harvard subordinated its claims, has a continuing trust action against the assets of Falrock. Issue 1
OPINION The question presented in this first issue is whether Stone and Rosenbaum are properly chargeable with income for certain amounts disallowed as deductions to Chromcraft. Respondent has determined (or claimed in his amended pleadings) that Stone received constructive dividends from Chromcraft to the extent of the amounts disallowed as deductions. As to Rosenbaum, respondent's position is that identical amounts are "unreported income * * * representing funds accruing to [his] benefit from [his] manipulation of transactions to divert monies arising from contracts between Chromcraft [and Alsco] and the United States Government." The case of Stone will be considered first. Section 316(a) defines "dividend" in language requiring the satisfaction of four criteria: There must be (1) a "distribution" of property (2) "made by a corporation" (3) "to its shareholders" (4) *759 "out of its earnings and profits." There is no requirement that the distribution be made pursuant to a formal declaration. Informal withdrawals and distributions, although characterized by the parties as other than dividends, must be taxed as such if the statutory criteria are met. Commissioner v. Makransky,321 F.2d 598 (3d Cir. 1963), affg. 36 T.C. 446 (1961). The motive, or expressed intent of the corporation is not determinative, and constructive dividends have been found contrary to the expressed intent of the corporation. Loftin and Woodward, Inc. v. United States,577 F.2d 1206 (5th Cir. 1978) revg. and remanding an unreported District Court decision; Sachs v. Commissioner,277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959). There is also no requirement that the distribution be pro rata among the shareholders or even that all shareholders participate in receiving a distribution. Crosby v. United States,496 F.2d 1384 (5th Cir. 1974), revg. on other grounds an unreported District Court decision; Simon v. Commissioner,248 F.2d 869 (8th Cir. 1957), revg. *760 a Memorandum Opinion of this Court.
Where controlling shareholders divert corporate income to themselves, the courts have held it is proper to regard such diverted funds as constructive dividends for tax purposes. [9]Sachs v. Commissioner,supra;Dawkins v. Commissioner,238 F.2d 174 (8th Cir. 1956), affg. a Memorandum Opinion of this Court; Currier v. United States,166 F.2d 346 (1st Cir. 1948), affg. 70 F. Supp. 219 (D. Mass. 1947); United Mercantile Agencies, Inc. v. Commissioner,23 T.C. 1105 (1955), revd. on another issue sub nom. Drybrough v. Commissioner,238 F.2d 735 (6th Cir. 1956); Chesbro v. Commissioner,21 T.C. 123 (1953), affd. 225 F.2d 674 (2d Cir. 1955). Neither does the dividend escape taxation simply because it fails to pass through the hands of the particular taxpayer when, as in the instant case, the dividend is diverted at the behest of the taxpayer into the hands of others. Sammons v. United States,433 F.2d 728 (5th Cir. 1970), *761 affg. an unreported District Court decision; Biltmore Homes,Inc. v. Commissioner,288 F.2d 336 (4th Cir. 1961), affg. a Memorandum Opinion of this Court. The shareholder is taxable on the distribution of corporate earnings made at his demand or request to a third person for some purpose or obligation which he wished to fulfill, even though he, himself, received no direct economic gain. Sachs v. Commissioner,supra;Greenspon v. Commissioner,229 F.2d 947 (8th Cir. 1956), revg. on another issue 23 T.C. 138 (1954); Byers v. Commissioner,199 F.2d 273 (8th Cir. 1952), affg. a Memorandum Opinion of this Court; Commissioner v. Makransky,supra.
The courts, in determining the existence of constructive dividends, have consistently used a two-pronged test. First, the corporation must have conferred an economic benefit on the shareholder *762 without expectation of repayment. United States v. Smith,418 F.2d 589 (5th Cir. 1969), revg. and remanding 266 F. Supp. 814, (S.D.Tex. 1967). This part of the test is based upon the assignment of income principle enunciated in Helvering v. Horst,311 U.S. 112, 116-117 (1940), wherein it was explained that income is realized by the assignor when he "who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants." [10] Second, the corporation-provided benefits must primarily advance the shareholder's personal interest as opposed to the business of the corporation. Ireland v. United States,621 F.2d 731 (5th Cir. 1980), affg. on this point an unpublished District Court opinion; Sammons v. Commissioner,472 F.2d 449 (5th Cir. 1972), affg. on this point a Memorandum Opinion of this Court; United States v. Gotcher,401 F.2d 118 (5th Cir. 1968), affg. on this point 259 F. Supp. 340 (E.D. Texas 1966). *763 The determination of a constructive dividend is a question of fact to be determined in each case. Hardin v. United States,461 F.2d 865 (5th Cir. 1972), affg. on this point an unpublished District Court opinion; Lengsfield v. Commissioner,241 F.2d 508 (5th Cir. 1957), affg. a Memorandum Opinion of this Court.On the facts before us, and for the following reasons, we cannot find either that the payments made to Scientific, Bregman, and Western were without economic benefit to Stone, or that they advanced the corporation's interest. Consequently, a portion of such payments resulted in constructive dividends to Stone. Turning next to the case of Rosenbaum, who was not a Chromcraft stockholder, respondent's determination is that Chromcraft's payments to Scientific, Bregman, Republic, and Western were Rosenbaum's "unreported income * * * representing funds accruing to your benefit * * *, etc." The impact of the holding just made in regard to Stone is that a portion of such payments (with the exception of those made to Republic, see infra) were Rosenbaum's *764 income and that they were properly included in his income by respondent. (a) Scientific Electronics, Ltd.--Stripped of details, the facts are appallingly simple. Chromcraft purchased raw materials and sent them to Wolf for assembly; it then paid Scientific the full cost of labor and materials, with Scientific, at Stone's direction, forwarding the labor costs to Wolf. Scientific, headed by Schwartz, then transferred portions of the surplus payments from Chromcraft to Swiss bank accounts controlled by Rosenbaum and, at times, Stone as well. We note at the outset that petitioners [11] have conceded the existence of the above transactions. However, they contend the plan to accumulate funds in Switzerland was effectuated for corporate, not personal, purposes, e.g. rocket launcher promotion, investments, and corporate acquisitions, and that they therefore had no personal interest in the Swiss funds. As proof of this they argue, as they did many times at trial, that they never used the Swiss funds for personal purposes and that any withdrawals of those funds were viewed by them as "borrowings" and repaid with interest. They contend, moreover, that the moneys paid by Chromcraft *765 to Scientific cannot possibly be attributed to them as income in the amounts and at the times the moneys left Chromcraft because they had no control over Scientific or its president, Schwartz. If Schwartz had refused to pay the foreign invoices, they argue, their only recourse would have been for Chromcraft to bill Scientific for the moneys owed it for the raw materials. It is well settled that the burden is on the taxpayer to prove by a preponderance of the evidence that the specific transfer of funds determined by the Commissioner to be dividend income was in fact a bona fide payment for a corporate business purpose. Welch v. Helvering,290 U.S. 111 (1933); Gurtman v. United States,237 F. Supp. 533 (D.N.J. 1965). The primary factual determination is recognized to be the intention of the shareholder-officer of the corporation at the time the transfer is made. Commissioner v. Makransky,321 F.2d 598 (3d Cir. 1963); Wiese v. Commissioner,93 F.2d 921 (8th Cir. 1938), *766 affg. 35 B.T.A. 701 (1937). To carry the burden imposed upon him the taxpayer must prove that he had a state of mind at the time of withdrawal which included a specific plan to use the money solely for the corporation's business.A vague, uncertain or indefinite intention as to use for corporate purposes at some time in the future is insufficient where the withdrawal places the money in the taxpayer's absolute control and subject to his absolute discretion as to its use. Nasser v. United States,257 F. Supp. 443 (N.D. Cal. 1966); Gurtman v. United States,supra.
In attempting to ascertain Stone's intention at the time of the transfer, we must consider three types of evidence. Nasser v. United States,supra, at 447. First, the testimony of Stone himself which to the extent it is inconsistent with the conclusion we reach, is flatly contradicted by the course of conduct he engaged in. Second, objective evidence contemporaneous with the transfer of funds which is weighed to determine whether it corroborates or contradicts the petitioners' asserted intention. Kaplan v. Commissioner,43 T.C. 580 (1965). *767 Third and last, evidence as to acts subsequent to the date of the transfer which may be considered in light of its consistency or inconsistency with the testimony as to original intent. Baird v. Commissioner,25 T.C. 387 (1955). After consideration of all the evidence, we conclude that the payments from Chromcraft to Scientific were not intended to be nor were they made for a legitimate corporate purpose. Stone's testimony at best showed only sketchy and hypothetical plans for the accumulated funds. Although Stone's testimony was corroborated by that of Rosenbaum, under the circumstances before us Rosenbaum's testimony was no more detailed than Stone's and was equally inconsistent with the course of conduct he engaged in. The contemporaneous objective evidence conveys a contrary intention to that asserted by Stone and Rosenbaum. Stone argues that he was initially hopeful that Scientific would become a full-service supplier of electrical assemblies, thereby taking the place of Insul-8. He asserts that only after it became apparent that Schwartz could not do the job, did he decide to use Scientific to send money overseas for Chromcraft. But it is what he *768 did that decides this case even if it is different from his original plan. And in any event, it is clear that neither Stone nor Rosenbaum ever intended Scientific to be anything other than a conduit for the funds from Chromcraft to Swiss accounts controlled by Stone and Rosenbaum. [12] Scientific had no manufacturing facilities, no production staff, and no purchasing agents. Schwartz was its president by virtue of being Rosenbaum's friend; he had no knowledge of or experience with electrical components. Scientific's paperwork was done by a Chromcraft secretary on Scientific stationery ordered by Stone. Moreover, the funds channeled through Scientific were placed in Swiss bank accounts under Rosenbaum's control, and none of these *769 accounts--not even the one in Chromcraft's name--were listed on any of Chromcraft's ledgers or financial statements. The moneys in these accounts were used for investments by Rosenbaum and "loans" by Stone. No corporations were acquired by Chromcraft, and no amounts were expended for rocket launcher promotion. The $2,000,000 spent on rocket launcher promotion and development was paid from the Chromcraft corporate treasury. Subsequent events likewise convince us the transfers were made to advance the personal interests of Stone and Rosenbaum. When the grand jury investigation was taking place, inquiring into Rosenbaum's affairs concerning Scientific and the Chromcraft Swiss Fund, Rosenbaum paid Schwartz's expenses for a two-week trip to Europe; the payment was made from the Fund. Also, Rosenbaum executed an agreement for Schwartz whereby Schwartz would be held harmless for any taxes or claims arising out of Schwartz's connection with Scientific. Even were we to find as a reason for the transfers the corporate purpose alleged by Stone and Rosenbaum, such purpose would be too vague and indefinite to negate constructive dividend treatment to Stone where "the withdrawal places *770 the money in * * * [his] absolute control and subject to his absolute discretion as to its use." Nasser v. United States, supra at 447. This leads us back to the test of economic benefit outlined earlier. The crucial question here is whether Stone obtained sufficient power and control over the diverted funds or even receipt of the diverted funds to make it reasonable to treat him as the recipient of the income for tax purposes. See Commissioner v. Sunnen,333 U.S. 591 (1948). Such power and control exist where the taxpayer has "freedom to dispose of it at will, even though * * * it may be assailable by someone with a better title to it." Rutkin v. United States,343 U.S. 130, 137 (1952). As the Supreme Court stated in Corliss v. Bowers,281 U.S. 376, 378 (1930), "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." See also Burnet v. Wells,289 U.S. 670 (1933); Helvering v. Horst,311 U.S. 112, 118-119 (1940). *771 We believe the question must be answered in the affirmative. The payments from Chromcraft to Scientific were made and transferred at the direction and control of Stone (in conjunction with Rosenbaum). Some of the money so transferred was used to pay Stone's obligation to Price for services (by Scientific checks to her father, L. T. O'Connell), and some were disbursed to Stone's nephew, Andrew Smith. Additional sums were used to pay the expenses of Scientific and Schwartz. By far the largest amounts (about 80 percent) were transferred to Switzerland and deposited in bank accounts over which Rosenbaum (and at times, Stone) had complete dominion and control. The funds were remitted by Schwartz by checks written as payment on foreign invoices furnished by Stone and Rosenbaum, i.e., the funds were transferred in the amounts and at the times directed by Stone and Rosenbaum. Although Rosenbaum, whom Stone trusted like a brother, was more directly involved with the funds, both men were in the entire elaborate scheme together. Indeed, Rosenbaum kept Stone informed of the important personal applications of the Swiss funds, most particularly the acquisitions by Falrock. We are unpersuaded *772 by petitioners' contention that they had no control over the persona of Schwartz. [13] We must look at what actually happened, not what could have, in determining petitioners' control over Schwartz's actions. Schwartz obviously believed, and so testified, that he was to take orders from Stone and/or Rosenbaum. Schwartz paid the invoices sent to him, and wrote the checks to Wolf, O'Connell, Smith and others as directed. We are likewise unpersuaded by petitioners' attempts to distinguish the many cases cited as the basis for our decision [14] on the grounds that petitioners personally received no money or economic benefit from such money. As we have already found, Stone did use the funds in the Swiss accounts for his personal purposes, and derived economic benefit therefrom. In any event, it is not the enjoyment of income but the power to dispose of income and the exercise of that power that determines whether taxable income has been received. Helvering v. Horst,supra; *773 Sammons v. Commissioner,472 F.2d 449 (5th Cir. 1972). Our finding that the payments from Chromcraft to Scientific were constructive dividends to Stone poses no problem with regard to our stipulated decision entered January 5, 1973, in docket No. 7926-71, pertaining to consolidated returns of Ladevco and Scientific, wherein the receipts by Scientific from Chromcraft were determined to be income to Scientific in fiscal years 1964 through 1966. We have found that the consolidated returns there at issue were filed at Schwartz's suggestion to save tax money and to support the appearance of Scientific as a viable and separate subcontractor to Chromcraft. The stipulated decision does not preclude a determination that the same funds, siphoned through those "corporations," are income to Stone and Rosenbaum. Certainly there can be no bar of res judicata, as the same parties are not before us, nor is there any privity between Scientific or Ladevco *774 and Stone or Rosenbaum. Moreover, there can be no collateral estoppel, as a stipulated decision is "only a proforma acceptance by the Tax Court of an agreement between the parties to settle their controversy for reasons undisclosed." Unless we can say that the decision reflected an adjudication on the merits, it has no greater effect than a compromise of the parties. United States v. International Bldg. Co.,345 U.S. 502, 505 (1953). Finally, it is clear that respondent was unaware when these settlements were reached that the corporations were simply conduits for Stone and Rosenbaum. Indeed, an essential part of the fraudulent scheme was keeping this knowledge from the Government. As our analysis of the facts before us reveals that Stone did receive constructive dividends from Chromcraft during the years in issue, it remains for us to determine the amount. Stone and Rosenbaum had each an undefined, percentage interest in the Swiss funds, which has never been specified in amount. We believe the two were equally involved in the diversion and transfer of funds; they therefore should share equally in the amounts diverted and transferred. We conclude, *775 then, that Stone is chargeable with having received as constructive dividends 50 percent, or one half of the payments from Chromcraft to Scientific in the years and amounts as determined by respondent. We have just stated that Stone and Rosenbaum were equally involved in the "scheme" to divert money to Swiss bank accounts, as described earlier. Respondent's determination that such moneys were "unreported income" to Rosenbaum "representing funds accruing to [his] benefit, etc." must be upheld in view of our decision with regard to Stone. Rosenbaum, therefore, received unreported income equal to 50 percent or one-half of the payments from Chromcraft to Scientific in the amount and years determined by respondent. (b) Bregman Electronics, Inc.--The situation with respect to Bregman closely parallels, if it is not identical with, the situation regarding Scientific. Chromcraft continued to purchase raw materials for assembly by Wolf; Bregman now was the repository of the difference between the amounts paid by Chromcraft for the completed units and the labor costs of Wolf. Bregman, through its president Robert Bregman, made payments on fictitious foreign invoices and issued *776 various checks at the direction and control of Stone and Rosenbaum. The payments overseas were deposited in a Swiss bank account over which Rosenbaum at all times had control. The payments to Bregman were for the purpose of accumulating funds in Switzerland for use by Stone and Rosenbaum. Bregman was merely a conduit for the funds from Chromcraft to the Swiss account, or in the words of Rosenbaum, a "company to run paperwork through." Bregman had no manufacturing facilities, no production staff, and no purchasing personnel. Robert agreed to be the president of Bregman as a favor to Rosenbaum; he had no knowledge of or experience with electrical components. Stone's secretary continued to do the paperwork involved. After the Chromcraft-Bregman phase was ended, Rosenbaum staked Robert in a business in Europe, and made additional funds available to him from the Swiss accounts. During the pendency of the criminal investigation against Stone and Rosenbaum, Rosenbaum made payments to Robert to ensure his cooperation. The payments by Chromcraft to Bregmen were made under the same circumstances and for the same purposes as set forth in the discussion regarding Scientific. Accordingly, *777 50 percent or one-half of such payments disallowed by respondent, in the amounts and years determined, are constructive dividends to Stone.[15] The other 50 percent or one-half of the payments are "unreported income" to Rosenbaum. (c)(1) Republic Electronics Industries, Inc.--Zuni Rocket Launcher--The findings of fact on this issue reveal that in January 1977, Chromcraft paid Republic $225,000 for the latter's rights to the Zuni rocket launcher, which Republic had acquired from its former controlling stockholder (Belock Instruments Corporation), and $30,000 later in the year to enable Republic to continue work on the development of the Zuni. After considering the evidence, we believe the price paid for the rights to the Zuni was a fair and reasonable one. The $30,000 payment for further development costs was based upon estimates by Republic's engineers. There is, and can be, no question that *778 Republic was a viable corporate entity, separate and distinct from Chromcraft. Stone was not an officer, director, or shareholder of Republic, although Rosenbaum had an indirect ownership interest in Republic through Falrock. In our opinion, the payments by Chromcraft to Republic for the rights to the Zuni and to enable Republic to continue development of the Zuni were proper disbursements by Chromcraft and advanced Chromcraft's corporate purposes. The amounts so paid to Republic were deposited in its bank account, and were reported as income on its Federal income tax return. None of the moneys were ever transmitted to the Swiss bank accounts, and none were remitted to Stone or to Rosenbaum. We conclude the Chromcraft payments did not confer an economic benefit upon Stone and do not constitute constructive dividends to him. Inasmuch as those payments were the income of Republic, they were not the "unreported income" of Rosenbaum. (c)(2) Republic Electronic Industries, Inc.--Purchases of Materials--This issue was raised by respondent in his amended pleadings. Accordingly, respondent has the burden of proof on this issue. Rule 142(a). From the evidence, it is established *779 to our satisfaction that Republic was from the beginning envisioned as a functioning full-service supplier of electrical assemblies to Chromcraft. Shortly after Belock's 62 percent interest in Republic was acquired by Falrock, Chromcraft, in November 1965, issued two purchase orders to Republic for electrical assemblies. These were followed by two more in December 1965. Due to its commitments under Government contracts for navigation equipment, Republic was unable to fulfill its orders from Chromcraft with the requisite promptness, and, at Stone's suggestion, turned to Wolf to perform the necessary labor. Republic itself did ultimately fully perform on the two November purchase orders. The Wolf arrangement continued until July 1967 when the Tenbrook division became operational. From and after July 1, 1967, respondent has made no claim for increased deficiencies from Stone and Rosenbaum, presumably because he considers the Chromcraft-Republic relationship after that date to be entirely regular. The evidence is that Republic on occasions even after Tenbrook became operational continued to utilize Wolf when necessity required. The payments which Chromcraft made to Republic represented *780 the cost of completed electrical assemblies which Chromcraft used in the manufacture of rocket launchers. All of such payments were deposited in Republic's own bank account and included in its own tax returns. Respondent has made no dollar adjustment to Republic's income. None of those payments were transmitted to Switzerland and none were kicked back to Stone or to Rosenbaum. Respondent's assertions to the contrary notwithstanding, our conclusion is that Chromcraft did not pay inflated invoices from Republic. The prices charged by Republic for electrical assemblies were competitive with quotations Chromcraft had received from other companies. The prices charged after Tenbrook, about which respondent has evinced no concern, were in line with Republic's prices to Chromcraft prior thereto. We conclude the Chromcraft payments to Republic for completed electrical assemblies advanced Chromcraft's corporate purpose and did not confer an economic benefit upon Chromcraft's shareholder Stone. Consequently, they did not constitute constructive dividends to Stone.
It is recognized that in the early stages of the Chromcraft-Republic relationship, Republic was in a poor financial condition. *781 It required infusions of working capital, and to meet this need of its supplier Chromcraft made advances on its purchase orders to Republic. Two observations must be made. First, advances to suppliers were not unusual in either Chromcraft's experience or in Republic's experience. Second, Chromcraft received full deliveries on all its purchase orders to Republic, including those against which it had made advances. We have found that Chromcraft undercharged Republic for the materials which Chromcraft purchased and furnished to Wolf on behalf of Republic. This was done in order to assure that Republic, Chromcraft's supplier, would be an economically healthy and profitable enterprise. That objective appears a valid one, and it is difficult in any event to figure out how such undercharging could give rise to constructive dividends to Stone from Chromcraft. The most that can be said is that Chromcraft, not Stone, had a claim against Republic for the amounts by which the latter had been undercharged. Again, the holding that the payments to Republic for electrical assemblies became Republic's income and were not constructive dividends to Stone impels the further conclusion that *782 those payments were not Rosenbaum's "unreported income." If Republic's profitable business with Chromcraft enabled Republic to pay dividends, then Falrock would be entitled to its share, and then Rosenbaum as a 10 percent Falrock stockholder might receive some of the amounts of dividends paid to Falrock if Falrock declared and paid dividends of its own. But that conditional receipt of income sometime in the future hardly warrants charging Rosenbaum with income by virtue of Chromcraft's payments to Republic in the earlier years here involved, as repondent would have it. Similarly, Republic's profitable business with Chromcraft no doubt affected the value of Republic's stock held by Falrock, which still holds the Republic stock (now represented by shares of Health-Techna Corporation, into which Republic was merged in a tax-free exchange in 1969). As and when those holdings are disposed of in a taxable transaction, any gain will be taxable to Falrock, at which point Rosenbaum may realize some benefit as a Falrock shareholder. (d) Western Molded Fibre Products, Inc.--This issue involves kickback-like payments made by Western on phony invoices from foreign companies, the bulk of *783 which payments ended up in Swiss bank accounts under Stone's and Rosenbaum's control. The payments had their origin in a scheme devised by Stone and Rosenbaum: Chromcraft would pay inflated prices for the fairings it purchased from Western, and DeLuca and Austin for Western would forward the overpayments to the Chromcraft Swiss Fund by means of the foreign invoices mentioned above. Pursuant to this scheme, Stone increased prices by $2.96 for each set of 19-round launcher fairings and by $2.82 for each set of 7-round launcher fairings purchased by Chromcraft. It is the total amount of those price increases that respondent has disallowed as deductions to Chromcraft and which he has determined to be constructive dividends to Stone and "unreported income" to Rosenbaum. Our analysis remains the same as in the issues involving Scientific and Bregman.Western served as a funnel through which Stone channelled funds via phoney invoices to the Swiss bank accounts controlled by him and Rosenbaum. The excess payments did not advance Chromcraft's interests, and were not made for a valid corporate purpose. Therefore, if Stone received an economic benefit from or power and control over the *784 diverted funds, we must hold for respondent. As noted earlier, Stone did possess such power and control over the funds as "to make it reasonable to treat him as the recipient of the income for tax purposes." See Commissioner v. Sunnen,333 U.S. 591, 604 (1948). Whatever his motivation, DeLuca clearly felt obligated to remit the funds in his possession to Stone, at Stone's direction. That he did so to the tune of $663,481 is further proof of Stone's power and control. From our previous observations concerning Schwartz and Robert, we cannot believe that Stone would have poured such sums of money into Western if he did not believe DeLuca would pay as directed. We likewise believe that if Stone at any time had perceived his control over DeLuca to be diminishing, he would have discontinued the overpayments. Nowhere do we find evidence of the transferred amounts actually going to "reimburse" Chromcraft, or to pay for any launcher development or promotion. Of the well over $600,000 transferred to the Swiss accounts, only $50,000 of that amount was ever disbursed, and then only to Schwartz, Robert, Vollmer, and others in furtherance of the scheme. From a consideration *785 of all the evidence, including the prolonged testimony of DeLuca which was not very reliable, we conclude that Stone exercised power and control over the disposition of the income in question, and thus should be taxed on that income. Our only concern now is the amount of such income. There is a suggestion in the record that of the $2.96 (19-round) and $2.82 (7-round) price increases per set of fairings, $ .50 was intended to cover Western's own increases in cost. Chromcraft's overpayments then would be $2.46 (19-round) and $2.32 (7-round) per set. Our problem arises from the fact that this calculation would create total diversions from Chromcraft to Western of approximately $550,000 [16] rather than $684,507 as determined by respondent. As stated earlier, the amounts sent overseas by Western and deposited in the Swiss accounts totalled $663,481, and Austin on his own initiative had accrued on Western's books the figures of $2.96 and $2.82 per set to be offset against the payments on the foreign invoices. As these figures more closely correspond with the amounts determined by respondent, we think it is clear that 50 percent of the total overpayments ($684,507) by Chromcraft to Western, *786 95-98 percent of which were ultimately deposited in bank accounts over which Rosenbaum (and Stone by his association with Rosenbaum) had complete dominion and control, are constructive dividends to Stone, [17] and 50 percent of those amounts are then unreported income to Rosenbaum. As the Supreme Court stated in Rutkin v. United States,343 U.S. 130, 137 (1952): An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells289 U.S. 670, 678; Corliss v. Bowers,281 U.S. 376, 378. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it. *787 Issue 2.Constructive Dividends and Unreported Income--Establissements Velo and Orma-Commerce, CEPAB, Finax, Haemmerli, and Scientific
FINDINGS OF FACT (a) Establissement Velo International
Max Vollmer (Vollmer) during the years in issue was a Swiss businessman living in Basel, Switzerland. Rosenbaum became acquainted with Vollmer around 1961 in connection with Vollmer's development of a business in Switzerland known as Mitrolux Lights. Vollmer intergrated Mitrolux into a manufacturing business, Transmatic A.G., in which he had an interest. Transmatic had a sales organization which covered the European countries of NATO promoting the sale of Transmatic's vending machines and Mitrolux's high intensity lights. Stone was introduced to Vollmer by Rosenbaum at Rosenbaum's office in Washington in 1963. Vollmer informed Stone at that meeting, or at a subsequent meeting, of the availability of the Transmatic sales force operating in the NATO countries, which could be utilized to promote the sale of Chromcraft's rocket launchers when Transmatic's sales people called on defense establishments. In 1965, Chromcraft was the low bidder on a $20,000,000 contract with the *788 United States Navy for the manufacture of the Mark XIV and Mark XV Snake Eye bomb fin. The Snake Eye was an aluminum bomb fin, an umbrella-like apparatus that would retard the rate of descent on a bomb dropped by low-flying aircraft on a mission. This enabled the aircraft to depart the area before the bomb exploded and also caused the explosion to occur before the bomb reached the ground, thereby increasing its effectiveness. Due to Chromcraft's heavy involvement in the production of rocket launchers, the Navy persuaded Chromcraft not to undertake the production of the Snake Eye, and turned to other manufacturers. In November 1965, Rosenbaum contacted Vollmer with respect to assuming responsibility for the administration of an entity known as Establissement Velo International (Velo), and Vollmer agreed. Velo was a dormant Liechtenstein establishment, similar to a corporation but with no shares of stock. On December 14, 1965, Velo sent a letter to Les Forges De Zeebrugge, S.A. (Zeebrugge), a Belgian manufacturer of arms and munitions to be described more fully in subsequent issues, in which there was a purported agreement among Velo, Chromcraft, and Zeebrugge to enter into a *789 joint venture for the design, production, and sale of bomb fins in the NATO countries.The substance of the agreement was that, utilizing Chromcraft's engineering and technical knowledge acquired in connection with the submission of its low bid on the Snake Eye, Transmatic would make the hardware for the bomb fins, Zeebrugge would do the assembly, and Transmatic and Zeebrugge would combine efforts in marketing the product. This letter agreement was signed by Vollmer on behalf of Velo at the direction of Rosenbaum. At the time he signed the letter, he had not discussed the proposal to manufacture bomb fins with Rosenbaum, Stone, Mr. Bodinaux on behalf of Zeebrugge, or any of their representatives. On January 18, 1966, Rosenbaum sent a letter to Vollmer requesting that he prepare and mail to Stone as president of Chromcraft an invoice on Velo stationery similar to the one attached to the letter. The model invoice of $87,000 was for engineering research and development for the 7-round French Matra rocket launcher. The letter from Rosenbaum also informed Vollmer that he (Rosenbaum) would soon be opening a bank account for Velo at the Handel Bank in Zurich, and that Vollmer was to *790 receive, sign, and return a signature card thereon.The Velo account was opened on January 31, 1965, and its signatories were Rosenbaum, Stone, and Vollmer. All correspondence with respect to the account and bank statements were to be, and were, sent to Rosenbaum. At the request of Stone, Rosenbaum thereafter obtained several more invoices from Vollmer to Chromcraft, ostensibly for services and materials with respect to rocket launchers. Chromcraft paid such invoices with its checks to Velo on dates and in amounts as follows: January 17, 1966
$ 87,000.00
February 17, 1966
68,000.00
May 7, 1966
83,787.50
May 7, 1966
54,336.00
May 7, 1966
90,504.00
May 9, 1966
10,000.00
June 17, 1966
177,700.00
Total
$571,327.50
The checks were initially deposited in the Velo account at the Handel Bank. The funds were then transferred from the account to the Agencia account in the same bank. None of the services and materials described on the invoices were furnished or supplied to Chromcraft. In 1967, Rosenbaum again called upon Vollmer to execute some documents on behalf of Velo. These documents "substantiated" payments made to Velo by Western (see Issue *791 1(d)) and were sent by Rosenbaum to counsel for Western in connection with the Hawley investigation. Vollmer had no knowledge of the activities described in the documents nor did he have any knowledge of any work done by Velo for Western. Vollmer or Transmatic was paid $190,000 from the Chromcraft Swiss Fund in 1968 and 1969. On its 1966 income tax return, Chromcraft deducted the $571,327.50 paid on the invoices, partly as purchases of materials and partly as purchases of dies and jigs. Respondent disallowed the deductions and determined the amount thereof was a constructive dividend to Stone from Chromcraft, and "unreported income" to Rosenbaum. On October 26, 1967, Chromcraft paid $250 to Velo, representing the charges for shipping fairings to Zeebrugge, and included this amount among its sundry expenses. Respondent disallowed the deduction therefor and determined the amount to be a constructive dividend to Stone and "unreported income" to Rosenbaum in 1967. (b) Establissement Orma-Commerce
In 1963, Chromcraft issued a check to a European entity by the name of Establishment Orma-Commerce (Orma) in the amount of $22,768. After the deduction of a small percentage *792 by Orma as a fee for paperwork and handling, the amount was deposited in the Agencia account at the Handel Bank. The payment was for goods and services never received by Chromcraft. The $22,768 was charged to purchases by Chromcraft, and was disallowed as a deduction by respondent. Respondent determined the amount so disallowed was a constructive dividend to Stone and "unreported income" to Rosenbaum in 1963. (c) CEPAB
In 1965, Chromcraft issued a check in the amount of $52,172 to the order of a European entity known as CEPAB. That amount was deposited in full in the Agencia account at the Handel Bank. The payment by Chromcraft to CEPAB was for goods and services not received. The $52,172 was charged to purchases by Chromcraft, and was disallowed as a deduction by respondent. Respondent determined the amount disallowed constituted a constructive dividend to Stone and "unreported income" to Rosenbaum in 1965. (d) Finax A.G.
In 1967, Finax billed Chromcraft for $8,000 in connection with services having to do with European patents on launcher parts.Some services were rendered to Chromcraft, but the invoice overstated the actual charges for Finax's services. *793 Chromcraft paid the invoiced amount and the funds, after the deduction of a small service fee, were deposited in the Agencia account at the Handel Bank. Chromcraft deducted the amount of its payment to Finax and respondent disallowed the deduction. Respondent determined the $8,000 was a constructive dividend to Stone and "unreported income" to Rosenbaum in 1967. (e) Jorg Haemmerli
Chromcraft made two payments totalling $16,000 to Jorg Haemmerli (Haemmerli) in 1967, on Haemmerli's invoices for research with respect to and copies of certain European patents. Copies of 42 European patents were furnished to Chromcraft and some services were performed by Haemmerli. However, the amounts of the invoices overstated the actual charges of Haemmerli for his services. Chromcraft deducted the amounts of its payments to Haemmerli, which (after deduction of a small service fee) were deposited in the Agencia account at the Handel Bank, and respondent disallowed the deduction. He determined the $16,000 was a constructive dividend to Stone and "unreported income" to Rosenbaum in 1967. (f) Scientific Electronics, Ltd. -- Purchases of Dies and Jigs
Chromcraft made payments *794 to Scientific (the same corporation as in Issue 1(a)) of $50,400 in 1964 and $38,500 in 1965, which amounts were charged as expenses to an account labeled "Dies and Jigs". No such items were in fact purchased or delivered. The proceeds of the checks by Chromcraft paying these amounts were initially deposited in Scientific's bank account in California. As with Orma, Finax, and Haemmerli, the amounts were transferred to the Agencia account at the Handel Bank after the deduction of a small service charge. Respondent disallowed Chromcraft's claimed deductions with respect to these payments to Scientific, and determined the amounts were constructive dividends to Stone and "unreported income" to Rosenbaum of $50,400 in 1964 and $38,500 in 1965. Issue 2
OPINION In the transactions with the various entities involved in Issue 1, Stone, through Chromcraft, made payments to conduit corporations which transferred the moneys received to Swiss bank accounts via foreign entities and phony invoices. The domestic intermediaries (with the exception of Scientific have here been removed. The payments under Issue 2 were made by Chromcraft directly to the foreign entities (for ultimate *795 deposit in the Chromcraft Swiss Fund) on phony invoices submitted directly to Chromcraft. (a) Establissement Velo International--The facts with regard to the payments made to Velo have been set forth in the findings of fact, and there is no need to repeat them here. The facts show, and our conclusion is, that the $571,327.50 which was paid to Velo in 1966, on invoices for goods and services which were not furnished or rendered, was for the purpose of transferring funds to Switzerland for the personal benefit of Stone and Rosenbaum. Rosenbaum has conceded that the payments were made for goods and services never received or rendered. Petitioners contend, however, that the purpose of those payments was to accumulate a fund in Switzerland for the development, production, and promotion of the Snake Eye bomb fin. They seek to discredit Vollmer's testimony that he knew of no such plan by arguing that Vollmer's deposition was self-serving and taken from prepared answers to the interrogatories. [18] Vollmer's testimony could be no more self-serving than that of Stone and Rosenbaum; we see no reason to discount it on this basis alone, particularly when the documentary evidence supports *796 Vollmer's assertions that his duties were merely clerical in nature, encompassing only the writing of correspondence and execution of documents at Stone's and Rosenbaum's direction. Vollmer was not even in charge of the Velo bank account. True, he was a signatory on that account along with Stone and Rosenbaum, but all the correspondence and statements with regard to the account were to, and did, go to Rosenbaum. We likewise find little merit in the contention that Vollmer read his answers to the interrogatories. The vice consul and deposing officer has certified that "on each instance when the witness referred to his notes and memoranda and certain exhibits, it is my opinion he did so for the purpose of refreshing his memory so as to permit him to testify to matters of his personal knowledge." We can find no evidence beyond the original tripartite (Chromcraft, Velo and Zeebrugge) collaboration agreement of any intent for or actual work done on the Snake Eye joint venture. Supposedly the NATO countries learned of the United States' *797 troubles with the Snake Eye in Vietnam and lost interest. We find this explanation too convenient and too improbable to believe. We have found that during the Hawley investigation Vollmer accommodated Rosenbaum by writing letters to Western "substantiating" payments by it to Velo.Those letters were admittedly fabricated, and we believe the present transactions followed a similar pattern. As there was no corporate purpose for the payments to Velo, and as Stone and Rosenbaum received complete dominion and control over the funds paid (first in the Velo account and later when they were transferred to the Agencia account), it is proper to tax Stone on the receipt of one-half of such funds as constructive dividends. [19] The remaining one-half is properly chargeable to Rosenbaum as "unreported income." In 1967, Chromcraft paid $250 to Velo. This represented the cost of shipping fairings to Zeeburgge, and was deducted by Chromcraft as an expense. Respondent disallowed the deduction, and charged the $250 to Stone as a constructive dividend from Chromcraft and as "unreported income" to Rosenbaum. We are satisfied that the expenditure was a proper *798 corporate expense, although the services were obviously performed by some entity other than Velo. The expenditure advanced the corporate purpose of Chromcraft, conferred no economic benefit on Stone, and is not a constructive dividend to him. Neither is that amount chargeable as income to Rosenbaum. (b), (c), (d), (e), and (f) Orma-Commerce, CEPAB, Finax, Haemmerli, and Scientific--The findings show that amounts were paid in the various years by Chromcraft on invoices supplied by the above-named entities and individual for goods and services, which goods and services were in whole or in part never furnished or rendered to Chromcraft. The principal purpose of the payments was to build a fund overseas for the personal investments and uses of Stone and Rosenbaum. For the same reasons set forth above on Issue 2(a), involving the payments to Velo, our conclusions are that 50 percent or one-half of the amounts paid to Orma, CEPAB, Finax, Haemmerli, and Scientific are taxable each to Stone as constructive dividends and to Rosenbaum as "unreported income." Issue 3. Constructive Dividends and Unreported Income--S.I.D, GEAG, Pacific, Schendell
FINDINGS OF FACT (a) *799 Scientific Industrial Development, Ltd.
Scientific Industrial Developments, Limited (SID) was an engineering consulting firm with its offices in London, England. The owner and president of SID was an engineer named Fred Charnock. SID performed services on behalf of Chromcraft related to the promotion of the sale of rocket launchers in England and British Commonwealth countries. It was also a client of Rosenbaum's law firm, GRM&W, and Rosenbaum was the firm's partner who handled the SID account. Rosenbaum had business transactions with SID which were not related to Chromcraft. SID had a regular bank account in a London bank. In addition, an account in the Union Bank of Switzerland (the Union Bank) was opened in 1963 to handle joint operations of Rosenbaum and Charnock, but this account was used basically by Rosenbaum for his own purposes. Rosenbaum and Charnock were the signatories on the SID account in Switzerland. Stone was not aware of the existence of that account until he saw the endorsements on checks at the time of the Tax Court trial in these cases. In 1962, SID rendered services to Chromcraft, for which it billed Chromcraft in the amount of $15,000. Chromcraft *800 paid that amount in 1963 by two checks which SID deposited to its regular bank account in England. In 1963, SID rendered services to Chromcraft, for which it billed Chromcraft in the amount of $3,000. Chromcraft paid that amount by its check of December 23, 1963, which check was deposited in the SID account in the Union Bank. In 1966, SID rendered services to Chromcraft, for which it billed Chromcraft in the amount of $48,000. Chromcraft paid that amount by its check of August 29, 1966, which check was deposited in the SID account in the Union Bank. The reason for the deposit of the last two mentioned checks in the SID account in the Union Bank was that SID owed fees to GRM&W which were unpaid, due to British currency control restrictions. Rosenbaum arranged to have Chromcraft's checks to the order of SID sent to the Union Bank so that Rosenbaum could be certain of being paid. Charnock was aware that the checks were being deposited in that Swiss bank account. In 1967, SID rendered services to Chromcraft, for which it billed Chromcraft in the amount of $25,000. Chromcraft paid $18,500 of that amount in 1967, and the remainder in 1968. Chromcraft's checks in payment *801 of the $18,500 in 1967 were deposited by SID in its regular bank account in London. Respondent disallowed Chromcraft's deductions for payments to SID of $15,000 in 1963, $48,000 in 1966, and $18,500 in 1967. Respondent determined the foregoing amounts were constructive dividends to Stone from Chromcraft, and "unreported income" to Rosenbaum for the respective years in which Chromcraft made the payments to SID. SID was also paid for its services to Chromcraft with moneys taken from the Agencia account, which payments are not involved under the present issue. No part of the payments to SID was returned to Stone or disbursed for either his benefit or that of any member of his family. (b) GEAG, Aktiengesselschaft
In December 1962, Chromcraft bought from GEAG the rights to a German patent, for which it was billed by GEAG in the amount of $15,000. The patent pertained to filters and switches used in the production of rocket launchers. Chromcraft paid GEAG's invoice by its check to the order of GEAG in March 1963. Chromcraft deducted the payment as an expense on its 1963 return, and respondent disallowed the claimed deduction. Respondent determined the $15,000 thus *802 disallowed as a deduction to Chromcraft was a constructive dividend to Stone from Chromcraft, and "unreported income" to Rosenbaum, in 1963. (c) Pacific Enterprises, Inc.
As stated earlier in connection with Republic, Pacific Enterprises, Inc. (Pacific), was incorporated on June 4, 1957. Its place of business was located in the offices of Rosenbaum's law firm, GRM&W, in Washington. It kept its books and records on the accrual method of accounting and filed its income tax returns on a calendar year basis. Prior to March 1, 1965, Rosenbaum and his brother, Joseph, each owned a record 20 percent of the 250 shares of Pacifichs outstanding stock. The remaining shares were held of record in equal shares by three other persons as nominees for Rosenbaum. On March 4, 1975, Finanz A.G., a Liechtenstein corporation, acquired of record 375 newly issued shares of Pacific stock as a nominee of Rosenbaum. Stone was not a shareholder, officer, or director of Pacific. Rosenbaum was president of Pacific; Louis Hoppe, a partner in GRM&W, was the secretary of Pacific; and Joseph Rosenbaum was its treasurer. Pacific performed services for Chromcraft with respect to sales promotional work *803 with foreign embassies and with foreign defense missions in Washington. Some work was also performed by Pacific for Chromcraft which entailed travel overseas. Pacific never billed Chromcraft for the legal work of GRM&W, but GRM&W did occasionally bill Chromcraft for nonlegal services of rocket launcher promotional work, such as when Rosenbaum conferred with armament manufacturers for Chromcraft while in Europe on other business. In 1965, Chromcraft paid Pacific $70,500 for the latter's services actually rendered in connection with the 1964 promotional development of rocket launcher business and for work in 1965 on a 7-round Zuni rocket launcher program for Canada, Japan, and NATO countries. In 1966, Chromcraft paid Pacific $40,000 for services actually rendered in connection with an investigation of 36-round rocket launchers produced by Contraves, Switzerland, necessary engineering changes required by the Canadian government, and promotional work with Australian and New Zealand governments. The $70,500 received by Pacific from Chromcraft in 1965 and the $40,000 Pacific received from Chromcraft in 1966 were deposited in Pacific's account at the American Security Bank & Trust *804 Co. in Washington and reported in Pacific's income tax returns for those years. Those returns were extensively audited by respondent's revenue agents and special agents whose reports accepted the income reported on those returns. None of those amounts were remitted as a kickback to either Stone or Rosenbaum. Chromcraft deducted the above amounts as expenses on its 1965 and 1966 Federal income tax returns. Respondent disallowed those claimed deductions by Chromcraft. Respondent determined the $70,500 and the $40,000 were constructive dividends to Stone from Chromcraft, and "unreported income" to Rosenbaum, in 1965 and 1966, respectively. (d) Harold E. Schendell
Harold E. Schendell (Schendell), a resident of Paris, France, had at one time been employed in the economics field by NATO. In the late 1950's, he became employed by Chromcraft to promote the sale of military office and quarters furniture manufactured by Chromcraft to the defense establishments of member countries of NATO. In the 1960's, after Chromcraft became heavily involved in the manufacture of rocket launchers, Schendell was placed in the employment of SID, at Chromcraft's suggestion, to promote the *805 adoption of the 2.75 inch rocket launcher by the NATO countries which were then using a launcher that fired a slightly different sized rocket. SID, although continuing to employ Schendell, in 1966 refused to pay him his salary. Schendell then sought payment from Chromcraft. In 1966, Rosenbaum paid Schendell $13,500 from the Chromcraft Swiss Fund.This payment is not involved under this issue. In 1967, Schendell sent invoices totaling $33,000 (11 months at $3,000 per month) to Chromcraft.Chromcraft paid those invoices with its checks in 1967 to the order of Schendell, totaling $33,000. Schendell deposited those checks in his bank account in Paris. No part of the money paid to Schendell was returned to Stone or to Rosenbaum or expended for their benefit or the benefit of any member of their families. Schendell was the brother of Rosenbaum's then wife's (Jane's) stepfather. Chromcraft deducted those amounts on its tax return as an expense, and respondent disallowed the claimed deduction. Respondent determined the $33,000 thus disallowed as a deduction to Chromcraft was a constructive dividend to Stone from Chromcraft, and "unreported income" to Rosenbaum, in 1967. In *806 1968, Rosenbaum paid an additional $3,000 to Schendell from the Chromcraft Swiss Fund. This payment is not involved under this issue. Issue 3
OPINION (a) Scientific Industrial Developments, Ltd.--SID was a London-based engineering consulting firm which performed services on behalf of Chromcraft related to the promotion of the sale of rocket launchers in England and British Commonwealth countries. SID was also a client of Rosenbaum's law firm (GRM&W), and Rosenbaum was the firm's partner who handled the firm's SID account. Chromcraft made payments to SID in 1963, 1966, and 1967 which respondent has disallowed as deductions to Chromcraft and charged to Stone as constructive dividends from Chromcraft and to Rosenbaum as "unreported income." Based on our consideration of the evidence, we have found that those payments were for SID's services to Chromcraft. We conclude those payments were legitimate expenses of Chromcraft, Advancing its corporate interest. Those payments, none of which were kicked back to Stone, did not confer any benefit upon him as a Chromcraft stockholder and were not constructive dividends to him. Turning to the question of the liability asserted *807 against Rosenbaum in respect to these payments, the evidence shows that $3,000 paid to SID by Chromcraft in 1963 and $48,000 paid to SID in 1966 were deposited in the SID account in Switzerland on which Rosenbaum and Charnock, SID's president, were the signatories. (The other payments here involved were deposited in SID's regular account in London, on which Rosenbaum is not shown to have been a signatory.) To assure that GRM&W received payment of fees owed it by SID, Rosenbaum arranged to have Chromcraft send its check in payment for the services to it, to the order of SID to the Union Bank where the SID account was. Thus, Rosenbaum did gain control of the money that went to Switzerland, but that money was the income of GRM&W from SID for services and was thus the partnership's income which would be reflected in Rosenbaum's distributive share. That money is not, in our judgment, "unreported income" to Rosenbaum from the moment it left Chromcraft, as respondent has determined. Those Chromcraft payments which went to Switzerland, and a fortiori that which went to SID in London, were SID's income and not Rosenbaum's, and respondent erred in determining otherwise. (b) GEAG, Aktiengesselschaft. *808 --In December 1962, Chromcraft bought from GEAG the rights to a German patent, pertaining to filters and switches used in the production of rocket launchers. Chromcraft paid GEAG $15,000 for those rights in the following March 1963. Respondent disallowed the deduction Chromcraft claimed with respect to its payment to GEAG, and determined that the amount so disallowed was a constructive dividend to Stone and "unreported income" to Rosenbaum. The expenditure was a proper one by Chromcraft, advancing its corporate purposes, although it possibly should have been capitalized rather than charged to expenses. Even so, it did not confer any economic benefit to Stone, Chromcraft's stockholder, and did not constitute a constructive dividend to Stone. Chromcraft's payment to GEAG became part of GEAG's income and, contrary to respondent's determination, it was not the "unreported income" of Rosenbaum. (c) Pacific Enterprises, Inc.--Pacific was a corporation of which Rosenbaum was a stockholder and of which he was president. Pacific performed services for Chromcraft with respect to sales promotional work with foreign embassies and defense missions in Washington. In 1965 and *809 1966, Chromcraft paid Pacific's charges for services, described in the findings of fact. Pacific deposited Chromcraft's payments in its (Pacific's) bank account in Washington and did not remit any such amounts as a kickback to either Stone or Rosenbaum. Pacific included those amounts in income on its Federal income tax returns, which were extensively audited by respondent's agents whose reports accepted the income reported on those returns. Chromcraft claimed deductions for its payments to Pacific, which respondent disallowed and determined to be constructive dividends to Stone from Chromcraft and "unreported income" to Rosenbaum. We are satisfied that those payments were for proper corporate purposes of Chromcraft and did not confer an economic benefit upon Stone. Consequently, they were improperly determined to be constructive dividends to him as a Chromcraft stockholder. As regards Rosenbaum, Chromcraft's payments were income to his corporation, Pacific, and reported by it as such. However, they were not the "unreported income" of Rosenbaum, a stockholder who must be treated separate and distinct from the corporation. The benefit to Rosenbaum from the payments will *810 arise when, as, and if Pacific declares and pays a dividend to him. (d) Harold E. Schendell--Schendell lived in Paris. His prior background and experience, as well as the services which we have found to be for the benefit of Chromcraft, are set out in the findings of fact, and there is no need to repeat them here.Suffice it to say that he did perform services for Chromcraft in 1967, for which he billed the corporation. Chromcraft paid Schendell for the services for which it had been billed, and he deposited Chromcraft's checks in his own bank account in Paris and returned none of the amounts which he was paid to either Stone or Rosenbaum. Chromcraft deducted the $33,000 which it paid to Schendell in 1967. Respondent disallowed the deduction and determined that amount to be a constructive dividend to Stone and "unreported income" to Rosenbaum. While there may be some doubt that Schendell was worth the full $33,000 which Chromcraft paid him in 1967, so that if Chromcraft's case was before us the full amount might not be found to be deductible, there is no evidence that any of the amount redounded to the economic benefit of Chromcraft stockholder Stone. We conclude the *811 amount paid to Schendell was not a constructive dividend to Stone from Chromcraft. As to Rosenbaum, he got none of the money paid to Schendell and there is no evidence that the payments were made to Schendell, who was the brother of Rosenbaum's then wife's stepfather, for Rosenbaum's benefit. The payments were Schendell's income and did not constitute income to Rosenbaum, and it was error for respondent to have set up the amount of those payments as "unreported income" to him. Issue 4. Constructive Dividends and Unreported Income-- Les Forges de Zeebrugge
FINDINGS OF FACT (a) Understated Sales to Les Forges de Zeebrugge
During the taxable years involved, Les Forges de Zeebrugge (Zeebrugge) was a Belgian corporation engaged in the manufacture and sale of arms and munitions. It became affiliated in 1960 with Chromcraft in the promotion of the 2.75 inch rocket launcher in European countries. In 1961, Zeebrugge entered into an agreement formalizing its arrangements with Chromcraft, under which, among other things, Chromcraft was to sell to Zeebrugge, at prices and on terms to be negotiated from time to time, such manufactured parts of rocket launchers, and such *812 tools, dies, jigs, and fixtures and machinery for use in the manufacture of rocket launchers as Zeebrugge should request from Chromcraft. Stefan Czarnecki, a Nicaraguan citizen residing in France, had been engaged by Zeebrugge for a number of years prior to the Chromcraft-Zeebrugge arrangement, in the promotion of the sale of armaments. An underatanding was reached between Zeebrugge and Chromcraft that the two companies would share in the payment of Czarnecki for his promotional services. At the time of the onset of dealings between Chromcraft and Zeebrugge in 1960, Belgium had currency restrictions on the conversion of Belgian francs into U.S. dollars but not into Swiss francs, the latter of which could be converted into dollars in Switzerland. As stated earlier, in 1960 an account for Chromcraft was opened at Rosenbaum's suggestion in the Union Bank of Switzerland in Aarau, Switzerland. This account was maintained through 1970. [20] The account served the dual purposes of enabling Chromcraft to be paid in dollars for the goods it sold to Zeebrugge and of providing a fund for the payment of Czarnecki for his services. *813 The method worked out for implementing those purposes was as follows: On certain shipments that Chromcraft made to Zeebrugge, Chromcraft would prepare two invoices--one in an amount higher than the normal sales price for the goods, and one at a price lower than the normal.The invoice for the higher amount was sent to Zeebrugge for payment, while the invoice for the lower amount was recorded on the books of Chromcraft as an account receivable. Zeebrugge orders received at Chromcraft in St. Louis were routed to Stone's secretary, Price, who then brought them to the attention of Stone. Through the collaboration of Price and Stone, with respect to certain (but by no means all) of the sales to Zeebrugge, two invoices, would be prepared, as just mentioned, with respect to the same order received from Zeebrugge. One invoice, called the master factory copy, would be used by Chromcraft for its in-house procedures, and it would reflect a price lower than the normal selling price. The amount of the lower invoice was recorded as a receivable on Chromcraft's books, while the higher invoice was sent to Zeebrugge for payment. The higher invoices were not distributed through Chromcraft in *814 its ordinary course of business, but were kept in Price's desk drawer. In determining the differential between the amount actually billed to Zeebrugge and the amount recorded as a receivable on Chromcraft's books for the same sale, there was no standard percentage discount or formula used by Stone. The purpose of the differential between the two amounts was to provide funds for payment to Czarnecki. Based upon the billings that it received, Zeebrugge would make bank transfers from its account in Belgium to the Chromcraft account in the Union Bank. Rosenbaum, who was initially the only signatory on that account (Stone became a signatory thereon in 1964), periodically remitted to Chromcraft in St. Louis the amounts represented by the lower invoices, as well as the amounts for sales which were not subject to the two-invoice procedure. Stone informed Rosenbaum of the amounts to be thus remitted. By utilizing the two-invoice procedure, Zeebrugge contributed to the moneys paid to Czarnecki the amount by which the higher invoices exceeded the normal selling price while Chromcraft contributed the amount by which the related lower invoices were less than the normal selling price. *815 The Chromcraft account in the Union Bank was not listed in the general ledger of Chromcraft. The only two people at Chromcraft who knew of the two-invoice procedure were Stone and Price. Payments to Czarnecki were measured by the differentials between the invoice amounts in the two-invoice procedure. The payments to Czarnecki, made by Rosenbaum and usually in cash, were not made at regular set times. Those payments began in about 1961 and continued to 1968 or 1969. Approximately $250,000 was paid to Czarnecki during that period, and the payments usually amounted to between $25,000 and $30,000 per year. [21] None of those amounts were repaid by Czarnecki to Rosenbaum. Respondent, in his notices of deficiency, computed the amounts of understated sales of Zeebrugge, on an accrual basis from an examination *816 of the higher and lower invoices for 1965, 1966, and 1967. The amounts so computed were: 1965
$158,059
1966
21,529
1967
13,428
Those amounts were determined by respondent to be constructive dividends to Stone from Chromcraft, and "unreported income" to Rosenbaum, who were on the cash basis. Certain Chromcraft invoices which were dated late in 1965 (in which year the differentials were charged as income to Stone and Rosenbaum) may not have been paid by Zeebrugge until the following year. (b) Unreported Royalties from Les Forges de Zeebrugge
Under the 1961 agreement between Chromcraft and Zeebrugge, Zeebrugge was obligated to pay Chromcraft a royalty of 6 percent on all of Zeebrugge's sales of rocket launchers. That royalty was subsequently changed to 4 percent in March 1965, effective as of March 20, 1961. Royalties which Zeebrugge accrued on its books as due Chromcraft under the agreements were not paid in the amounts of the accruals. The matter of royalties due was settled by and between Chromcraft and Zeebrugge in June 1967, as of May 31, 1967, whereby Zeebrugge paid Chromcraft $7,890. The receipt of this amount is reflected on Chromcraft's *817 books as of May 31. The remaining royalties were waived by Chromcraft to reimburse Zeebrugge for the expenses it had incurred in the development of a reusable fairing and rocket launcher. In his notices of deficiency, by reference to the books of Zeebrugge, respondent determined royalties had been earned by Chromcraft in the following amounts for the years indicated: 1963
$13,793
1964
13,700
1965
101,321
1966
69,201
These amounts were determined by respondent to be constructive dividends to Stone from Chromcraft and "unreported income" to Rosenbaum, in the years and in the amounts set forth above. Issue 4
OPINION In issues 1, 2, and 3, the questions have been whether payments made by Chromcraft and deducted on its returns, which deductions were disallowed by respondent, constitute constructive dividends to Stone and "unreported income" to Rosenbaum. The question under this issue involves (1) sales income which was understated by Chromcraft on its returns, and (2) royalties, claimed by respondent to have been received by Chromcraft from Zeebrugge, which were not included in income at all on Chromcraft's returns. Respondent has determined such *818 sales income and royalties to be dividends to Stone from Chromcraft and "unreported income" to Rosenbaum.
The applicable law, as to which there does not appear to be any dispute by the parties, is that sales proceeds, or some other item of income attributable to the corporation, received by shareholders of the corporation and not reported by the corporation as its income are constructive dividends to the shareholders. Dawkins v. Commissioner,238 F.2d 174 (8th Cir. 1956); United Mercantile Agencies, Inc. v. Commissioner,23 T.C. 1105 (1955), revd. on another issue sub nom., Drybrough v. Commissioner,238 F.2d 735 (6th Cir. 1956). A cash basis shareholder should report such a dividend item in the year of receipt, even though the corporation on the accrual basis would be required to report the item in income in an earlier year. Estate of Stein v. Commissioner,25 T.C. 940 (1956), affd. per curiam sub nom., Levine v. Commissioner,250 F.2d 798 (2d Cir. 1958). (a) Understated Sales to Les Forges de *819 Zeebrugge--Chromcraft's admittedly understated sales on its returns arose from Chromcraft's preparation of two invoices for some of its sales to Zeebrugge, one at a higher price than the other. In instances where the two-invoice procedure was followed, the invoice in the higher amount was sent to Zeebrugge, while the invoice in the lower amount was kept by Chromcraft and set up as the sales amount on its books. To circumvent Belgian currency restrictions, a Chromcraft account in the Union Bank was set up, which account was under the control of Rosenbaum. Zeebrugge paid all of Chromcraft's invoices (the inflated invoices and those not inflated) by transfers of funds to the Chromcraft account in the Union Bank. Rosenbaum then remitted the amounts of the lower invoices as well as the amounts of invoices not inflated to Chromcraft in the United States. That practice of course resulted in the difference between the higher invoice amounts, and the lower invoice amounts remitted to Chromcraft, remaining in Switzerland. That difference is the amount of understated sales which respondent has determined to be constructive dividends to Stone and "unreported income" to Rosenbaum. We *820 believe the purpose of accumulating that differential in Switzerland was to provide resources for the sales promotional efforts of Stefan Czarnecki, who had been engaged by Zeebrugge in the sale of armaments for a number of years. An understanding was reached between Chromcraft and Zeebrugge to share in the payment of Czarnecki, and the two-invoice procedure was the means of accomplishing the sharing. Zeebrugge contributed its share by paying the amount by which the higher invoices exceeded the normal selling price for the goods it bought, while Chromcraft contributed its share by not receiving the amounts by which the lower invoices were less than the normal selling prices for the goods it sold. As a result of the sales differential amount, approximately $255,000 was paid to Czarnecki over the years. Those amounts were not constructive dividends to Stone or "unreported income" to Rosenbaum, and respondent erred in his determinations to the contrary. (b) Unreported Royalties from Les Forges de Zeebrugge-- From the evidence before us, we are satisfied the royalties which Zeebrugge accrued on its books as owing to Chromcraft were never paid by Zeebrugge. Payment thereof was *821 waived by Chromcraft in 1967. Consequently, there is no basis for respondent's determinations that the amounts of those accrued, but unpaid, royalties were a constructive dividend to Stone and "unreported income" to Rosenbaum. Such determinations, in our opinion, should not be sustained. Issue 5. Constructive Dividends--Stone
FINDINGS OF FACT (a) Goodwin, Rosenbaum, Meacham & White
GRM&W was tax counsel to Chromcraft and also rendered services to Chromcraft pertaining to its rocket launcher business. In 1963, GRM&W rendered services to Chromcraft having to do with legal and financial problems relative to the manufacture, sale, and export of rocket launchers. GRM&W billed Chromcraft for its fee, which was reasonable in amount, in the amount of $5,000. Chromcraft paid the bill in 1963 and deducted the amount thereof as a sundry rocket launcher expense. In 1963, GRM&W rendered further services to Chromcraft of the same character as those described in the preceding paragraph, for which it billed Chromcraft for its fee in the amount of $12,000. This fee was reasonable in amount. Chromcraft paid the bill in 1964 and deducted the amount thereof as a sundry rocket *822 launcher expense. In 1964, GRM&W rendered tax-related services to Chromcraft, for which it billed Chromcraft for its fee, which was reasonable in amount, in the amount of $10,000. Chromcraft paid the bill in 1964, and deducted the amount thereof as a legal and professional expense. In 1965, GRM&W rendered special services to Chromcraft concerning various phases of the latter's business, including a study of rocket launcher contracts and licensing arrangements. GRM&W billed Chromcraft for its fee, which was reasonable in amount, in the amount of $11,500. The $11,500 was charged on Chromcraft's books, one-half ($5,750) to legal and professional expense, and one-half ($5,750) to sundry rocket launcher expense. Chromcraft paid the bill and deducted the amounts as legal and professional expense and sundry rocket launcher expense, as allocated. GRM&W deposited Chromcraft's checks in payment of all the fees mentioned under this issue in its (GRM&W's) bank account, and included those amounts in income on its partnership returns. No part of those fees was remitted to Stone or was for services for Stone or any member of his family. Respondent did not disturb the deduction of *823 $5,750 in 1965 for legal and professional expense. However, he disallowed the other $5,750 in 1965 and all of the amounts mentioned above for 1963 and 1964. Respondent determined the amounts so disallowed were constructive dividends to Stone from Chromcraft for the years in which Chromcraft paid the fees. (b) Fred French
Mr. and Mrs. Stone have been married since July 1947.At the time of their marriage, Mrs. Stone was living in a one-bedroom efficiency apartment in Tudor City in New York City. They have maintained that apartment ever since. The address of the apartment is the same address that was used on the Stones' income tax returns for the years at issue, although they have for all relevant years had their residence in St. Louis, Missouri. Mrs. Stone considered the apartment as a place to stay when she was in New York; Mr. Stone stayed at the Waldorf-Astoria when he was in New York. In years prior to the taxable years at issue, Chromcraft had made at least a partial use of the Tudor City apartment for corporate purposes. However, during the years at issue, Chromcraft had leased an apartment at the Delmonico Hotel for those purposes, the expense of which was originally *824 disallowed as a deduction to Chromcraft and determined to be a constructive dividend to Stone by respondent. Respondent has conceded on brief that the Delmonico rent expense is not a constructive dividend to Stone. Chromcraft paid rent on the Tudor City apartment to an individual named Fred French in the following amounts for the years indicated: 1963
$1,265
1964
1,265
1965
959
1966
633
Chromcraft deducted the foregoing amounts as rent expense on its returns. Respondent disallowed the claimed deduction, and determined the amounts so disallowed were constructive dividends to Stone from Chromcraft for the years in which Chromcraft paid the rent. (c) L. M. Stone
L. M. Stone was petitioner Andrew Stone's father. He died of a stroke toward the end of 1967. L. M. Stone graduated from an electrical college in Cincinnati, Ohio, and then went to work for the Pennsylvania Railroad, where he worked for 25 years. Upon his retirement from the railroad, he was a supervisor in the telegraphy system of the railroad. Following his railroad employment, L. M. Stone went to work in the construction business, and was a supervisor in a nitro plant in West Virginia. *825 Thereafter he was with the United States Treasury Department on construction projects until his retirement in 1947. During the years 1963 until his death, L. M. Stone resided in Phoenix, Arizona. He looked after a warehouse in Phoenix owned by Chromcraft and used by it to store furniture. Also during the taxable years, L. M. Stone undertook investigations of various sites which Chromcraft was contemplating acquiring for furniture manufacturing plants and furniture storage warehouses. L. M. Stone made reports of his investigations to petitioner Andrew Stone as president of Chromcraft. Such reports were useful to Chromcraft. L. M. Stone received pensions from the Pennsylvania Railroad, a Secial Security pension, and a Civil Service annuity. He was not dependent upon petitioner Andrew Stone for support. Chromcraft paid an annual retainer fee of $3,000 per year to L. M. Stone for his services for each of the years 1963, 1964, 1965, and 1966. He was not separately reimbursed by Chromcraft for his travel expenses incurred in his investigatory efforts for Chromcraft. No part of the payments to L. M. Stone was returned to petitioner Andrew Stone.
Chromcraft deducted the payments *826 to L. M. Stone as professional fees. Respondent disallowed the claimed deductions and determined the amounts so disallowed were constructive dividends to petitioner Andrew Stone from Chromcraft in the amount of $3,000 per year for each of the years 1963 through 1966. (d) Vivian Smith
Chromcraft leased a house in Glendale, Arizona, near Phoenix, and close to Luke Air Force Base. The house had been leased in the late 1950's after Chromcraft had obtained a contract to supply the furniture for some 700 units in the Thunderbird Homes Subdivision, so-called Capehart housing for the commissioned and non-commissioned officers and their families stationed at Luke Air Force Base. The house had been leased by Chromcraft, at the suggestion of an Air Force officer, as a place to display furniture where Air Force personnel could inspect the furniture before making selections for their homes. After the Thunderbird project had been completed, Chromcraft continued to maintain the display house to display furniture, usable in regular quarters as well as in bachelor officers quarters, to General Services Administration personnel and officers of the Armed Services. Chromcraft's billings *827 to the Armed Services for furniture ranged from two to six million dollars per year. From the days of the Thunderbird project and continuing thereafter until 1962, Virginia Aleen (Virginia), Stone's niece, acted as caretaker for the display house, keeping it clean and opening it upon request when military personnel and others came to inspect the furniture therein with a view to placing orders for furniture from Chromcraft. When Virginia left Phoenix in 1962, her duties were taken over by her mother, Vivian Smith (Vivian), Stone's sister. Chromcraft paid Virginia $50 per week for her services, and when Vivian took over the duties, Chromcraft continued to pay her the same amount. Through inadvertence the checks in payment continued to be drawn to the order of Virginia. Vivian deposited the checks in her bank account, included the amount thereof on her income tax returns, and did not return any portion thereof to Stone. When Stone was in Phoenix, he stayed with his parents and not at the display house.
Chromcraft claimed expense deductions on its returns for the amounts it paid to Vivian for each of the years 1963 through 1967. Those amounts were as follows: 1963
$2,400
1964
2,550
1965
2,500
1966
2,950
1967
2,500
*828 Respondent disallowed the deductions thus claimed by Chromcraft. He determined the amounts thus disallowed as deductions to Chromcraft were constructive dividends to Stone from Chromcraft in the amounts listed above for the years indicated. (e) Southwest Furniture, Inc.
Southwest Furniture, Inc. (Southwest), was one of three furniture-selling enterprises controlled by an individual named Thurmond Witt. Chromcraft had had dealings over the years with all three of the enterprises, and Stone was well-acquainted with Witt, whom he regarded as knowledgeable in the furniture business. Subsequent to Chromcraft's sale of a furniture manufacturing subsidiary, Stone for Chromcraft began considering the acquisition of other furniture manufacturing businesses. In that connection, Stone for Chromcraft enlisted Witt's assistance in the search. Witt traveled in several states in his investigations, and on February 25 and March 31, 1966, Southwest billed Chromcraft in the respective amounts of $7,562 and $7,840 for Witt's services and expenses in connection with his investigations for Chromcraft. Chromcraft paid those amounts, totaling $15,402, and deducted them as expenses on *829 its return. The payments were deposited by Southwest in its bank account, and no portion thereof was returned to Stone or expended for the benefit of his family. Stone was not a shareholder of Southwest. Respondent disallowed the deduction claimed by Chromcraft for the payments to Southwest in 1966. He determined the $15,402 so disallowed as a deduction to Chromcraft was a constructive dividend to Stone from Chromcraft in 1966. Issue 5
OPINION (a) Goodwin, Rosenbaum, Meacham and White--GRM&W rendered various services to Chromcraft which have been described in the findings of fact, for which it billed Chromcraft amounts which have been found to be reasonable in amount. GRM&W deposited the amounts it received in its bank account, and no part thereof was returned to Stone. Chromcraft deducted the amounts it paid to GRM&W and respondent disallowed the deductions.He has charged the amount so disallowed as a constructive dividend to Stone. The evidence satisfies us that the amounts paid by Chromcraft to GRM&W were for proper corporate purposes and that they did not confer any personal economic benefit on Stone. We conclude those payments did not constitute constructive *830 dividends to Stone and it was error for respondent to determine they did. (b) Fred French--The evidence shows that the Chromcraft payments here involved were for rent to an apartment in New York City. Prior to the taxable years, the apartment had been used for corporate business purposes. However, during the taxable years here involved, the sole use of the apartment was by Jeanne when she was in New York City, and that use is not shown to have been in furtherance of any corporate purpose of Chromcraft. Respondent disallowed Chromcraft's deductions for the rental payments and he charged Stone with constructive dividends in the amounts disallowed. We believe the payments were not properly deductible by Chromcraft and did confer a personal economic benefit on Stone by providing a place for his wife to stay while she was in New York City. Accordingly, respondent's determination of constructive dividends to Stone for the amounts paid for rent of the apartment should be sustained.
(c) L. M. Stone--The evidence establishes that throughout the years 1963 through 1966, Chromcraft paid $3,000 per year to L. M. Stone (Stone's father) for services that are described in the findings *831 of fact. The amounts appear reasonable in amount. The payee was receiving three pensions from previous employers, and was not dependent for support on Stone, his son. No part of the payments were returned to Stone. Chromcraft deducted the amounts paid to L. M. Stone as an expense on its tax returns, and respondent disallowed the claimed deductions.He determined the amounts so disallowed were constructive dividends to Stone. The payments served a proper corporate purpose; Chromcraft received L. M. Stone's services for the payments it made to him. Moreover, they did not confer any personal economic benefit on Stone.L. M. Stone was not dependent on Stone for support, and he did not return to Stone any of the amounts which he was paid by Chromcraft. It was therefore error to charge the amounts to those payments to Stone as a constructive dividend, and respondent's determination on this item should not be sustained. (d) Vivian Smith--The evidence establishes that Chromcraft's payments here involved were to Vivian (Stone's sister) for maintenance and upkeep of a house where Chromcraft displayed furniture which it manufactured, and for opening the display house for Government *832 representatives considering the purchase of furniture. Chromcraft sold millions of dollars of furniture to the Armed Services each year. The payments appear reasonable in amount--only $50 per week. Stone did not stay at the display house when he was in Phoenix, and Vivian did not return to Stone any of the amounts which Chromcraft paid her. Chromcraft deducted the payments to Vivian as an expense on its tax returns, and respondent disallowed the claimed deductions. He determined the amounts of such claimed deductions were constructive dividends to Stone from Chromcraft. The evidence convinces us the payments were for a proper corporate purpose and they did not confer any personal economic benefit on Stone. For those reasons, we conclude the amounts of the payments by Chromcraft to Vivian Smith were not constructive dividends to Stone. (e) Southwest Furniture, Inc.--The evidence establishes that Thurmond Witt, president of Southwest, performed services for Chromcraft investigating other furniture manufacturing businesses for possible acquisition by Chromcraft. Southwest billed Chromcraft for the services performed by Witt and his expenses in traveling to make his *833 investigations. Chromcraft paid southwest the amounts of its bills, which Southwest deposited in its bank account. It did not return to Stone any of the amounts paid to it by Chromcraft. Stone was not a shareholder of Southwest. Chromcraft deducted the amounts paid to Southwest as expenses on its tax returns, and respondent disallowed the claimed deduction. He determined the disallowed amount was a constructive dividend to Stone from Chromcraft. The evidence persuades us that Chromcraft's payments to Southwest advanced Chromicraft's corporate purposes and did not confer any persona economic benefit on Stone. We therefore conclude it was error for respondent to determine the amounts paid by Chromcraft to Southwest were constructive dividends to Stone. Issues 6 & 7.Interest Expense Deductions of Stone and Alternate Issue of Capital Gain Reported on Transfer of Alsco Stock.
FINDINGS OF FACT Respondent disallowed deductions for interest expense claimed by Stone on his returns for each of the taxable years involved herein, in the following amounts: 1963
$2,098.55
1964
17,000.00
1965
34,000.00
1966
30,407.43
1967
199,740.65
Petitioners *834 Stone have not made any requested findings of fact or presented any argument on brief with respect to the disallowance for 1963. The amounts disallowed for 1964, 1965, 1966, and 1967 were comprised of the following claimed interest payments by Stone: 1964
Finanz Gesellschaft
$ 14,000.00
L. M. Stone
3,000.00
Total
$17,000.00
1965
Finanz Gesellschaft
$ 31,500.00
L. M. Stone
2,500.00
Total
$ 34,000.00
1966
Finanz Gasellschaft
$ 28,000.00
L. M. Stone
2,400.00
Unidentified
7.43
Total
$ 30,407.43
1967
Finanz Gesellschaft
$189,833.00
PeraltaShipping Corp.
6,227.65
L. M. Stone
800.00
First National Bank of Memphis
2,880.00
Total
$199,740.65
Petitioners Stone have not made any requested findings of fact or presented any argument on brief with respect to the L.M. Stone transactions or with respect to the unidentified amount of $7.43 for the year 1966. (a) Finanz Gesellschaft mbH
In early 1964, Stone borrowed $300,000 from William Kaelin and $300,000 from the First National Bank of St. Louis on a short-term basis to invest in the common stock of K-D Lamp Company. Stone asked Rosenbaum to get him the money to *835 repay these loans and to use whatever money was overseas to the extent it was needed. Rosenbaum had used all the money in the account at that time for personal purposes, so there was none available for Stone's use. Rosenbaum put Stone off by fabricating a representation that he (Rosenbaum) was having difficulty getting funds out of Switzerland due to Swiss currency restrictions. Rosenbaum then embezzled $600,000 from the account of one Francis Vitello, which he deposited in the Agencia account in the Handel Bank on March 4, 1964. On the same date, the bank disbursed the money to Stone. Rosenbaum had caused to be created a three-party agreement dated February 20, 1964, between Finanz GmbH (a German corporation), Agencia Industriale C por A, and Stone, according to which: (1) Finanz GmbH would deliver to the Handel Bank $600,000 for the account of Stone and $60,000 for the account of Agencia, against Stone's note in favor of Finanz GmbH in the principal amount of $700,000, bearing interest at the rate of 4 percent for the first year, 5 percent for the second year, and 6 percent thereafter, payable semi-annually on September 1 and March 1 of each year, together with ten semi-annual *836 installment payments of principal commencing March 1, 1966; (2) Agencia guaranteed payment by Stone of principal and interest on his note to Finanz; and (3) Stone agreed to deposit with Finanz GmbH K-D Lamp stock to be held by Finanz GmbH as collateral. Finanz GmbH was to have the right to convert all or any portion of the $700,000 note into common stock of K-D Lamp on such basis that the total principal amount of $700,000, if fully converted, would represent 49 percent of K-D Lamp common stock. Rosenbaum created the documentation to make the transfer of funds to Stone look like a bona-fide loan, but the loan was totally without substance, and Finanz GmbH was not an actual party to the loan. On June 9, 1964, Finanz GmbH stated in a letter prepared by Rosenbaum for the signature of its officers that it waived the deposit of K-D Lamp stock as collateral. On December 28, 1964, a document purporting to modify the February 20, 1964 agreement was executed by Stone and Finanz A.G., a Liechtenstein corporation (parent of Finanz GmbH) to which, the document recited, the February 20, 1964 agreement had been assigned. The modifications were: (1) payment of the principal was to be made *837 in six semi-annual installments beginning March 1, 1966; and (2) Finanz waived its conversion privilege. In the spring of 1966, Stone requested that Rosenbaum arrange for an increase of the loan by $200,000. On May 11, 1966, an agreement between Finanz GmbH, Stone, and Agencia was entered into, which recited that Finanz GmbH agreed to advance an additional $200,000 to Stone on or before May 31, 1966; Stone agreed to execute a new note to Finanz GmbH in the principal amount of $933,333, bearing interest at the rate of 6 percent, which interest was payable in installments of $28,000 each on December 1, 1966, and June 1, 1967, and the principal amount to become due and payable of June 1, 1967; and Agencia unconditionally guaranteed Stone's payment of principal and interest. Finanz GmbH did not advance the $200,000 to Stone. Instead Rosenbaum made this amount available to Stone from the account of Establishment Velo, one of the accounts which served as a depository of the Chromcraft Swiss Fund. With regard to the above-mentioned embezzlement by Rosenbaum of $600,000 from the account of Francis Vitello, civil and criminal actions were begun against Rosenbaum. Those actions were *838 terminated by Rosenbaum's agreement to repay to Vitello the $600,000, together with interest at the rate of 7 1/2 percent. Rosenbaum effected the repayment within 18 months after the embezzlement, utilizing money that he borrowed in the United States as well as funds under his control in Switzerland. Stone drew checks to Finanz GmbH on his personal account in a New York bank for all of the purported interest payments for 1964, 1965, and 1966, and for $28,500 of the claimed 1967 payments. Upon receipt of these checks, Finanz GmbH deposited them to its account. Pursuant to its agreement with Rosenbaum, Finanz GmbH deducted for its services 2 1/2 percent of each amount remitted to it and transferred the remainder to the Handel Bank for credit to the Agencia account. On May 30, 1967, Stone repaid the initial Finanz GmbH "loan" of $600,000 plus premium thereon of $100,000 and the second "loan" of $200,000 plus premium thereon of $33,333 plus accrued interest of $28,000, by the transfer to Finanz GmbH of 113,000 shares of Alasco common stock, which had a value on that date of $960,500. The 113,000 shares were issued in the name of Finanz GmbH and turned over to Volker Gotz, an *839 officer of Finanz GmbH. Finanz GmbH transferred the 113,000 Alsco shares to the Handel Bank for safekeeping for Agencia. The shares were not endorsed by Finanz GmbH, but Finanz GmbH executed a blank stock power which Rosenbaum attached to the stock certificate. Resenbaum was not able to secure a proper endorsement from Finanz GmbH in 1969 when Alsco shares were converted into preferred shares of Harvard Industries. These Alsco shares were never converted into Harvard preferred, and they are now held in escrow for the United States pending the outcome of its suits for the recovery of claimed overcharges on Chromcraft contracts. Stone first became aware of the actual whereabouts of the 113,000 shares of Alsco stock at the time of depositions taken in other proceedings in 1971. As stated above, Stone claimed deductions for the several interest payments on his returns for the years in which they were paid. Respondent disallowed the claimed deductions on the ground that they did not represent payments with respect to a bona fide indebtedness. Stone treated the transfer of the 113,000 shares of Alsco stock to Finanz GmbH as a sale or exchange of a capital asset on his 1967 *840 return. He reported a long-term gain on the transaction in the amount of $919,474.76. Respondent made no adjustment with respect to said transaction in his notice of deficiency. In an amendment to petition at Docket No. 5312-72, Stone has alleged that respondent erred in failing to exclude such long-term capital gain from his income for 1967, if the Court should sustain respondent's determination that the interest payments to Finanz GmbH were not made with respect to a bona fide indebtedness. (b) PeraltaShipping Corporation
Armando Peralta (Armando) is engaged in the shipping business. He is associated with Peralta Shipping Corporation (Peralta) which has offices in New York City and with Peralta's foreign affiliate, Odnamra Shipping Corporation (Odnamra) (Armando spelled backward). Armando is a friend and client of Rosenbaum.Stone has known Armando for about 25 years, and he met him through Rosenbaum. At a dinner meeting of Stone, Rosenbaum, and Armando in early 1966, Stone asked Armando to lend him $86,400. Armando agreed to do so, and thereafter Stone received Peralta's check and gave his demand note to Peralta in the amount of $86,400, bearing interest at the *841 rate of 6 percent. On January 24, 1967, Peralta advanced another $13,600 to Stone, which was evidenced by Stone's demand note to Peralta bearing interest at the rate of 6 percent. Stone had not asked Rosenbaum to arrange these loan transactions. However, Rosenbaum had agreed with Armando that he (Rosenbaum) would advance the money to Armando or one of his companies with which to make the loans to Stone. When Stone repaid the principal plus "interest," the funds would be transferred back to the Agencia account. On March 17, 1966, $86,400 was transferred on Rosenbaum's instructions from the Agencia account to a Lisbon, Portugal, bank for the account of Odnamra. On December 14, 1966, another $13,600 was transferred on Rosenbaum's order from the Agencia account to a Geneva, Switzerland, bank for the account of Odnamra. On May 12, 1967, Stone sent three checks to Peralta. One was for $100,000, representing the principal amount of the loans; one was for $5,976, representing interest on the $86,400 loan; and the third was for $251.65, representing interest on the $13,600 loan. Those checks were deposited by Peralta in its bank accounts in New York City. The two notes, marked *842 "paid," were returned to Stone. On May 31, 1967, $100,000 was transferred to the Handel bank for credit to the account of Agencia. The transcript of the Agencia account reflects the deposit of a "CH GENEVE" check of $6,000 on May 18, 1967. Stone was not aware of the source of funds used by Peralta to make the loans nor was he aware of the disposition of Peralta of the amounts representing repayment of the principal and interest by Stone. As stated above, Stone deducted the interest payments to Peralta on his 1967 return. Respondent disallowed the claimed deduction on the ground that the payment were not made with respect to a bona fide indebtedness. (c) The First National Bank of Memphis
Keystone Farms, a partnership of Stone and Irwin Keefer engaged in a cattle-raising business in Mississippi, borrowed $86,000 from the First National Bank of Memphis, Tennessee, in 1966, at an interest rate of 6 percent. Stone's participation in the loan was 50 percent. Stone paid interest of $1,200 on February 12, 1967, and $1,680 on August 21, 1967, with respect to his 50 percent participation in the loan. Those payments were made by checks on his personal bank account at *843 a New York bank, were marked as payments of interest, and were received by the Loan and Discount Department of the Memphis bank. As stated above, Stone deducted the interest payments, totalling $2,880, on his 1967 return. Respondent disallowed the claimed deduction on the ground that the payments were not made with respect to a bona fide indebtedness. Issue 6
OPINION Section 163 allows a cash basis taxpayer a deduction for interest paid on indebtedness during the taxable year. Essential to the allowance of a deduction for interest is a showing that (1) there was "interest" paid, and (2) there was a bona fide indebtedness. Interest has been defined as compensation for the use of borrowed money or for the forbearance of money legally due, Deputy v. DuPont,308 U.S. 488 (1940), and indebtedness as an unconditional and legally enforceable obligation for the payment of money. Autenreith v. Commissioner,115 F.2d 856 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); Commissioner v. Park,113 F.2d 352 (3d Cir. 1940), *844 affg. 38 B.T.A. 1118 (1938). In his notice of deficiency to the Stone wherein he disallowed portions of the interest deducted in each of the taxable years, respondent stated the disallowances were based upon the Stones' failure to establish that the disallowed amounts "represent interest on bona fide indebtedness." Petitioners Stone have amply substantiated, with canceled checks, payment of the amounts claimed for each of the years 1964 through 1966, in respect to the Finanz, Peralta, and the First National Bank of Memphis transactions. They have introduced no evidence for the claimed deductions for 1963 as well as for portions of the disallowed amounts for each of the other years, as indicated in the findings. The thrust of respondent's position on the Finanz and Peralta transactions is that Stone was merely borrowing his own money and was not borrowing money from the entities to which he gave his promissory notes. (a) Finanz GmbH--Our findings indicate that, with respect to the original $600,000 which Stone borrowed to pay off short-term indebtedness incurred by him in the United States to purchase K-D Lamp stock, there are three possible ways of viewing *845 the transactions involved: The "loan" from Finanz GmbH to Stone might be viewed as valid, regardless of where the money to Finanz GmbH came from; the loan might be viewed as actually having been made by Rosenbaum to Stone, with money belonging to Rosenbaum as a result of the embezzlement, see James v. United States,366 U.S. 213 (1961) (embezzled funds held income to taxpayer); or the money borrowed by Stone may be viewed as half his and half Rosenbaum's, as a result of their equal ownership of the Chromcraft Swiss Fund. Petitioners Stone argue on brief that the loan from Finanz GmbH was bona fide, that Stone paid interest for the use of the money borrowed and the rate of such interest was not excessive, that Finanz GmbH could have enforced and collected on the loan agreement, and that Stone's reporting position of taxable profit on the liquidation of the debt was consistent with his belief in the substance of such debt. They also argue that the fact that Finanz GmbH did not use its own funds for the loan does not determine the deductibility of the purported interest payments, as almost every loan company is using borrowed money which it in turn lends to others. *846 " To the contrary, respondent argues that petitioners were using their own money in the transactions at issue, and that the loan was a mere device to create artificial deductions, a "sham", and a paper transaction amounting only to a "financial round robin." While passing for the moment the question of exactly to whom the money used did belong, we agree with respondent that the loan arrangement with Finanz was a "paper transaction." In reaching this conclusion, we find the following language from Rubin v. United States,304 F.2d 766, 769 (7th Cir. 1962), affg. an unpublished District Court opinion, particularly helpful: In determining whether the purported indebtedness was valid, it would serve no purpose to examine each step in the purported acquisition and sale by taxpayer of the securities. * * * Many real and substantial business transactions may involve some steps similar to the individual steps taken by taxpayer here. That is, in real transactions investors may borrow in order to make purchases of securities; brokers may hold securities as collateral and, if necessary, borrow the securities held as collateral in order to cover short sales; lenders may *847 lend much more than their actual capital; non-recourse promissory notes may be given for borrowed money; and securities may change hands by debiting or crediting accounts rather than by actual delivery. * * * What we must decide is not whether the individual steps necessary to establish a formalistic debtor-creditor relationship were undertaken but whether, when the transaction is considered as a whole and realistically, there was in substance a debtor-creditor relationship. In other words, we must determine whether taxpayer paid interest for the "use or forbearance of money" actually loaned. * * * We do not believe there was a valid debtor-creditor relationship between Stone and Finanz GmbH. Finanz GmbH never borrowed the money from Agencia to loan to Stone, it merely acted as a conduit for the transfer of funds from Agencia to Stone. Collateral for the loan was waived. All of the principal and interest payments, less 2 1/2 percent of each interest payment which Finanz GmbH retained for its services, went back into the Agencia account, the principal depository of the Chromcraft Swiss Fund. Consequently, there is no basis upon which we can find a valid debtor-creditor relationship *848 existed between Stone and Finanz GmbH. As stated earlier, respondent maintains Stone was attempting to deduct interest for the use of his own money by setting up the transaction to appear as a borrowing. Rosenbaum had used for his own purposes all the money in the Agencia account at that time, and so embezzled $600,000, which he deposited in the Agencia account, to conceal this fact from Stone. It was this money which was borrowed by Stone. In James v. United States,supra at 219, the Supreme Court held that embezzled funds, although not held under a claim of right, constitute taxable income to the embezzler "even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). It is thus unclear whether the money was Rosenbaum's, or more properly, Frank Vitello's (from whom it was embezzled). The one thing that is clear is that none of it was Stone's, that he borrowed it, and paid interest *849 on it. While Stone was not indebted to Finanz, we believe he was indebted to Rosenbaum and/or Frank Vitello. While the issue is a close one, we believe Stone is entitled to the interest deduction as it pertains to this amount. As to the additional $200,000, which Stone obtained in 1966, the source of these moneys was the Velo account, one of the depositories for the Chromcraft Swiss Fund. Our holdings in Issues 1 and 2 that the fund belonged to Stone and Rosenbaum dispose of this issue. Stone has the burden of proving entitlement to the deduction claimed, Welch v. Helvering,290 U.S. 111 (1933), and, absent any showing that the "loan" proceeds came from that part of the account representing Rosenbaum's one-half interest, we cannot find a valid indebtedness existed. (b) PeraltaShipping Corporation --In the Peralta transactions, that company initially advanced to Stone $86,400 in 1966 and $13,600 in 1967. These same amounts were made available to Odnamra, another of Armando Peralta's companies, from the Agencia account. Stone gave interest-bearing promissory notes to Peralta for the amounts advanced him. He was not aware that the borrowed funds were *850 derived from the Agencia account. Stone's payments to Peralta of principal and interest were deposited in Peralta's bank account in New York City. Shortly thereafter, deposits were made in the Agencia account of almost identical amounts. We conclude, for the reasons set forth with respect to Finanz GmbH, that the loan to Stone from Peralta was merely a paper transaction. The fact that Stone had no knowledge of the money transfers by and between Rosenbaum and Armando does not alter our conclusion. The money borrowed came out of the Agencia account, in which Stone had a one-half interest. He was either "borrowing" his own money, or Rosenbaum's, or both. As to money "borrowed" from himself he would certainly not get an interest deduction.Because he has failed to prove the money so borrowed did not come from his portion of the fund, we must sustain respondent's disallowance. (c) First National Bank of Memphis--The interest expense deduction here involved, $2,880 in 1967, has nothing to do with the Swiss accounts or Chromcraft. Stone was a member of a partnership operating a cattle farm in Mississippi. He and his partner borrowed money for the partnership's purposes. *851 The amount here involved represents Stone's payment with his own personal checks of his share of the interest on the amount borrowed. The interest payments were received by the bank's loan and discount department. Clearly the payments to this Memphis bank were payments of interest on indebtedness, and Stone is entitled to the $2,880 deduction claimed therefore in 1967. Issue 7
OPINION Stone amended his petition to claim that the capital gain of $919,474.76 which he reported on his 1967 return, should not have been included thereon if he is found not to be entitled to deduct the payments of interest to Finanz GmbH. To the extent we held in Issue 6 that he is not entitled to deduct such payments, his alternative position regarding the capital gain is correct. To that extent, we hold that the capital gain reported on his 1967 return should be excluded. Issue 8. Interest Expense Deductions of Rosenbaum
FINDINGS OF FACT The amounts shown below have been disallowed by respondent as interest expense deductions on the tax returns of Rosenbaum. The deductions of those amounts have been disallowed on the ground that they do not represent payments on bona fide indebtedness. *852 1963
$5,250.00
1964
5,825.00
1965
7,593.75
1966
8,427.78
1967
12,878.42
The foregoing amounts represent alleged payments by Rosenbaum to the Bank German in Switzerland of $5,250 in 1963 and $4,100 in 1964, and to the Handel Bank in Switzerland of $1,725 in 1964 and of the entire amounts shown for 1965, 1966, and 1967. Rosenbaum and his brother Joseph from time to time jointly took moneys, derived from various sources including the Chromcraft Swiss Fund, which were in Swiss bank accounts under Rosenbaum's control. The moneys so taken were used by the Rosenbaum brothers for their own purposes unrelated to Chromcraft. The amounts claimed as deductions, as set out above, are claimed by Rosenbaum to represent his share of the interest on the moneys taken. The record herein does not establish the amounts taken in any year, the dates when taken, the rate of interest, or the dates of the payment of interest. Nor does the record establish that any note or other evidence of indebtedness was given by the Rosenbaum brothers. Issue 8
OPINION Respondent takes the position regarding the disallowed Rosenbaum interest deductions that Rosenbaum has failed *853 to substantiate the interest expenses incurred, and has failed to establish the existence of a bona fide indebtedness. Rosenbaum argues in his brief: From time to time petitioner transferred funds from Swiss bank accounts under his control to himself and to his brother, Joseph H. Rosenbaum.Petitioner and his brother recorded these funds on their own books as loans, and repaid them with interest, both principal and interest going back into the accounts from which the funds had been obtained.
Rosenbaum has the burden of proving entitlement to the deductions claimed. Welch v. Helvering,290 U.S. 111 (1933). From the record before us, it cannot be ascertained what amounts he claims he and his brother took from the Swiss accounts under his control, what rate of interest he paid on these amounts, or when the claimed interest payments were made. Moreover, we have previously held that the moneys in the Chromcraft Swiss fund were the joint property of Stone and Rosenbaum. As Rosenbaum has offered no evidence showing that the amounts borrowed were from that part of the account *854 representing Stone's one-half interest, we cannot find that a valid indebtedness existed. Rosenbaum has totally failed to carry his burden of proving that he is entitled to the interest expense deductions claimed. We therefore conclude respondent acted properly in disallowing those deductions. Issues 9 & 10. Additions to Tax for Fraud--Stone and Rosenbaum
OPINION At the risk of redundancy we believe a brief synopsis of the pertinent facts as they bear on the fraud issue is essential. The facts are segregable into four distinct phases: (1) Scientific/Bregman; (2) Western; (3) Velo, Orma, CEPAB, Finax, Haemmerli, and Scientific; and (4) Finanz GmbH/Peralta. During the Scientific/Bregman phase, which occurred between March 1963 and December 31, 1965, Stone and Rosenbaum set up corporations managed by people they thought they could trust. The companies billed Chromcraft and were paid for completed electrical assemblies; but the actual work on the assemblies was done by Wolf, and the raw materials therefor were supplied by Chromcraft. Scientific and Bregman accumulated the money received from Chromcraft, less their payments to Wolf for labor. Upon instructions from *855 Stone and Rosenbaum, they then transmitted the moneys to Swiss bank accounts under Rosenbaum's control via fictitious invoices obtained by Rosenbaum. The invoices came from several Swiss and Liechtenstein companies, and purported to be for raw materials shipped to Scientific and Bregman, which materials were in actuality never shipped or received. The Scientific and Bregman checks in payment thereof were negotiated by these foreign entities, and the proceeds were remitted to the Swiss bank accounts in which Stone and Rosenbaum had concealed, personal interests. The Western phase involved a Chromcraft subcontractor that manufactured the fairings for Chromcraft's rocket launchers.In 1963, Stone induced Western's president, DeLuca, to increase the price of fairings by a designated amount per set and remit that amount to Swiss bank accounts, again, via fictitious invoices for raw materials from foreign entities. The Swiss bank accounts used were those in which Stone and Rosenbaum had a personal interest. In order to certify Chromcraft's cost increase to the Navy and to justify the overseas payments to Western's parent corporation, Stone, Rosenbaum, and DeLuca created a body of false *856 correspondence and documentation substantiating such increase and payments. Velo, Orma, CEPAB, and Finax were foreign entities which issued fictitious invoices to Chromcraft, purportedly for raw materials and services. Those materials and services were never received or rendered. Haemmerli was a Swiss individual who invoiced Chromcraft for services in excess of those actually rendered. Scientific, the same corporation mentioned earlier in the Scientific/Bregman phase, sent invoices to Chromcraft for raw materials never delivered. Chromcraft paid all the above invoices and the various entities negotiated the checks in payment therefor and remitted them to Swiss bank accounts for deposit. Stone and Rosenbaum controlled the Swiss bank accounts, and the funds therein were used for personal and investment purposes. We turn now to the issues before us: whether petitioners Stone and/or Rosenbaum are liable for the section 6653(b) addition to tax for fraud. [22]
*857 Respondent determined all or a part of petitioners' underpayments of tax for each year at issue was due to fraud and imposed the section 6653(b) addition to tax. Petitioners deny any underpayment of tax was due to fraud.
In order to sustain his determination of fraud for any given year, respondent must prove by clear and convincing evidence that some part of an underpayment for that year is due to fraud. Section 7454(a); Rule 142(b). E.g., Denenberg v. Commissioner,73 T.C. 370, 393 (1979); Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (5th Cir. 1972), revg. an unpublished District Court opinion; Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), *858 affg. a Memorandum Opinion of this Court; Lowy v. Commissioner,288 F.2d 517 (2d Cir. 1961), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,supra;Estate of Brame v. Commissioner,25 T.C. 824, 831-832 (1956), affd. 256 F.2d 343 (5th Cir. 1958). He must show the taxpayer intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), affg. 264 F. Supp. 824 (E.D. Pa. 1967); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The presence or absence of fraud is a factual question to be determined upon consideration of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner,67 T.C. 181, 191 (1976), affd. per order (8th Cir., May 2, 1978); Otsuki v. Commissioner,supra at 105-106. *859 Since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978); Stone v. Commissioner,supra at 223-224; Otsuki v. Commissioner,supra at 105-106. We hold that respondent has established fraud by clear and convincing evidence for each of Stone's and Rosenbaum's 1963 through 1967 taxable years. The record is replete with evidence of fraud. A merely cursory review of the record reveals no less than nine strong indicia of fraud, which apply to either Stone, or Rosenbaum, or both. Those indicia are: (1) Consistent and large understatement of income.
The mere failure to report income is not enough to establish fraud. Merritt v. Commissioner,301 F.2d 484 (5th Cir. Cir. 1962), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,supra. However, the consistent and substantial understatement of income is evidence of fraud. Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966), *860 affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,supra;Lollis v. Commissioner,595 F.2d 1189 (9th Cir. 1979), affg. a Memorandum Opinion of this Court; Smith v. Commissioner,32 T.C. 985, 987 (1959); Arlette Coat Co. v. Commissioner,14 T.C. 751 (1950). Both Stone and Rosenbaum have, for at least each of the years before us, substantially understated their income. (2) Failure to report income from dividends and gain on sale of securities.See Lusk v. Commissioner,250 F.2d 591 (7th Cir. 1957) affg. a Memorandum Opinion of this Court; Parsons v. Commissioner,43 T.C. 378 (1964).Rosenbaum made investments, both for himself and for him and Stone, with the moneys accumulated in the Chromcraft Swiss fund. Neither he nor Stone (nor Chromcraft) ever reported income of any kind from these investments. (3) Diversion of corporate funds for personal use by the controlling shareholder/president. See Foster v. Commissioner,391 F.2d 727 (4th Cir. 1968) *861 affg. a Memorandum Opinion of this Court. We have previously held in Issues 1 and 2 that Stone diverted Chromcraft funds into Swiss bank accounts over which Rosenbaum and Stone, in conjunction with and through Rosenbaum, had complete dominion and control. The funds for investments and loans benefitted both Stone and Rosenbaum. (4) Use of fictitious invoices. [23] There is overwhelming evidence of, and indeed petitioners concede, the use of fictitious invoices throughout the years involved. And it is clear that both Rosenbaum and Stone were involved in the procuring or creation of these fictitious invoices which provided the mechanism for the diversion of corporate funds. (5) Keeping false books--the deliberate making of false entries or not entries at all to conceal income or overstate expenses. See Kreps v. Commissioner,351 F.2d 1 (2d Cir. 1965) affg. 42 T.C. 660 (1964). Stone, through his secretary Price and other employees, caused Chromcraft not to bill Scientific and Bregman for the raw materials used in the electrical parts assembled by Wolf. When Chromcraft *862 paid the Scientific/Bregman invoices for the completed units, it was in effect paying a second time for the materials already supplied, and it was through those fraudulent accounting procedures that Stone and Rosenbaum consistently diverted large sums of money overseas to the Swiss bank accounts over which they had dominion and control. (6) Concealed bank accounts. See Gunn v. Commissioner,247 F.2d 359 (8th Cir. 1957) affg. a Memorandum Opinion of this Court. The bank accounts utilized as the depositories for diverted funds were maintained in Swiss banks, and in the names of what were, for the most part, defunct or dummy corporations. (7) False deductions. [24] Rosenbaum knowingly claimed interest expense deductions on money he "borrowed" from the Chromcraft Swiss Fund. [25]
*863 (8) Absence of ignorance or mistake. Foster v. Commissioner,391 F.2d 727 (4th Cir. 1968), affg. on this point a Memorandum Opinion of this Court; Long v. Commissioner,12 B.T.A. 488 (1928). Stone was a college graduate and undoubtedly a shrewd businessman. His claim that he didn't know the diversions from Chromcraft would be taxed as income to him must be rejected. Rosenbaum was a lawyer specializing in taxation. (9) Awareness of tax law. Grosshandler v. Commissioner,75 T.C. 1 (1980); O'Connor v. Commissioner,412 F.2d 304 (2d Cir. 1969), affg. on this point a Memorandum Opinion of this Court.As noted, Rosenbaum was a lawyer who specialized in the tax field; as such he cannot excuse his failure to report items of income by alleging ignorance or mistake. Neither was Stone ignorant of the tax laws. For the taxable years at issue, Stone and Rosenbaum have admitted they engaged in the transactions previously mentioned, and that they did so in order to evade taxes. They insist, however, that all of this was done for Chromcraft's benefit and that the funds accumulated overseas were Chromcraft funds ultimately *864 intended to be used for Chromcraft's benefit.[26] This is simply inconsistent with the record before us.The money went into accounts controlled by Rosenbaum and Stone (in conjunction with and through Rosenbaum). Rosenbaum was a signatory on all the accounts, Stone on some of them. Pursuant to an agreement between Rosenbaum and Stone, and in accordance with the close working relationship and mutual trust they shared, the funds were managed by and under the control of Rosenbaum. He received *865 statements from the bank detailing deposits and withdrawals and freely commingled the funds coming into the account from various sources. No written records were kept by Rosenbaum. Payments were made to Schwartz and Bregman to secure their absence and cooperation during the criminal investigation of Rosenbaum and Stone. The moneys were invested by Rosenbaum for both men or in some cases, in projects he was interested in, sometimes after consultation with Stone. When Stone wanted to pay off short-term notes borrowed for K-D Lamp stock, he asked Rosenbaum to get him the money and to use whatever money was overseas to the extent it was needed. When Stone personally desired to purchase property in St. Louis, the the Swiss funds were again utilized, as they were when Rosenbaum paid the expenses of a trip Mrs. Stone took to Europe. In short, Rosenbaum and Stone exercised complete dominion and control over millions of dollars they siphoned off from Chromcraft via a veritable blizzard of fraudulent paper created by their various manipulations. They on many occasions utilized the funds as their own. How Chromcraft, as a victim of this massive fraud, was to benefit is left largely *866 to speculation. There were no concrete plans, no specific blueprints for the use of those funds for Chromcraft's benefit. We are given at most "a pie in the sky by and by," baked from a recipe prepared by Rosenbaum and Stone when they were unexpectedly presented with a bill they hoped never to receive. We simply do not believe that if Chromcraft were sold or went bankrupt that the Swiss funds would have been produced by Rosenbaum and Stone for the benefit of the buyers or creditors. They had complete control and dominion over the funds in the same sense as one who embezzles funds, and would have returned them only when and if their defalcations were discovered. See United States v. Stonehill,420 F. Supp. 46 (C.D. Cal. 1976); Rutkin v. United States,343 U.S. 130 (1952); see also Spies v. United States,317 U.S. 492, 499 (1943). [27]
*867 In so holding, we have considered the depositions of Stone and Rosenbaum taken in 1971 and 1972 during the Alsco-Harvard Fraud Litigation. In those portions of the depositions admitted into evidence, Stone and Rosenbaum admitted the existence of a tax evasion scheme (without stating whether corporate or personal), and admitted that they had "beneficial interests" in the moneys referred to herein as the Chromcraft Swiss Fund or Swiss funds. Petitioners on countless occasions, throughout both the Alsco-Harvard Fraud Litigation and this case, have complained about the conditions under which these depositions were taken. [28] They now urge us to consider those depositions only in conjunction with the explanations and modifications made by them at trial. The Special Trial Judge accepted petitioners' contentions and regarded their testimony before him as being "more reliable in ascertaining what happened than the testimony *868 in their depositions which were taken under what appears to be harsh, almost inquisitorial conditions." Respondent, however, argues we should give the depositions greater weight than that accorded them by the Special Trial Judge because petitioners Stone and Rosenbaum were deposed under court supervision and the complaints as to improper conditions were resolved against them when they were raised, and because the depositions, taken in 1971 and 1972, were far more proximate in time to the transactions at issue than the trial, which occurred in 1977 and 1978. Respondent contends the above-quoted finding by the Special Trial Judge wholly disregards the prior determinations of three United States District Judges, [29] who reviewed the conduct of the depositions on nine separate occasions. He argues that on none of these occasions did any of these judges, who were far more familiar with the circumstances under which the depositions were taken than the Special Trial Judge, conclude that the depositions of Stone or Rosenbaum were being improperly conducted. Moreover, throughout the period of the depositions, and later, Stone and Rosenbaum were represented by eminent and resourceful counsel, *869 who vigorously presented their position to the Court. Petitioners counter that the District Court judges were not assessing the weight to be given the depositions as affecting credibility, but were faced with applications to strike because of incarceration. They argue Judge Weiner's order to file the depositions cannot be dispositive of this issue because he was sitting in Philadelphia, Pennsylvania, and held no evidentiary hearing. Petitioners argue further that in Campbell v. McGruder,416 F. Supp. 100 (D.D.C. 1975), decided after Judge Wiener's order to file the depositions, the District Court held that incarceration in the District of Columbia jail, where Stone and Rosenbaum were housed during the taking of their depositions, violated the inmates' constitutional rights due to overcrowding, vermin infestation, and violations of inter alia health, *870 plumbing, and fire code regulations. The arguments on both sides were ably presented, but we see no reason to address this issue. For the depositions and the testimony at trial are not so inconsistent as has been suggested. Respondent read hundreds of pages of the depositions into the record, and on each occasion, gave Stone or Rosenbaum the opportunity to deny or explain the statements read. With few exceptions, petitioners agreed with the statements, often expressing surprise at the accuracy of their answers. [30] Giving due regard--in light of what was actually done over the years--to the running explanation by petitioners that Stone's use of "I", "me", and "mine", always referred to Chromcraft rather than Stone, we still believe the facts are as we have found them in previous issues. Our last concern on this issue *871 is to the effect, if any, of petitioners' prior guilty pleas to conspiracy to defraud the United States Government. Respondent raised this question for the first time in his exceptions to the Special Trial Judge's report, contrary to the requirement of Rule 39 that such an affirmative defense be alleged in the pleadings. We therefore find their argument untimely. Additionally, even aside from this defect the argument must be rejected. First, we note that a guilty plea has the same effect as a conviction for estoppel purposes. See generally, Emich Motors v. General Motors,340 U.S. 558, 568 (1951); United States v. Podell,572 F.2d 31 (2d Cir. 1978), affg. 436 F. Supp. 1039 (S.D. N.Y. 1977). Second, while a guilty plea can collaterally estop the relitigation of certain issues in subsequent civil litigation, such estoppel extends only to those issues that were essential to the plea. Emich Motors v. General Motors,supra at 569; *872 Brown v. United States,207 Ct. Cl. 768, 524 F.2d 693, 705 (1975). Third and last, the essence of a conspiracy is an illegal agreement (or a legal agreement to do something by illegal means) and it is not essential for the conspirators to have achieved their goal or even participated in an overt act. Nash v. United States,229 U.S. 373, 379 (1913); Ewing v. United States,386 F.2d 10, 15 (9th Cir. 1967). The pleas of guilty must be confined to the judicial admissions that petitioners engaged in a conspiracy to defraud the United States, and cannot be used as admissions of responsibility for the complete recital of deeds that respondent ascribed to the conspiracy. United States v. Guzzone,273 F.2d 121 (2d Cir. 1959); United States v. Ben Grunstein & Sons Co.,127 F. Supp. 907 (D. N.J. 1955); United States v. American Packing Corp.,113 F. Supp. 223 (D. N.J. 1953). See, generally Commissioner v. Sunnen,333 U.S. 591 (1948). *873 A plea of guilty to a conspiracy can thus work no collateral estoppel as to the substantive acts alleged as the means of effectuating the conspiracy. Issue 11. Innocent Spouse Status of Petitioners Jane C. Rosenbaum and M. Jeanne Stone
FINDINGS OF FACT (a) Jane C. Rosenbaum
In paragraph 268 of the parties' Second Stipulation for Trial, it is stipulated: Respondent agrees that Jane Rosenbaum in signing the joint returns for 1963 through 1967 did not know of and had no reason to know of the alleged omissions from gross income as determined by respondent, and that taking into account whether she significantly benefited directly or indirectly from the items allegedly omitted from gross income, and all other facts and circumstances, it would be inequitable to hold her liable for the deficiencies in tax for said years attributable to such omissions, provided there is a determination by the Court that the amount omitted from gross income in each of said years was in excess of 25 percent of the amount of gross income stated on the return for that year. (b) M. Jeanne Stone
Jeanne's interest was in art which she *874 studied and practiced as a commercial artist prior to her marriage to Stone in 1947. After her marriage, she was a housewife and mother. Jeanne knew nothing about the operations of Chromcraft, and Stone never discussed the financial aspects or the operations of the business with her. Jeanne knew nothing about the Swiss bank accounts.During the years 1963 through 1967, Jeanne went to the Chromcraft premises only a few times. These were on Sundays when she and Stone and the children went to pick up something that Stone had left there. On those occasions Jeanne was only in the office, and never out in the plant where manufacturing operations were carried on. The Stone family's pattern of living during the period 1963-1967 was a conservative one, and was consonant with that of the previous five years.Stone himself paid such expenses as utilities, taxes, and repairs. He gave Jeanne from $150 to $200 per week for groceries, cleaning, laundry, and similar household expenses, as well as her own personal expenses. The family owned two Oldsmobile automobiles. Stone did not purchase for Jeanne any expensive jewelry, furs, or art work. On January 14, 1966, Falrock purchased 386,952 *875 shares of Alsco stock from Kaiser Aluminum and Chemical Sales, Inc. (Kaiser) for a cash consideration of $4.25 a share; 25,000 of said shares were purchased for Irwin C. Keefer. As a result, Falrock became the record holder of approximately 44 percent of the outstanding shares of Alsco. The other 56 percent of the outstanding shares of Alsco was widely held. (See discussion of Falrock, supra, 43-48, 71-75). In order for Falrock to purchase the Alsco stock of Kaiser, it borrowed the necessary funds from John M. Seabrook who in turn borrowed the funds from Pacific. Pacific had received the funds from drafts drawn on the Handel Bank which were entered on Pacific's books as loans from Finanz A.G. In fact, no money was borrowed from Finanz A.G. with respect to the aforesaid purchases by Falrock, and Finanz A.G. was not the real party in interest. At a January 19, 1966 meeting of Alsco shareholders, Falrock caused the election of five nominees as a majority of the board of directors of Alsco.At a board of director's meeting held on February 18, 1966, the board of directors of Alsco considered the acquisition of Chromcraft by Alsco. On April 9, 1966, Stone and Alsco entered *876 into an agreement for the acquisition by Alsco of all of the outstanding shares of Chromcraft, all of which were held by Stone, in exchange for 1,050,000 shares of Alsco class A common stock. On April 9, 1966, Stone deposited his Chromcraft shares with Alsco. The issuance of the shares of Alsco stock was made on May 31, 1966 after the ratification of the April 9, 1966 agreement by the shareholders of Alsco. On May 31, 1966, Chromcraft was dissolved and continued as the Techfab Division of Alsco. As a result of the exchange of his Chromcraft shares for Alsco shares, Stone became the owner of approximately 56 percent of the outstanding shares of Alsco and was elected Alsco's president and a director of Alsco. Stone sold the Alsco stock, which he received in exchange for his Chromcraft shares in the merger, to Harvard Industries on February 12, 1969, pursuant to an agreement dated November 30, 1968. He received a total consideration of $11,244,000, of which $8,819,069 was in cash and $2,424,931 was represented by Harvard's note, on which Stone never collected. The cash of $8,819,069 constituted the opening deposit on February 12, 1969, in account number 33-0487-8, opened in Stone's *877 name at the First National Bank in St. Louis. On February 13, 1970, Stone closed his account at the First National Bank in St. Louis and opened a joint account with Jeanne in the same bank. On February 9, 1970, Stone gave Jeanne a power of attorney which authorized Jeanne to act in all matters with "full, plenary and complete power." She was empowered to buy or sell and to, in any way, dispose of Stone's property. Stone was incarcerated on February 24, 1970. Stone had purchased securities with some of the funds received from the sale of his Alsco stock to Harvard Industries. When securities matured after Stone was incarcerated, the proceeds were deposited in the joint bank account of Stone and Jeanne. Other securities were later purchased in Jeanne's name only, with funds from the joint account. The securities thus purchased by Jeanne were recommended by Stone or a broker. The cost of securities purchased in Jeanne's name and paid for with the moneys from the joint account was $1,460,097.75. Respondent's arguments for denying innocent spouse treatment to Jeanne are based, in essential part, on the acquisition of this $1.4 million in securities by Jeanne. However, respondent *878 also contends (and we agree--see infra issue 13) that Jeanne is liable as a transferee of these funds. In 1969, after the sale of Stone's Alsco shares to Harvard Industries, Stone and Jeanne and their children moved into a home on South Warson Road in the suburbs of St. Louis.The ownership of that property, which consists of approximately 11 acres, was in the joint names of Stone and Jeanne. On March 1, 1970, the Warson Road property was estimated by the Stones to have a value of $350,000. The furnishings in the Warson Road home were considered by Stone as owned by Jeanne and estimated by her to have had a value on March 1, 1970, of $35,000. On March 1, 1970, Stone owned jewelry worth $200, and Jeanne owned jewelry with an estimated value of $9,500. Prior to moving to the Warson Road property, the Stone family had resided in a home on Cornell Avenue, in University City, Missouri. The Cornell Avenue property was estimated by Stone to have a value on March 1, 1970, of $33,500. It was not encumbered by a mortgage. Title to the Cornell Avenue property was acquired by Jeanne from Stone prior to January 1965. Issue 11 OPINION *879 The general rule involving the filing of a joint return is that liability with respect to the tax is joint and several, regardless of the source of the income or of the fact that one spouse may be less informed about the contents of the return than the other. This is true because both spouses ordinarily benefit from the reduction in tax that ensues by reason of the joint return. Congress, however, was concerned with the results of this rule, particularly where a wife had been divorced, separated or abandoned after the tax year, where she was saddled with a disporportionately high tax liability from income attributable only to the husband, unknown to the wife, and where she had not enjoyed any benefit therefrom. See Scudder v. Commissioner,48 T.C. 36 (1967). It was in an effort to eliminate the unfairness of the joint and several liability provisions in such circumstances that section 6013(e) was enacted. [31] That section provides as follows: SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. * * * (e) *880 Spouse Relieved of Liability in Certain Cases.-- (1) In general.--Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission in gross income. (2) Special rules.--For purposes of paragraph (1)-- (A) * * * (B) the amount omitted from gross *881 income shall be determined in the manner provided by section 6501(e)(1)(A). (a) Jane C. Rosenbaum--By their stipulation, the parties have narrowed the issue of Jane's entitlement to the relief accorded an innocent spouse to one question: whether more than 25 percent was omitted from the gross income stated on the joint return which she made with her then-spouse, Rosenbaum, for each of the taxable years 1963 through 1967. Section 6013(e)(1)(A). An analysis of the joint returns filed by Rosenbaum and Jane for those years reveals gross income stated on the returns as follows: 1963
$94,988.06
1964
141,631.22
1965
132,677.16
1966
169,399.11
1967
188,106.44
In our dispositions made in Issues 1 through 4, and in the adjustments settled by the parties, the omissions from gross income attributed to Rosenbaum are as follows: 1963
1964
1965
1966
1967
Scientific
$54,087.50
$525,833
$ 580,589
Bregman
406,193
190,387
Western
4,491.50
68,017
110,542
159,203
Velo
285,664
125
Orma-Commerce
11,384   CEPAB
26,086
Finax
4,000
Haemmerli
8,000
Scientific
25,200
19,250
(dies and jigs)
CG on trade in
4,160
of car
Total omissions
$69,963.00
$619,050
$1,142,660
$639,414
$12,125
*882 Combining these two tables with the item of 25 percent of the gross income stated on the return, produces the following result: Gross Income
25% of Gross Income
Omissions from
Year
Stated on Return
Stated on Return
Gross Income
1963
$94,988.06
$23,747.01
$69,963
1964
141,631.22
35,407.80
619,050
1965
132,677.16
33,169.29
1,142,660
1966
169,399.11
42,349.77
639,414
1967
188,106.44
47,026.61
12,125
Inasmuch as there are omissions from gross income in excess of 25 percent of the gross income reported on the returns for the years 1963 through 1966, Jane is entitled to be treated as an innocent spouse under section 6013(e) for those years. She is not entitled to innocent spouse status for 1967, however, as the amount of omissions for that year is less than 25 percent of the gross income reported on their return. (b) M. Jeanne Stone--The joint returns filed by Stone and Jeanne for the years 1963 through 1967 show gross income stated on those returns as follows: 1963
$63,728.09
1964
93,360.34
1965
182,679.30
1966
245,026.94
1967
1,269,876.05
Our conclusions under Issues 1 through 5, and concessions by *883 the parties, show the following amounts to be constructive dividends to Stone: 1963
1964
1965
1966
1967
Scientific
$54,087.50
$525,833
$580,589
Bregman
406,193
190,387
Western
4,491.50
68,017
110,542
159,203
Velo
285,664
125
Orma-Commerce
11,384   CEPAB
26,086
Finax
4,000
Haemmerli
8,000
Scientific
25,200
19,250
(dies and
jigs)
Fred French
1,265   1,265
959
633
(Tudor City,
Apt.)
from Chromcraft,
7,009
Inc.
(Miss.)
from Chromcraft
4,000
(payment
to Terry
Smith)
Total omissions
$71,228.00
$627,324
$1,147,619
$635,887
$12,125
Again, combining the two tables to include the item of 25 percent of the gross income stated by the Stones on their returns, we have the following: Gross Income
25% of Gross Income
Omissions from
Year
Stated on Return
Stated on Return
Gross Income
1963
$63,728.09
$15,932.02
$71,228
1964
93,360.34
23,340.08
627,324
1965
182,679.30
45,669.82
1,147,619
1966
245,026.94
61,256.73
635,887
1967
1,269,876.05
317,469.01
12,125
As can readily be seen, with the exception of 1967, the omissions *884 from gross income are far in excess of 25 percent of the gross income stated on the return. Section 6013(e)(1)(A). Accordingly, for those years, we must decide whether Jeanne meets the further conditions for innocent spouse status provided in section 6013(e)(1)(B) and (C). The Stones have raised this issue in the alternative in the event we determined Stone received constructive dividends and therefore omitted from gross income more than 25 percent of the gross income stated on the returns for the taxable years at issue. With respect to the provisions of section 6013(e)(1)(B), they argue that Jeanne clearly did not know of the omissions from gross income, that their manner of living was modest and from 1963 through 1967 varied little from previous years, and that Stone did not give her any expensive gifts. We agree with petitioners. [32]Jeanne was given a relatively small allowance for her personal and household expenses. The house in which the Stone family resided until 1969 was valued as of March 1, 1970 at only $33,500, and the family owned two Oldsmobiles. Jeanne knew nothing of her husband's business, and only visited the plant on rare occasions. We are convinced on *885 the record before us that Jeanne did not know of or have reason to know of the omissions from gross income, and the requirement of section 6013(e)(1)(B) is thus met.
Petitioners, however, have the burden of proving Jeanne satisfies allthree conditions for each of the years at issue. Quinn v. Commissioner,524 F.2d 617 (7th Cir. 1975), affg. 62 T.C. 233 (1974); Estate of Jackson v. Commissioner,72 T.C. 356 (1979); Galliher v. Commissioner,62 T.C. 760 (1974), affd. without published opinion 512 F.2d 1404 (5th Cir. 1975); Rule 142. As we have already determined the first two requirements for innocent spouse status are met, in order for them to prevail they need only prove it is inequitable to hold Jeanne liable for the deficiencies in tax attributable to the omissions.
We must look to all the facts and circumstances to determine whether it *886 is inequitable to hold a wife liable for the deficiencies. One of the factors to be considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the omitted items. Evidence of direct or indirect benefit may consist of transfers of property which are traceable to such omitted items, including transfers which may be received several years after the year in which the omitted item(s) of income should have been included. Sec. 1.6013-5(b), Income Tax Regs.
It is respondent's contention that petitioner Jeanne Stone has not satisfied this third and final requirement because she received money which was traceable to the Chromcraft overcharge scheme. This money, totalling at least $1.4 million, was used by her to purchase stocks and securities which were registered in her name. These events are the nucleus of respondent's argument on this issue, as he makes clear in his brief: Jeanne Stone received at least $1.4 million. This money was transferred from her husband's account to an account in which she was a joint signator. This money originated from the Chromcraft overcharge scheme.These funds enabled Jeanne *887 Stone to purchase stocks and securities which were registered in her name. Therefore, the respondent charges that these dollars came from the transactions which occurred during the tax years at issue. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which are received several years after the years in which the omitted item(s) of income should have been included in gross income. Treas. Reg. sec. 1.6013-5(b). We have sustained (see issue 13 infra) respondent's determination that Jeanne is accountable for these funds as a transferee. We believe that in essence she held these funds pursuant to a constructive trust; this holding is the functional equivalent for purposes of this case of holding that the $1.4 million was the property of Stone. We do not believe that Jeanne's transitory management of the funds while her husband was in prison should, in light of all the complex facts and circumstances surrounding this peculiar case, be considered a "significant" benefit to Jeanne. For the most part, Jeanne enjoyed modest material comforts, and even her move to a larger residence is not significant in view *888 of her husband's financial success wholly aside from the defalcations considered herein. On this basis, and in light of all the facts and circumstances before us, we hold that Jeanne Stone qualifies as an innocent spouse. [33]
Issue 12. Statute of Limitations--Stones and Rosenbaums
FINDINGS OF FACT (a) Stone cases at dkt. Nos. 5311-72 and 5312-72
Stone and Jeanne filed a joint return for each of the taxable years 1963 through 1967, on the dates indicated: Taxable Year
Date Return Filed
1963
April 15, 1964
1964
April 15, 1965
1965
April 15, 1966
1966
April 15, 1967
1967
April 15, 1968
Respondent has conceded in his reply brief that the year 1963 is barred unless fraud is established. Prior to the expiration of the time prescribed by section 6501(a) for the assessment of income tax due from Stone and Jeanne for the taxable years 1964, 1965, 1966, and 1967, petitioners Stone and respondent timely *889 executed agreements in writing pursuant to the provisions of section 6501(c)(4), extending the period of assessment of tax due for said years. The extended dates of assessment of tax were further extended under subsequent agreements in writing, duly executed by said parties. The agreements and extensions are as follows: Taxable Year
Date Executed
Statute Extended to: 1964
March 4, 1968
June 30, 1969
December 18, 1968
June 30, 1970
February 16, 1970
June 30, 1971
December 21, 1970
June 30, 1972
1965
December 18, 1968
June 30, 1970
February 16, 1970
June 30, 1971
December 21, 1970
June 30, 1972
1966
February 16, 1970
June 30, 1971
December 21, 1970
June 30, 1972
1967
December 21, 1970
June 30, 1972
Prior to the expiration of the periods of assessment as duly and timely extended under the consecutive agreements in writing by both petitioners Stone and respondent, a jeopardy assessment was made pursuant to section 6861 on February 7, 1972. A statutory notice of deficiency setting forth respondent's determinations of petitioners Stones' income tax liability for the taxable years 1964 through 1967 was timely mailed to those *890 petitioners by certified mail on April 6, 1972. Separate petitions from said notice were filed by Stone and Jeanne on July 3, 1972 and assigned Docket Nos. 5311-72 and 5312-72, respectively. (b) Francis Rosenbaum case at dkt. No. 5200-72
Rosenbaum and Jane filed a joint return for each of the taxable years 1963 through 1967, on the following dates: Taxable Year
Date Return Filed
1963
June 15, 1964
1964
June 9, 1965
1965
Not identifiable
1966
Not identifiable
1967
June 17, 1968
Prior to the expiration of the time prescribed by section 6501(a) for the assessment of income tax due from Rosenbaum and Jane for the taxable year 1963, petitioners Rosenbaum and respondent timely executed an agreement in writing pursuant to the provisions of section 6501(c)(4), extending the period of assessment of tax due for said year to April 15, 1968. Prior to the expiration of the time prescribed by section 6501(a) for the assessment of income tax due from Rosenbaum and Jane for the taxable years 1965, 1966, and 1967, petitioners Rosenbaum and respondent timely executed agreements in writing pursuant to the provisions of section 6501(c)(4), extending the period *891 of assessment of tax due for said years. The extended dates of assessment of tax were further extended under subsequent agreements in writing, duly executed by the parties. Those agreements and extensions are: Taxable year
Date Executed
Statute Extended to: 1965
March 11, 1969
April 15, 1970
December 11, 1969
October 15, 1970
June 26, 1970
April 15, 1971
December 7, 1970
October 15, 1971
August 16, 1971
April 15, 1972
January 25, 1972
October 15, 1972
1966
December 11, 1969
October 15, 1970
June 26, 1970
April 15, 1971
December 7, 1970
October 15, 1971
August 16, 1971
April 15, 1972
January 25, 1972
October 15, 1972
1967
December 7, 1970
October 15, 1971
August 16, 1971
April 15, 1972
January 25, 1972
October 15, 1972
The statutory notice of deficiency setting forth respondent's determinations of petitioners Rosenbaums' income tax liability for the taxable years 1965 through 1967 were timely sent to those petitioners by certified mail on April 3, 1972.Separate petitions from said notice were filed by Rosenbaum and Jane and assigned Docket Nos. 5200-72 and 5199-72, respectively. Jane did not plead the *892 bar of the statute in the petition at Docket No. 5199-72. Issue 12
OPINION The issues here are whether as regards the Stones and Rosenbaums, assessment and collection of deficiencies and additions to tax for each of the years is barred by the statute of limitations. The relevant provisions of section 6501 are as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. (4) Extension by agreement.--Where, before the expiration of the time prescribed in this section for *893 the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.
Taxpayers relying on the statute of limitations in resisting an assessment must affirmatively plead the statute and prove the assessment was made (or deficiency notice sent) after the normal limitation period expired. Lawrence v. Commissioner,3 B.T.A. 40 (1925); Rule 39. However, where assessment is made after the normal 3-year period, and respondent claims a longer period, he has the burden of pleading and proving an exception to the normal period. United States v. Rosenberger,235 F.2d 69 (8th Cir. 1956), affg. 138 F. Supp. 117 (E.D. Mo. 1955); Farmers Feed Co. v. Commissioner,10 B.T.A. 1069 (1928). (a) Stone cases at Docket Nos. *894 5311-72 and 5312-72--Respondent has conceded on brief that the year 1963 is barred by the statute of limitations unless fraud is established for that year. We have previously held under Issue 9 that respondent has proven by clear and convincing evidence the existence of fraud on the part of Stone for each of the taxable years 1963 through 1967. The necessary corollary of this holding is that the return filed by petitioners Stone for 1963 was a false and fraudulent return within the meaning of section 6501(c)(1). Consequently, the assessment and collection of tax and additions to tax determined by respondent are not barred for 1963. [34]
*895 As appears from the findings, the Stones and respondent timely executed consents under section 6501(c)(4), extending the normal periods for assessment and collection for each of the years 1964 thrugh 1967 to June 30, 1972.Respondent timely mailed his notice of deficiency to the Stones on April 6, 1972. Even without our finding of fraud, then, assessment and collection of tax and additions to tax for those years are not barred by the statute of limitations. (b) Francis Rosenbaum case at Docket No. 5200-72--As stated earlier, Jane did not plead the bar of the statute of limitations in her petition in Docket No. 5199-72, so we will consider only the case of Rosenbaum. Lawrence v. Commissioner,supra; Rule 39. The record contains only one consent executed by the Rosenbaums and respondent extending the statute of limitations for 1963, and that consent extended the normal period of assessment and collection for that year only until April 15, 1968. There are no consents in the record pertaining to 1964. However, as respondent has established fraud by clear and convincing evidence for each of the years before us, a fortiori the assessment and collection *896 of tax and additions to tax are not barred for the years 1963 and 1964.
With respect to years 1965 through 1967, the Rosenbaums and respondent timely executed consents under section 6501(c)(4) extending the periods of assessment and collection for each of those years until October 30, 1972. The notice of deficiency was timely mailed by respondent on April 3, 1972. Moreover, we have already found the returns filed for those years were false and fraudulent returns within the meaning of section 6501(c)(1). Therefore, the assessment and collection of tax and additions to tax for the years 1965 through 1967 are not barred by the statute of limitations. Issue 13. Transferee Liability of M. Jeanne Stone
FINDINGS OF FACT On February 12, 1969, pursuant to a purchase agreement dated November 30, 1968, Harvard Industries purchased 937,000 shares of Alsco stock from Stone for $11,244.000, of which amount $8,819,069 was paid in cash and $2,424,931 by delivery of Harvard's 4 percent non-negotiable promissory note due January 2, 1970. The $8,819,069 paid in cash constituted an opening deposit on February 12, 1969, in Account No. 33-0487-8, opened in Stone's name at the First National *897 Bank in St. Louis. On May 29, 1969, Alsco commenced a civil action in the United States District Court, Eastern District of Missouri, against Stone, Rosenbaum, and others for damages allegedly incurred in connection with the sale of Stone's Chromcraft stock to Alsco. On October 6, 1969, Alsco commenced a civil action in the Court of Chancery, State of Delaware, against Stone, Rosenbaum, and others alleging a common-law claim for liability in connection with the sale of Stone's Chromcraft stock to Alsco. On or about October 7, 1969, the board of directors of Harvard asserted as an offset to claims against Stone arising under indemnities given by Stone to Harvard, Harvard's indebtedness to Stone evidence by its 4 percent non-negotiable promissory note of $2,424,931 due January 2, 1970. Prior to October 29, 1969, five derivative shareholders' actions were commenced against Stone, Rosenbaum, and others in various state and Federal courts. On February 9, 1970, Stone gave Jeanne a power of attorney authorizing her to act in all matters with "full, plenary and complete power." She was empowered to buy or sell and to, in any way, dispose of Stone's property.
On February 13, 1970, Stone *898 closed his account at the First National Bank in St. Louis and opened a joint account with Jeanne at the same bank, Account No. 33-0487-8. On February 23, 1970, Stone sent two letters to the Bond Department at the First National Bank in St. Louis, instructing them to reinvest for him the proceeds to be received upon maturity of several bonds and short-term securities held by the bank for safekeeping. On February 24, 1970, Stone was incarcerated at the Federal penitentiary at Lewisburg, Pennsylvania, to begin serving a 15-year sentence. In January 1969 the United States of America had filed an action in the United States District Court, Eastern District of Missouri, seeking recovery of damages from Stone, Rosenbaum, Chromcraft, and Alsco as a result of an alleged multi-million dollar fraud on the United States perpetrated by Stone and Rosenbaum through Chromcraft and Alsco for 1963 through 1967. The Government as an alternative cause of action also sought double damages, together with interest, costs, and such forfeitures as were allowable at law under the False Claims Act, 31 U.S.C., sections 231 et seq. (1976). On or about April 17, 1970, the Department *899 of Justice provided Stone's counsel with accounting work papers of the Department of Justice setting forth a computation of the alleged single damages in that action, amounting to $6,170,571.59. On July 24, 1970, pursuant to an escrow agreement with the United States Department of Justice, Stone transferred various securities having a par value of $2,500,000 plus his 21,600 shares of Concord stock to the St. Louis Union Trust Company as security for any judgment that might be obtained in the suit pending in the Eastern District of Missouri. The reasons that the escrow agreement was entered into were the pendency of the above-mentioned United States' suit in the Eastern District of Missouri and the United States' desire to be assured that when, as and if judgment was obtained in said action against Stone, or other final disposition was made by the plaintiff's claims, sufficient assets of Stone would be available to satisfy such judgment or other final disposition. The escrow agreement was also made in order to avoid the institution of attachment proceedings by the United States against Stone. On August 13, 1970, $207,539.06 was credited to the joint account of Stone and Jeanne *900 in the First National Bank in St. Louis by a credit memorandum issued by the bank, which recited that it covered "principal of $206,250, and interest of $1,289.06 on Certificate of Deposit No. 85514, which matured today." On August 21, 1970, a wire transfer in the amount of $74,665.97 was made by the First National Bank in St. Louis to the First National Bank, Clayton, Missouri, and charged to the joint account of Stone and Jeanne in the First National Bank in St. Louis. A check in the amount of $74,665.97, dated August 18, 1970, and made payable to Newhard Cook & Company, a brokerage firm, was drawn by Jeanne on a joint account of Stone and Jeanne in the First National Bank in Clayton. A check dated August 26, 1970, and a check dated September 8, 1970, in the respective amounts of $64,474.68 and $10,243.01 were made payable to Newhard Cook and drawn on Stone's and Jeanne's joint account in the First National Bank in St. Louis. All three checks were deposited in a joint account of Stone and Jeanne at Newhard Cook and were used to purchase AVCO debentures in Jeanne's name. On October 16, 1970, a preliminary determination letter was issued by the District Director at St. Louis *901 to Stone and Jeanne together with a copy of an examination report dated May 7, 1970, for the taxable years 1963 through 1967, showing proposed income tax deficiencies of $4,739,241.14 and additions to the tax for said years under section 6653(b) of $2,369,620.59. On December 29, 1970, $29,600.24 was deposited to an account of A.G. Edwards & Sons, Inc., a brokerage firm, for the purchase of securities in Jeanne's name. On January 26, 1971, $600,000, was deposited in the joint account of Stone and Jeanne at the First National Bank in St. Louis. This deposit represented the proceeds from the redemption of Federal Home Loan Bank bonds which were originally paid for with funds from Stone's and Jeanne's joint account. Between January 28, and March 12, 1971, Jeanne signed the following checks drawn on Stone's and Jeanne's joint account in the First National Bank in St. Louis: Check No.
Date
Amount
156
January 28
$223,817.80
157
February 2
230,763.12
164
February 9
14,221.66
165
February 11
72,930.00
172
March 11
49,836.28
Total
$591,568.86
All the foregoing checks were payable to the order of A. G. Edwards or A.G. Edwards & Sons, Inc., and *902 deposited in the account of Jeanne at that brokerage firm and used for the purchase of securities in Jeanne's name. On April 17, 1971, $288,627.20 was deposited in the joint account of Stone and Jeanne at the First National Bank in St. Louis. On April 20, 1971, Stone signed a check drawn on the joint account of Stone and Jeanne at the First National Bank in St. Louis for $215,609.24 payable to A.G. Edwards & Sons, Inc., for the account of Jeanne at that brokerage firm, and said money were used for the purchase of securities in Jeanne's name. On April 20, 1971, $414,700 was deposited in the joint account of Stone and Jeanne at the First National Bank in St. Louis. The deposit represented the proceeds from the redemption of four bonds in the principal amount of $100,000 each, plus interest thereon of $14,700. From April 27 through May 25, 1971, Stone signed the following checks drawn on Stone's and Jeanne's joint account at the First National Bank in St. Louis: Check No.
Date
Amount
186
April 27
$414,799.03
197
May 18
775.00
198
May 24
5,720.00
199
May 24
600.00
Total
$421,894.03
All of the foregoing checks were made payable to the *903 A. G. Edwards brokerage firm and were deposited in the account of Jeanne at the firm and used for the purchase of securities in Jeanne's name. At least $1,460,097.75 was withdrawn from the joint account of Stone and Jeanne, and deposits to which originated from the proceeds of sale of the Alsco stock by Stone to Harvard Industries in 1969. The withdrawn funds were deposited with the Newhard Cook and A. G. Edwards brokerage firms for purchase of securities which became the property of Jeanne. Between February 12, 1969, and February 12, 1970, Stone made purchases of securities using funds in his account in the First National Bank in St. Louis and sold securities, depositing the proceeds in said account. Between February 13, 1970, and May 31, 1971, Stone was aware of and discussed with Jeanne at least one or more purchases of securities from funds in the joint account of Stone and Jeanne in the First National Bank in St. Louis, and was aware of and discussed with Jeanne at least one or more sales of securities, the funds from which sales were deposited in the joint account of Stone and Jeanne in the First National Bank in St. Louis. On February 7, 1972, jeopardy assessments *904 for deficiencies and additions to tax for fraud under section 6653(b) for the years 1963 through 1967 were made against Stone and Jeanne. On February 8, 1972, notice of assessment and demand for payment were made, and on the same date notice of a Federal tax lien was filed with the Recorder of Deeds, St. Louis County, and with the Recorder of Deeds of the City of St. Louis, and, thereafter, in other jurisdictions. On April 6, 1972, a statutory notice of deficiency was mailed to Stone and Jeanne for the years 1963 through 1967 determining income tax deficiencies of $4,739,241.14 and additions to tax for fraud under section 6653(b) for said years of $2,369,620.59. Separate petitions from said notice were filed with the Court on July 3, 1972, by Stone and Jeanne at docket Nos. 5311-72 and 5312-72, respectively, which are included in the group of cases here involved and consolidated for trial. Since the jeopardy assessments, respondent has served numerous levies on individuals, banking institutions, brokerage houses, insurance companies, partnerships, and corporations for collection of assets of the Stones. In addition, actions have been instituted in the District Court of Delaware *905 and Missouri to reduce the jeopardy assessments to judgment and to sequester stock and securities in Jeanne's name. Certificates of assessments and payments regarding the 1963 through 1967 assessments against the Stones reflect that the respondent has collected only $259,530 as of June 29, 1976, for the deficiencies and additions to tax and interest due from the Stones for the taxable years 1963 through 1967 based upon the jeopardy assessment which was made on February 7, 1972. Stone's net worth as of March 1, 1970, without reflecting either his contingent liabilities to the Government under its action for contract fraud, or his liabilities for deficiencies in income tax and additions to tax which are the subject of the present litigation, together with interest thereon to February 28, 1970, was $8,836,927. [35]
*906 Issue 13
OPINION Section 6901(a) authorizes the assessment of transferee liability at law or in equity, in the same manner as the liability for income taxes. [36] This provision, however, does not create any separate liability, it merely provides a secondary method for enforcing the existing liability of the transferor. Segura v. Commissioner,77 T.C. 734 (1981); C.B.C.Super Markets, Inc. v. Commissioner,54 T.C. 882 (1970).Whether a transferee of property is liable for the transferor's indebtedness is determined under the laws of the state in which the property transfer occurred. Commissioner v. Stern,357 U.S. 39, 42 (1958); Mysse v. Commissioner,57 T.C. 680, 700-701 (1972). Section 6902 provides that in cases before this Court the burden is upon respondent to show that the petitioner is liable as a transferee of property of a taxpayer but not to show that the taxpayer was liable for the tax. *907 Respondent has proffered the pertinent Missouri statute and applicable case law in support of his contentions that Stone was insolvent or rendered insolvent by the conveyances to Jeanne, or in the alternative that the conveyances were fraudulent. After careful examination of the record, we find that Jeanne is liable as a transferee by operation of such statute and law.
Mo. Ann. Stat. sec. 428.020 (Vernon 1952) provides that: Every conveyance or assignment in writing, or otherwise, of any estate or interest in lands, or in goods and chattels, or in things in action, or of any rents and profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, suit, judgment, decree or execution, made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands, or to defraud or deceive those who shall purchase the same lands, tenements or hereditaments, or any rent, profit or commodity issuing out of them, shall be from henceforth deemed and taken, as *908 against said creditors and purchasers, prior and subsequent, to be clearly and utterly void.
Bartmer Automatic Self Service Laundry, Inc. v. Commissioner,35 T.C. 317 (1960), was a transferee case involving Missouri law. In Bartmer, we said: A prima facie case of transferee liability is established if the respondent succeeds in proving, by competent evidence (1) that assets were transferred to the alleged transferee without consideration or for inadequate consideration; (2) that the transferor was insolvent or the transfer left the transferor insolvent or the transfer was a "purely voluntary conveyance conceived and made with the intent of hindering, delaying, and defrauding" the Government; (3) that the assets transferred had value, and what that value was on the date of transfer; and (4) he has made every reasonable effort to collect the sums due. [35 T.C. at 322.] The only one of the four above-listed requirements about which there is any dispute is the second. Under that requirement it would suffice to establish respondent's case if Stone *909 were insolvent at the time of, or rendered insolvent by, the transfers, or if the transfers were "purely voluntary conveyance[s] conceived and made with the intent of hindering, delaying, or defrauding" the Government. We will consider the second alternative first. Jeanne contends her designation as a co-signator on the account in the First National Bank in St. Louis and the subsequent purchases of securities in her name were not transfers in fraud of creditors.Instead, she claims, the actions were taken to enable her to provide for herself and children and maintain their home while Stone was incarcerated under a prison sentence of 15 years. As evidence of this, she points to the multiple suits against Stone begun in 1969, arguing that none of these suits moved Stone to dispose of his assets and that it was not until the two-week period between his sentencing and incarceration that he closed his own account and opened a joint one with his wife. Jeanne further argues the securities were purchased in her name upon the advice of her broker to facilitate their transfer in Stone's absence. Respondent, on the other hand, argues that under Missouri law the conveyances were *910 clearly fraudulent. Missouri applies the "badges of fraud" test to conveyance by a debtor. Some of the "badges" which warrant an inference of fraud, especially where there is a concurrence of many of the badges, are (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration; (3) the transfer of all or nearly all of the debtor's property; (4) insolvency; (5) retention of possession by the debtor; (6) a conveyance in anticipation of a suit; and (7) the failure to produce available or rebutting evidence when the circumstances surrounding the transfer are suspicious. Morris v. Holland,529 S.W. 2d 948 (Mo. Ct. App. 1975); Allison v. Mildred,307 S.W. 2d 447 (Mo. 1957); Conrad v. Diehl,344 Mo. 811, 129 S.W. 2d 870 (1939). In the evaluation process, certain of these badges carry more weight than others. In Cooper v. Freer,385 S.W. 2d 340 (Mo. Ct. App. 1964), it was held that a voluntary assignment from a husband to a wife to the prejudice of the husband's creditors is presumptively fraudulent and *911 void, and that such transfers are looked on with suspicion and their good faith must be so clearly shown that there is no reasonable doubt as to the honesty of the transaction. Of the seven "badges" enumerated above, we think (1), (2), (5), (6), and (7) are clearly present, with (1) being given particular weight. There is no question that this was a conveyance from a husband to a spouse, and no question that no consideration was given in exchange for the property transferred. Moreover, we feel certain that both during and after incarceration Stone continued to enjoy the benefits of the property transferred. Likewise, we believe the conveyances were made in anticipation of a suit. Jeanne offers as rebuttal evidence her original argument that the transfers were occasioned by her husband's concern to provide for his family in view of his impending incarceration. She argues that he did not transfer any assets directly to her, but, shortly before his imprisonment, placed funds from his bank account in their joint names so she could draw upon them and gave her a power of attorney to assist in managing his affairs. A review of the pertinent dates involved shows: February 12, 1969- *912 Receipt of $8,819,069 from Harvard and opening deposit on that date in the First National Bank in St. Louis in the name of Stone. May 29, 1969 - Alsco filed a civil action suit against Stone in Missouri. October 6, 1969 - Alsco filed a civil suit against Stone in Delaware. October 29, 1969 - Five derivative stockholder actions had been started against Stone in state and Federal courts. February 13, 1970 - Stone closed his account and opened a joint account with Jeanne at the first National Bank in St. Louis. February 24, 1970 - Stone incarcerated. April 17, 1970 - Department of Justice provided Stone's counsel with its computation for alleged damages of $6,170,571. July 24, 1970 - Securities of Stone with a par value of $2,500,000 and 21,600 shares of Concord Controls, Inc. (formerly K-D Lamp) placed in escrow with St. Louis Union Trust Co. pending the outcome of United States Government's claim for damages. August 18, 1970 - Jeanne draws first check in the amount of $74,665.97 on joint account of Stone and Jeanne in First National Bank of Clayton to Newhard, Cook & Co. for the purchase of Avco Corporation debentures in Jeanne's name. August 26, 1970 - Jeanne *913 draws a check in the amount of $64,474.68 on joint account of Stone and Jeanne in First National Bank in St. Louis to Newhard, Cook & Co. for the purchase of Avco Corporation debentures in Jeanne's name. September 8, 1970 - Jeanne draws a check in the amount of $10,243.01 on joint account of Stone and Jeanne in First National Bank in St. Louis to Newhard, Cook & Co. for the purchase of Avco Corporation debentures in Jeanne's name. September 15 and 16, 1970 - Jeanne purchases securities in an account in her name at Newhard, Cook & Co. at a cost of $52,041.32 using funds emanating from the joint account in the First National Bank in St. Louis. October 16, 1970 - Preliminary determination letter issued by District Director, St. Louis to Stone and Jeanne for the taxable years 1963 through 1967 proposing total deficiencies of $4,739,241 in tax and $2,369,620 in penalties. December 29, 1970 - $29,600.24 deposited to Jeanne's account at A.G. Edwards & Sons, Inc., for the purchase of securities. January 26, 1971 - Proceeds of $600,000 matured Federal Home Loan Bonds deposited in joint account of Stone and Jeanne in First National Bank in St. Louis. January 28 - March 11, 1971 - *914 $591,569 drawn from the joint bank account of Stone and Jeanne in the First National Bank in St. Louis to A. G. Edwards and used by Jeanne to purchase securities in her name. January 28 - March 11, 1971 - $591,569 drawn from the joint bank account of Stone and Jeanne in the First National Bank in St. Louis to A. G. Edwards and used by Jeanne to purchase securities in her name. April 20, 1971 - $215,609 drawn by Stone from the joint account in the First National Bank in St. Louis to A. G. Edwards and used to buy securities in Jeanne's name. April 27, 1971 - May 25, 1971 - $421,894.03 drawn by Stone from the joint account in the First National Bank in St. Louis to A. G. Edwards and used to buy securities in Jeanne's name. Jeanne argues the above dates show that neither the Alsco nor stockholders' derivative suits, filed four to nine months prior to the opening of the joint bank account in the First National Bank in St. Louis, created any pressure upon Stone or motivated the opening of the joint account, and that it was Stone's impending incarceration two weeks later that caused such action. At first blush, Jeanne's argument is persuasive and even evocative of sympathy *915 and understanding. However, an analysis of the above dates in light of the large sums transferred to Jeanne's name tells a different story. In particular, as the following chart demonstrates, her theory does not survive an analysis of the above data in relation to the receipt of the preliminary determination letter from respondent. Activity in Joint Account
Activity in Joint Account
Pre-Determination Letter
Post-Determination Letter
Aug. 13, 1970
$207,539.06 CR
Dec. 29, 1970
$29,600.64   Aug. 18 & 21, 1970
74,665.97   Jan. 26, 1971
600,000.00 CR
Aug. 26, 1970
64,474.68   Jan. 28 -
Sept. 8, 1970
10,243.01   Mar. 11, 1971
591,568.86   Sept. 15, 1970
50,324.53   April 17, 1971
288,627.20 CR
Sept. 16, 1970
1,716.79   April 20, 1971
215,609.24   April 20, 1971
414,700.00 CR
April 27-
May 25, 1971
421,894.03   Total deposits
$207,539.06
1,303,327.20   Total withdrawals *
201,424.98
1,258,672.77   As can be seen from the above, before the preliminary determination letter was received, Jeanne bought *916 only $201,423.88 in securities, as opposed to after it was received, when she bought $1,258,672.77 in securities. The inference to be drawn from this is that, after the determination letter was received, a concerted effort was made to transfer as many assets as possible from Stone's name to Jeanne's. Of the $8,836,927 in assets belonging to Stone, $5,835,000 [37] worth already had been placed in escrow pending the outcome of the Government's action for contract fraud. This left Stone with $3 million in available assets. Of these assets, he transferred nearly half to Jeanne, with most of the transfers taking place after he received the preliminary determination letter from respondent. This fact, coupled with Stone's giving Jeanne a power of attorney whereby she was empowered to act in his name, throws doubt on Jeanne's claim that the sole reasons for the opening of the joint *917 bank account and the subsequent purchase of securities in her name alone were to provide for the family and facilitate the managing of Stone's affairs during his incarceration. We are mindful of the seemingly innocent fact that the bulk of the deposits to the account were merely the proceeds of bonds or certificates of deposit which had recently matured. However, these bonds and certificates of deposit were all in Stone's name. Given Jeanne's power of attorney, there was no reason why the proceeds thereof could not have been reinvested in Stone's name, as these same bonds and some securities had been prior to the receipt of the preliminary determination letter. Jeanne has not offered sufficiently convincing evidence to rebut the presumption under Missouri law that the conveyances to her from Stone were fraudulent ones. While we believe Stone may have made the transfers with the incidental intent of providing for his family during his incarceration, we have found no Missouri cases, and Jeanne has cited us none, standing for the proposition that fraud has to be the sole or even the primary intent. We thus conclude that the transfers from Stone to Jeanne, totalling roughly $1.4 *918 million, were fraudulent.
Missouri law, as set out in Bartmer Automatic Self Service Laundry, Inc. v. Commissioner,35 T.C. 317, 322 (1960), requires that respondent prove either that the transferor was insolvent at the time of the transfer or rendered insolvent thereby, or "that the transfer was a 'purely voluntary conveyance conceived and made with the intent of hindering, delaying, or defrauding' the Government." As we have found the transfers in question to be fraudulent, we need not address respondent's alternative arguments of insolvency. Decisions will be entered under Rule 155 in dkt. Nos. 5199-72, 5200-72, 5311-72, and 5312-72.
Decisions will be entered for the respondent in dkt. No. 2460-75.
Footnotes
1. The following cases have been consolidated with the case at Docket No. 5199-72 for trial, briefing, and opinion: Docket No. 5200-72 (Francis N. Rosenbaum); Docket No. 5311-72 (Andrew L. Stone); Docket No. 5312-72 (M. Jeanne Stone); and Docket No. 2460-75 (M. Jeanne Stone, Transferee).↩
2. Brief amicus curiae was filed by Alexander Younger and Timothy F. Noelker↩ as attorneys for the Department of Justice.
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Erroneously stated as $532,809.54 in the prayer of amended answer.↩
4. For the years 1963, 1964, and 1965, the constructive distributions determined by respondent were treated by him as fully taxable dividends in their entirety. For 1966, the determined constructive distribution was treated by respondent in part as dividends to the extent of the corporation's available earnings and profits. The remainder was treated as a nontaxable recovery of basis to the extent of Stone's basis, with the excess being treated as long-term capital gain. For 1967, the entire determined constructive distribution was treated as a dividend. For convenience, the term "constructive dividends" will be used herein to refer to all of the determined constructive distributions to Stone. ↩
5. With respect to Rosenbaum, whenever herein the term "unreported income" is used, it will have reference to the unreported income as described by the language quoted from the notice of deficiency.↩
6. Schwartz later changed his name to Leon Salant; however, he will continue to be referred to herein as "Schwartz," since that is the name that appears on numerous documents in evidence.↩
7. While the checks to SID were initially deposited in the SID account at the Union Bank, most of the funds were immediately transferred to the Agencia account at the Handel Bank. Rosenbaum liked to keep the SID account balance low because Charnock was also a signatory on that account.↩
8. Stone met Rosenbaum sometime in 1945 in Rosenbaum's capacity as an attorney. The two thereafter participated in many business endeavors and developed a close personal relationship as well. Stone often stated at trial he trusted Rosenbaum "like a brother."↩
9. See, generally, Gardner, "The Tax Consequences of Shareholder Diversions in Close Corporations," 21 Tax L. Rev. 223↩ (1966).
10. This principle has allowed courts to hold as taxable corporate funds diverted by the dominant shareholder and officer of a corporation, regardless of whether or not there are corporate earnings and profits. Davis v. United States,226 F.2d 331 (6th Cir. 1955); Leaf v. Commissioner,33 T.C. 1093 (1960) affd. per curiam, 295 F.2d 503↩ (6th Cir. 1961). While this may mean it is unnecessary for respondent to characterize diverted funds as constructive dividends, the courts generally have been willing to accept the label he puts on the amounts, and so are we.
11. "Petitioners" will be used hereafter to refer to petitioners Stone and Rosenbaum.↩
12. We decline, however, to pass on the viability of Scientific as a corporate entity. A corporation may, or course, be disregarded if it is a sham or straw, National Carbide Corporation v. Commissioner,336 U.S. 422, 437, n. 20 (1949); Strong v. Commissioner,66 T.C. 12 (1976), affd. without published opinion 553 F.2d 94↩ (2d Cir. 1977); but such a finding is not essential to our holding herein.
13. Indeed, it is difficult to see how the payments to Scientific advanced Chromcraft's interest if Stone were causing Chromcraft to make double payments for materials with, according to him, no control over its repayment.↩
14. E.g. Rutkin v. United States,343 U.S. 130 (1952); Sachs v. Commissioner,277 F.2d 879 (8th Cir. 1960); Dawkins v. Commissioner,238 F.2d 174↩ (8th Cir. 1956).
15. Part of the determined constructive distribution for 1966 will be dividends to the extent of Chromcraft's earnings and profits. The remainder will be a nontaxable recovery of basis to the extent of Stone's basis, with the excess being treated as long-term capital gain.↩
16. Chromcraft purchased at least↩ 231,252 sets of fairings during the years in issue ($684,507 / $2.96 = 231,252). If all the sets were for 19-round launcher fairings, Chromcraft overpaid Western by $568,877 (231,252 X $2.46); if all the sets were for the 7-round launcher fairings, the overpayments totalled $536,504 (231,252 X $2.32).
17. See note 4, supra.↩
18. Vollmer was deposed on written interrogatories of the parties by the Vice Consul in the American Consulate General Offices, Munich, Germany.↩
19. See note 15, supra.↩
20. After the merger of Chromcraft into Alsco, the name of the account was changed to the Techfab Division of Alsco.↩
21. The payments to Czarnecki were not all made from the Chromcraft account in the Union Bank. This was due to the fact that Rosenbaum commingled the funds in the Chromcraft account with other Swiss bank accounts under his control. This commingling has been described above in the general findings re the funds in Switzerland and the Swiss bank accounts, under Issue 1.↩
22. Prior to trial and in the opening statement respondent agreed that the underpayments of tax due from the Stones were not due to the fraud of M. Jeanne Stone and that fraud additions were not being asserted against her.↩
23. See McGuire v. Commissioner,T.C. Memo. 1973-51↩.
24. Levy v. Commissioner,T.C. Memo. 1969-65; Carlson v. Commissioner,↩ a Memorandum Opinion of this Court dated May 29, 1953. 25. We express no opinion on Stone's intent behind the interest expense deductions we have disallowed. Stone testified that he thought the loan transactions were bona fide. Since he originally suggested the Chromcraft fund as a source for the loans, this claim must be viewed with some skepticism. Nevertheless, the interest deductions claimed by Stone are not relied on in any way in determining the fraud issue against him.↩
26. Petitioners seem to believe that the existence of corporate fraud automatically precludes a finding by us of personal fraud. The two, however, are not mutually exclusive. Cases are rare, in fact, where the fraud of a shareholder/officer is not imputed to the corporation, and vice-versa.E.g., Ruidoso Racing Assn., Inc. v. Commissioner,476 F.2d 502 (10th Cir. 1973), affg. a Memorandum Opinion of this Court; Still v. Commissioner,19 T.C. 1072 (1953); United States v. Stonehill,420 F. Supp. 46 (C.D. Cal. 1976). But see Botwinik Bros. of Mass., Inc. v. Commissioner,39 T.C. 988↩ (1963) (involving a minority shareholder).
27. While Spies v. United States,317 U.S. 492 (1943), dealt with a criminal conviction of fraud under sec. 7201, the term "willfully" as used in such section "has authoritatively been defined in prior judicial decisions to encompass all of the elements of fraud which are envisioned by * * * [the fraud addition to tax] in section 6653(b)." Amos v. Commissioner,43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965). See also Moore v. United States,360 F.2d 353 (4th Cir. 1965), modified 1966; Tomlinson v. Lefkowitz,334 F.2d 262 (5th Cir. 1964); Strachan v. Commissioner,48 T.C. 335 (1967); Gemma v. Commissioner,46 T.C. 821↩ (1966).
28. Petitioners allege jail overcrowding, lack of sleep, and insufficient opportunity always to confer at length with counsel in conducive surroundings as the conditions which so unduly influenced their answers as to make the depositions suspect and unreliable.↩
29. The Honorable William B. Jones, Chief Judge, United States District Court for the District of Columbia; the Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania; and the Honorable Louis F. Oberdorfer↩, United States District Judge for the District of Columbia.
30. When asked, "Did you give these answers?", Rosenbaum on one occasion said "Yes, I must say from this vantage point, I think it was pretty well put", and on another said "Yes * * * I think that statement accuratelyreflects↩ my intention with respect to the proceeds of the sale, if they--if the investments were sold." [Emphasis supplied].
31. H. Rept. No. 91-1734, to accompany H.R. 19774 (Pub. L. No. 91-679), P. 3 (1970).↩
32. "Petitioners" herein refers to Stone and Jeanne.↩
33. Jeanne contends that in any event the $1.4 million is not traceable to the Chromcraft diversions but to her husband's overall success in business. While this argument is by no means frivolous, we do not reach it in view of our holding.↩
34. Respondent's concession that Jeanne is not liable for the additions to tax under sec. 6653(b) for any of the taxable years involved does not affect any deficiencies determined against her. Respondent's proof of fraud on the part of her husband prevents the running of the statute of limitations so that she remains liable for the deficiencies (to the extent not relieved by our determination of the innocent spouse issue) by virtue of the joint and several liability provisions of sec. 6013(d)(3). Hicks Co. Inc. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970).See S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606↩, 608.
35. ↩
ASSETS
Cash in Banks: Franklin National Bank
$3,499
Marine Midland Bank
22,132
First National Bank, St. Louis
42,274
First National Bank, Clayton, Missouri
15,000
$ 82,905
Accounts Receivable: Merrill, Lynch, Pierce, Fenner & Smith
3,705
State of Missouri
5,704
9,409
Notes and Loans Receivable: Harvard Industries, Inc.
Lee Meadows, Inc.
158,000
Evelyn Price
30,000
Irwin Keefer
24,000
Howard Carefoot
20,000
Knute Gorman
17,000
1601 Corporation
7,000
256,000
Residence
350,000
Land
15,500
House, Phoenix, Arizona
12,000
Jewelry
200
Life Insurance
57,660
Securities: N.Y. State B.A.N.
250,000
City of Independence, Missouri
90,000
State of Alaska
45,000
Salt Lake City, Utah, B.A.N.
400,000
N.Y. City Ltd. Pft. Housing
500,000
N.Y. State Dormitory Authority
400,000
State of N.Y. Transport Capital Facilities Bond
Anticipation Notes
800,000
Franklin National Bank Repo's Receipt
500,000
First National Bank, St. Louis, Cert. of Deposit
200,000
Federal Home Loan Bank
600,000
3,785,000
Bonds: State of Alaska
155,000
Federal Home Loan
400,000
555,000
Stocks: 3,000 shares of McDonnell Douglas
66,000
1601 Corporation
13,333
228 shares Adamar Corp.
123,120
1,380 shares Lee Meadows, Inc.
13,800
21,600 shares Concord Control, Inc.
3,335,000
3,551,253
Keystone Farms
168,000
Total Assets
$8,842,927
LIABILITIES AND NET WORTH
Mortgage on Phoenix House
6,000
Net worth before contingent and tax liabilities
$8,836,927
36. SEC. 6901. TRANSFERRED ASSETS. (a) METHOD OF COLLECTION.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) INCOME, ESTATE, AND GIFT TAXES.-- (A) TRANSFEREES.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),↩
*. All used for purchases of securities in Jeanne's name.↩
37. ↩
21,600 shares Concord Control, Inc.
$3,335,000
Federal National Mortgage Association
Series SM 1971 K 8. 12%
1,050,000
Independence Missoui Sewer Bonds
Series 1969 6%
50,000
N.Y. Anticipation Notes, Ltd. Profit Housing
500,000
U.S. Treasury Bills
900,000
$5,835,000